**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**WEST VIRGINIA RIVERS COALITION, INC.,**
**and 350.ORG,**

**Plaintiffs,**

2:26-cv-679

**v.** **Civil Action No. 2:26-cv-______**

**JOHN B. MCCUSKEY, in his official capacity as**
**Attorney General of the State of West Virginia,**

**Defendant.**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This is an action under 42 U.S.C. § 1983 to enjoin baseless and retaliatory investigations that the Attorney General of West Virginia has opened into the environmental advocacy of nonprofit organizations, and to enjoin enforcement of the investigative subpoenas, each dated September 16, 2026, that he issued in those investigations to West Virginia Rivers Coalition, Inc. ("WV Rivers"), a nonprofit conservation organization, and to 350.org, a nonprofit climate advocacy organization.

2. Each subpoena purports to invoke the Attorney General's authority under the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-7-104(1). It identifies no consumer, no transaction, no complaint, and no act by either recipient that the Act regulates. None of its demands concern the sale of any goods or services.

3. Each subpoena instead demands nearly ten years of the recipient's records concerning its public statements on climate and energy, its internal deliberations about those statements, its requests for donations, the organizations that have funded its work and the amounts they gave, the organizations it has paid, the officers, directors, staff, and board members it shares

with renewable energy entities, its dealings with coalitions and other advocacy organizations on energy permitting and regulation in West Virginia, and its submissions to regulatory agencies.

4. The subpoenas were issued after the Attorney General had, over the preceding eighteen months, publicly urged federal agencies and the Department of Justice to investigate and defund climate advocacy organizations, including 350.org by name; after he had described environmental groups engaged in permitting litigation as "extreme" activists who "weaponize" the law; and while his office was litigating against WV Rivers in the United States Court of Appeals for the Fourth Circuit, where it had accused WV Rivers of relying on "slanted," "cherry-picked," and "deceiving" data.

5. The Attorney General issued materially identical subpoenas on the same day to at least four other nonprofit organizations engaged in similar environmental advocacy.

6. A government demand for an organization's funders, members, partners, and internal communications burdens the constitutional right of freedom of association from the moment it is made and for as long as it remains outstanding. *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174, 189 (2026). The subpoenas' demands for donor and associational information burdens Plaintiffs' First Amendment rights. The Attorney General's demands here also retaliate against WV Rivers and 350.org for speech, association, and petitioning that the First Amendment protects, and they are unreasonable demands under the Fourth Amendment, issued in investigations that the Attorney General has no authority to conduct.

7. Plaintiffs seek a declaration that the subpoenas, and the investigations in which they were issued, violate the First, Fourth, and Fourteenth Amendments, and an injunction barring the Attorney General from enforcing the subpoenas and proceeding with the investigations in any manner.

## JURISDICTION AND VENUE

8. This action arises under the Constitution and laws of the United States, including the First, Fourth, and Fourteenth Amendments and 42 U.S.C. § 1983. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

9. The Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, and injunctive relief under Federal Rule of Civil Procedure 65.

10. Defendant is an officer of the State of West Virginia sued in his official capacity for prospective relief. *Ex parte Young*, 209 U.S. 123, 155–56 (1908).

11. Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant resides in this district. The subpoenas were issued from Charleston, direct production to Defendant's office in Charleston, and are part of investigations Defendant conducts from Charleston. WV Rivers maintains an office and records in this district, and the injuries alleged here have occurred and are occurring in this district. Because Defendant resides in this district, venue is proper as to every claim of each Plaintiff. 28 U.S.C. § 1391(b)(1).

12. WV Rivers and 350.org are properly joined as plaintiffs under Federal Rule of Civil Procedure 20(a)(1). Their claims arise out of the same series of occurrences, materially similar investigations in which Defendant issued materially identical subpoenas on the same day, and they present common questions of law and fact, including whether Defendant has authority under W. Va. Code § 46A-7-104(1) to conduct the investigations and whether the subpoenas' demands survive scrutiny under the First and Fourth Amendments.

## PARTIES

13. Plaintiff West Virginia Rivers Coalition, Inc., is a nonprofit corporation organized under the laws of West Virginia and recognized as exempt under Section 501(c)(3) of the Internal Revenue Code. Its office is at 3501 MacCorkle Avenue SE, #129, Charleston, West Virginia 25304. Its mission is to promote clean and healthy West Virginia waters for all.

14. WV Rivers is funded by contributions from individuals, foundations, and other organizations. Apart from incidental sales of stickers, t-shirts, and similar items bearing its name and artwork, which it no longer markets online and provides only on request and at events, it does not sell goods or services.

15. Plaintiff 350.org is a nonprofit corporation and recognized as exempt under Section 501(c)(3) of the Internal Revenue Code. It takes its name from 350 parts per million, the concentration of carbon dioxide in the atmosphere that its founders identified as the upper limit consistent with a stable climate. Its mission is to build a grassroots movement to end the use of fossil fuels and to accelerate the transition to renewable energy.

16. 350.org pursues that mission through public education; grassroots organizing; and advocacy directed at governments and international bodies. It is funded by contributions from individuals, foundations, and other organizations. Like WV Rivers, it sells a de minimis amount of merchandise bearing its name. It maintains no office, employees, or property in West Virginia. It is registered with the West Virginia Secretary of State to solicit charitable contributions in the State.

17. WV Rivers and 350.org are referred to together as "Plaintiffs." The subpoenas from them are indistinguishable except for the recipient's name. Allegations in this Complaint about "the subpoena" and its definitions, instructions, and demands apply to each subpoena, and

allegations that a demand reaches WV Rivers's records apply equally to 350.org's records, except where this Complaint states otherwise.

18. Defendant John B. McCuskey is the Attorney General of the State of West Virginia. He commenced the investigations and issued the subpoenas at issue and holds the authority under W. Va. Code § 46A-7-104(3) to apply to a circuit court for an order compelling compliance with it. He is sued in his official capacity only.

19. At all relevant times, Defendant acted under color of state law.

## FACTS

### ***Plaintiffs and Their Protected Activity***

20. WV Rivers was founded in 1990 as a statewide river advocacy organization. Today, it is the West Virginia affiliate of the National Wildlife Federation.

21. WV Rivers has 15 staff members and an annual budget of approximately $2 million. More than eighty percent of its funding comes from foundations and other organizational funders. Its Executive Director, who has led the organization since September 2024, devotes 30 to 50 percent of her time to fundraising to keep the work of WV Rivers going.

22. WV Rivers advocates for clean water and healthy rivers through research, public education, policy advocacy, citizen water-quality monitoring, and engagement with state and federal agencies.

23. WV Rivers regularly submits comments to state and federal agencies on permits, rules, and water-quality standards, and testifies before legislative and administrative bodies.

24. WV Rivers has participated as a party in litigation challenging permits and approvals for energy infrastructure and industrial projects in West Virginia. That litigation includes challenges to the Clean Water Act certifications and other permits for the Mountain Valley Pipeline,

*see, e.g.*, *Sierra Club v. West Virginia Department of Environmental Protection*, 64 F.4th 487 (4th Cir. 2023); a challenge to the Army Corps of Engineers's permit for the Atlantic Coast Pipeline, in which the Fourth Circuit issued an order stopping instream work in November 2018, Order, *Sierra Club v. U.S. Army Corps of Eng'rs*, ECF No. 23, No. 18-2273 (4th Cir. Nov. 7, 2018); and a pending petition for review of EPA's approval of West Virginia's program for permitting carbon-dioxide injection wells, *West Virginia Surface Owners' Rights Organizations v. Zeldin*, No. 25-1384 (4th Cir.), in which the State of West Virginia, represented by Defendant's office, has intervened, and is currently ripe for decision.

25. In that litigation, WV Rivers has acted jointly with other organizations through shared counsel. Its communications with co-plaintiffs and/or co-petitioners and counsel about litigation strategy are confidential and privileged.

26. WV Rivers publishes statements about the effects of climate change on West Virginia's waters and communities, and about the environmental effects of fossil-fuel extraction, transport, and combustion. In September 2025, for example, WV Rivers's Executive Director joined leaders of other West Virginia organizations in a letter urging EPA to retain its 2009 finding that greenhouse gas emissions endanger public health and welfare, a finding that Defendant, in a letter he co-led the same month, urged EPA to repeal.

27. WV Rivers leads and participates in coalitions of organizations concerned with water, public lands, and energy policy in West Virginia, including small community groups and local churches.

28. WV Rivers solicits charitable contributions from the public through its website, mailings, emails, and events. WV Rivers does not publish the identities of its funders. Most funders ask that their support not be disclosed, to avoid unsolicited contact and because of the threats that

have been directed at WV Rivers and those associated with it. Individual donors ask for confidentiality more often than foundations do, but foundations and other organizations also give on the understanding that the fact and amount of their support will not be disclosed to the government.

29. WV Rivers's staff have been the targets of threats and harassment, online and in person, because of the organization's positions. WV Rivers has provided safety training to its staff in response.

30. WV Rivers's policy and community-engagement staff work directly with state executive agencies, including the West Virginia Department of Environmental Protection and the West Virginia Department of Agriculture, with legislators, county commissions, public service districts, and local development authorities, and with local community groups, churches, and watershed associations. That work depends on those officials and groups regarding WV Rivers as a reasonable partner.

31. All of the activity described in paragraphs 22 through 30 is protected by the First Amendment. WV Rivers complies with all state and federal laws.

32. 350.org publishes statements about the causes and effects of climate change and about the role of fossil fuels in causing it. It organizes and supports public demonstrations concerning climate and energy policy. It solicits charitable contributions from the public to support that work, and it associates with other organizations, including local organizations in West Virginia, the United States, and abroad, that share its aims.

33. 350.org solicits charitable contributions from the public through grant applications and through its website, mailings, emails, and events. 350.org voluntarily lists all institutional funders who have consented by name in its Annual Report, which is publicly available on its

website. However, some funders give on the understanding that their identity, or the amount they gave, will not be disclosed. 350.org has a small number of grant agreements with confidentiality terms, and some of its support comes through donor-advised funds, which are not required to disclose their donors. Funders have asked for confidentiality for reasons that include disagreement within a family about the gift and concern about the funder's own standing with the government. Even funders willing to be named publicly do not expect the terms of their grants to be disclosed to a government investigator.

34. All of 350.org's activity described in paragraphs 32 and 33 is protected by the First Amendment. 350.org complies with all state and federal laws.

***The Attorney General's Public Campaign Against Climate Advocacy Organizations***

35. Defendant took office as Attorney General in January 2025. His office's website describes coal, oil, and natural gas as "strategic assets to be defended" and claims that "radical state and local governments are now stepping in to continue the war on coal."

36. On February 6, 2025, Defendant announced a suit by the State of West Virginia against the State of New York over New York's Climate Change Superfund Act. The West Virginia Coal Association, the Gas and Oil Association of West Virginia, and Alpha Metallurgical Resources joined the suit as co-plaintiffs with the State.

37. On May 8, 2025, Defendant's office moved to intervene for the State of West Virginia in *West Virginia Surface Owners' Rights Organization v. Zeldin*, No. 25-1384 (4th Cir.), a petition for review in which WV Rivers is a petitioner. The motion, signed by Defendant and his Solicitor General, described the petitioners as "four advocacy" groups and told the court that the State anticipated that the petitioners would "attack the Department of Environmental Protection's ability or willingness to operate the program effectively," that "[t]hese reputational arguments are

of particular and unique concern to the State alone," and that the petition could harm the State "by stymying anticipated carbon-sequestration-related projects," citing an opinion piece by the president of the Gas and Oil Association of West Virginia.

38. On June 12, 2025, Defendant co-led a letter to the Attorney General of the United States recommending that the Department of Justice stop climate lawsuits, which the letter described as being funded by activist organizations.

39. On August 26, 2025, Defendant joined a letter from 23 state attorneys general urging the United States Environmental Protection Agency ("EPA") to cancel its grants to the Environmental Law Institute because of its climate-related education programs for judges. The letter invoked state consumer-protection laws against the Institute, asserting that those laws prohibit deceptive statements made to market a product and that the Institute had misrepresented its training as objective. In announcing the letter on August 28, 2025, Defendant stated that courts had been "weaponized to promote the liberal agenda."

40. On August 28, 2025, Defendant joined an amicus brief in the Supreme Court of the United States supporting a nonprofit advocacy organization's challenge to a state attorney general's investigative subpoena. The brief argued that the subpoena, which sought the organization's donor information, violated the First Amendment. Brief of Florida et al. as *Amici Curiae*, *First Choice Women's Resource Centers, Inc. v. Platkin*, No. 24-781 (U.S. Aug. 28, 2025).

41. In September 2025, Defendant co-led a letter from 26 attorneys general urging EPA to repeal its 2009 finding that greenhouse gas emissions endanger public health and welfare.

42. On December 16, 2025, Defendant signed a letter from 26 state attorneys general to the Department of Justice describing "well-funded, coordinate efforts to undermine American

energy independence through impact litigation, government lobbying, public relations campaigns" and "a broad network of climate activists supporting climate litigation."

43. On January 29, 2026, Defendant led a letter from 27 state attorneys general to the Federal Judicial Center demanding the withdrawal of a chapter on climate science from a reference manual for federal judges. His office's announcement stated that the chapter's authors were tied to programs that "promote legal warfare against States and energy producers." The Center withdrew the chapter on February 6, 2026.

44. On February 12, 2026, Defendant joined a letter from 19 state attorneys general asking the United States Department of Justice to investigate more than 150 U.S.-based organizations that, according to the letter, had received money from foreign funders of climate advocacy. The letter identified 350.org by name, citing a grant of "over $300,000 to 350.org for fossil-fuel-divestment campaigns." It described the conduct it asked the Department to investigate as including policy advocacy, media campaigns, "grassroots organizing; and planning and funding climate protests"; stated that it highlighted organizations that had "engaged in particularly extreme climate-related activism"; and concluded that the organizations were "engaging in coordinated funding and advocacy efforts to influence U.S. energy policy."

45. On February 17, 2026, Defendant signed a letter from 18 state attorneys general on EPA's rules under Section 401 of the Clean Water Act. The letter cited the Fourth Circuit's decision vacating West Virginia Section 401 certification of the Mountain Valley Pipeline, in the case WV Rivers brought and the Attorney General's office defended, as an example of a court demanding that States impose "additional expansive conditions" to survive judicial review.

46. On April 16, 2026, the Attorney General of Florida issued an investigative subpoena under Florida's deceptive trade practices statute to the Environmental Law Institute seeking its funding sources, its communications with Florida judges, and its role in climate litigation.

47. On May 18, 2026, Defendant's office filed the State's brief in the pending Fourth Circuit challenge to West Virginia's underground carbon sequestration program. The brief, signed by Defendant and his Solicitor General, named WV Rivers; accused it and its co-petitioners of proffering "stale, slanted data" and of "reliance on stale and cherry-picked data"; said of a report on which they relied that "[t]he report's data is deceiving, too" and that it was "published by an advocacy organization"; and told the court that it "shouldn't allow Petitioners to meddle" with the State's program.

48. On May 20, 2026, Defendant filed suit under the Consumer Credit and Protection Act against a proxy-advisor firm, alleging that comments supporting the firm's positions were "carbon copies from ESG activists, working in obvious coordination," and announced that the firm had been "coordinating with activist groups."

49. On June 1, 2026, Defendant announced an amicus brief that West Virginia filed on behalf of 21 states in the Supreme Court of the United States in *Department of the Air Force v. Prutehi Guahan*, No. 25-579, a case concerning an environmental group's suit over a federal agency's permit application. He stated that "[e]xtreme environmentalist activists are trying to weaponize laws and add unnecessary layers to an established and workable permit process," and that "[i]f activist groups can run to federal court before a state agency has even looked at an application, then the federal courts become the decision-makers, and states are left on the sidelines." The brief itself, filed on May 29, 2026, with Defendant's Solicitor General as counsel

of record, offered the Atlantic Coast Pipeline as an example, which was the subject of permit litigation in which WV Rivers was a petitioner.

50. On August 7, 2026, Defendant led a letter from 21 state attorneys general, where they urged EPA to reconsider its National Environmental Policy Act reviews to speed up reviews and get rid of red tape for businesses. Therein, Defendant accuses "[l]iberal eco-activist special interest groups" of weaponizing the Act to the detriment of industry.

51. On August 24, 2026, Defendant joined a letter from 16 state attorneys general to four accounting firms asserting that the firms' climate related statements "may have violated state UDAP laws by making deceptive representations."

52. On August 27, 2026, Defendant co-signed, as the third of 25 signatories, a letter urging federal agencies to suspend or debar the National Academies of Sciences, Engineering, and Medicine from federal contracts and grants because of a July 2026 report on the attribution of climate impacts, which the letter characterized as aiding climate litigation. The letter suggested that federal agencies "may wish to investigate" the relationship between the report and climate litigation.

53. On September 10, 2026, U.S. House Science, Space, and Technology Committee Chairman Brian Babin (R-Texas) and Investigations and Oversight Subcommittee Chairman Rich McCormick (R-Georgia) sent letters to 350.org, among other organizations, seeking to investigate alleged potential foreign influence operations opposing data centers.

54. Plaintiffs have engaged in protected activities that these statements, letters, and filings target or attack. WV Rivers has challenged permitting decisions in federal court, including against the State represented by Defendant's office. Both Plaintiffs have published statements relying on climate science and have associated with other organizations engaged in climate

advocacy. 350.org has organized the divestment campaigns that the February 12, 2026 letter identified. These are all lawful activities protected by the First Amendment.

55. On or about September 16, 2026, Defendant served the subpoena described below on WV Rivers in Morgantown, West Virginia. Its caption identifies it as issued in the matter of the investigation of WV Rivers.

56. On or about September 16, 2026, Defendant sent an identical subpoena (except for the recipient's name) to 350.org by certified mail addressed to its office in Washington, D.C. Its caption identifies it as issued in the matter of the investigation of 350.org.

57. On or around the same day, Defendant served subpoenas that are materially identical except for the recipient's name on at least four other nonprofit organizations engaged in environmental and climate advocacy in West Virginia.

58. On information and belief, none of the known subpoenas were preceded by a consumer complaint concerning the recipient. Neither Plaintiff has any reason to believe that it possesses information relevant to any violation of the West Virginia Consumer Credit and Protection Act.

59. Defendant's statements since issuing the subpoenas also confirm their purpose. On September 21, 2026, he told a reporter that if any other State enacts a climate superfund law, "we will be suing them almost instantaneously."

60. On September 24, 2026, his office promoted his Solicitor General's appearance at an event titled "Climate Lawfare."

61. On September 29, 2026, on his personal social-media account, he endorsed, with the caption "That's a fact," a pipeline company's statement about its court judgment against an environmental advocacy group.

62. On October 2, 2026, on the same account, Defendant described climate advocates as "insane leftist greeno's" who are "willing to destroy our economy, and harm our citizens in the name of a quasi religion and adherence to the doctrine of climate insanity"; and declared himself "proud to stand with my friends" at the Gas and Oil Association of West Virginia and the West Virginia Coal Association.

63. On October 5, 2026, he wrote that anyone who follows a pending climate case and "can't see the insidious nature of the green cabal" should "wake up," and his office described climate suits as "eco-radical lawsuits" and "climate warfare."

64. On October 9, 2026, he wrote that his office "will keep fighting, in every courtroom it takes, to protect the energy producers and working families of this state."

***The Subpoena***

65. The subpoena to WV Rivers is dated September 16, 2026, and is attached as Exhibit A. The subpoena to 350.org is also dated September 16, 2026, and is attached as Exhibit B.

66. The subpoenas cites W. Va. Code § 46A-7-104(1) as their sole source of authority. That provision permits the Attorney General to investigate only "[i]f the Attorney General has probable cause to believe that a person has engaged in an act which is subject to action by the Attorney General" under the Consumer Credit and Protection Act.

67. The subpoena does not identify any consumer, any consumer transaction, any complaint, or any act by Plaintiffs that the Attorney General contends violates the Act. It does not state the basis for any belief that WV Rivers or 350.org have engaged in such an act.

68. The subpoenas' captions identify them as issued in the matter of the investigation of West Virginia Rivers Coalition, Inc and 350.org, respectively. Each subpoena states that it "concerns an investigation into alleged unfair or deceptive acts or practices and other possible

violations of" the Act "by the persons and entities that are the subject of this investigation." It does not say what the alleged acts or practices are, who alleged them, or who the other persons and entities are.

69. The subpoena defines the "Relevant Period" as January 1, 2017, through the date of full compliance.

70. The subpoena defines "Climate Claim" as "a statement asserting, on a purportedly scientific or statistical basis, a demonstrable or otherwise traceable connection" between greenhouse gas emissions from fossil fuels and changes in climate, weather patterns, or extreme weather events, including weather event attribution, impacts to public health, and economic harm, where the harm is allegedly caused by energy companies or projects or the statement is linked to a specific WV Energy Business. The definition excludes statements expressed as personal or political opinion, statements made exclusively in litigation "as part of advocacy before a court," and scientific research published in peer-reviewed journals "absent evidence of knowing misrepresentation." It does not exclude comments submitted to regulatory agencies, testimony, and other petitioning activity outside a courtroom.

71. The subpoena defines "WV Energy Business" to include any entity that extracts, processes, transports, stores, or burns coal, lignite, natural gas, or petroleum in or from West Virginia, and any predecessor, successor, parent, subsidiary, or affiliate of such an entity.

72. The subpoena defines "Published" to include any communication to at least one person outside of the recipient organization. Under that definition, a private letter or email to a single person is "Published." The definition also covers content "Published anonymously or under a coalition or trade name," content "authored by a third party that" WV Rivers or 350.org "funded commissioned, approved, or reposted," and content that was "access-restricted, embargoed, later

deleted or retracted." A request for a Published item "also seeks all drafts and versions of it, including drafts never released, redlines, comments, and approval communications."

73. The subpoena defines "Pertaining" to include "relating to," "alluding to," and "mentioning," "either directly or indirectly, in whole or in part." Every demand seeks documents "Pertaining" to its subject.

74. The subpoena defines "Document" to include drafts, notes, diaries, e-mails, minutes, and records of telephone conversations, as well as "website and social media content (including posts, reposts, comments, and videos on organizational or work-related individual account)," "whether prepared by you or by any other person."

75. The subpoena contains sixteen demands.

a. Demand 1 seeks all documents pertaining to every statement the recipient has "Published" that names a WV Energy Business, or a facility, mine, well, pipeline, plant, or project it owns or operates, and that makes a Climate Claim about it. Because "Published" includes a communication to a single person outside the recipient organization, and because a request for a Published item also seeks all drafts, redlines, comments, and approval communications, Demand 1 reaches private correspondence and unreleased drafts.

b. Demand 2 seeks all documents pertaining to anything the recipient Published that uses the emissions scenarios known as RCP 8.5 or SSP5 8.5; which organizations supplied those projections; communications with third parties regarding those scenarios; whether to maintain, retire, replace, or qualify them; and the description of them as "business as usual," "baseline," or similar terms, including any objection to that description and any decision to retain or abandon it.

c. Demand 3 seeks all documents relied upon, consulted, or referenced in preparing, reviewing, approving, or Publishing the materials identified in Demand 2. Neither demand refers to a Climate Claim.

d. Demand 4 concerns each Published projection concerning West Virginia. It seeks all documents pertaining to the emissions scenario chosen, why it was chosen, the key assumptions, applied, whether the projection was reviewed for technical accuracy before publication, and the outcome of any such review. Demand 4 does not refer to a Climate Claim.

e. Demand 5 concerns the recipient's requests for donations containing a Climate Claim that the recipient aimed, in whole or in part, at "West Virginia Recipients," a term defined to include any person or entity associated with a West Virginia mailing address, billing address, IP geolocation, or telephone number. For each such request, Demand 5 seeks documents pertaining to each version sent; how the recipients were selected, including targeting criteria and audience segments; and the total amounts solicited from and received from West Virginia Recipients.

f. Demand 6 concerns any climate model that recipient used, licensed, funded, commissioned, or otherwise institutionally supported and that produced a West Virginia-specific output. Demands 6(a) and 6(b) seek documents pertaining to the model, its version, and its source, and to the West Virginia inputs, assumptions, and scenarios used. Demand 6(c) seeks the model's outputs, "whether Published or not." Demand 6(d) seeks communications about any gap between model output and a Published figure.

g. Demand 7 concerns any "Identified Claim," defined as a Climate Claim that appears in a Published item responsive to Demands 1, 2, 4, or 5.

h. Demand 7(a) seeks documents pertaining to the recipient or any person, including its officers, directors, employees, contractors, or agents, disputing, contradicting, or qualifying the attribution model, study, or method behind an Identified Claim.

i. Demand 7(b) seeks communications with World Weather Attribution or any other climate attribution organization about an Identified Claim.

j. Demand 7(c) seeks documents pertaining to internal objection or disagreement about an Identified Claim's accuracy or confidence level.

k. Demand 7(d) seeks regulatory comments, agency submissions, testimony, and materials prepared for any judicial education programs on climate science or climate litigation that repeat, discuss, rely upon, or otherwise concern an Identified Claim, including drafts, approvals, amendments, and withdrawals.

l. Demand 8 concerns each Published document quantifying fossil-fuel subsidies, externalities, the social cost of carbon, health costs, or economic damages. It seeks documents pertaining to the underlying data, the method, the discount rate, the damage function, and any pre-publication review. Demand 8 does not refer to a Climate Claim.

m. Demand 9 concerns each study, report, model, or paper that the recipient funded, commissioned, or otherwise institutionally supported and that concerns West Virginia, a WV Energy Business, or an Identified Claim. Demand 9(a) seeks funding agreements, statements of work, and contracts. Demand 9(b) seeks "the amount paid and the organization paid." Demands 9(c) and 9(d) seek communications about scope, method, assumptions, scenario choice, review, revision, approval, and publication timing. Demand

9(e) seeks documents pertaining to whether and how the sponsorship was disclosed in any Published work.

n. Demand 10 seeks documents pertaining to how any assumption, uncertainty range, confidence interval, model limitation, or contrary finding behind an Identified Claim "should be described, simplified, emphasized, downplayed, qualified, or left out of public materials."

o. Demand 11 seeks documents pertaining to any review, discussion, or analysis of new or updated evidence, data, or technical studies that may have contradicted, undermined, limited, or lowered confidence in the recipient's previous Identified Claims, and to any decision or action by which the recipient withdrew, qualified, or reconsidered a previous Identified Claim.

p. Demand 12 seeks documents pertaining to efforts to coordinate with any third party to develop communications, strategies, or public relations campaigns or messaging about an Identified Claim or a WV Energy Business, including strategy memos, campaign plans, communications calendars, talking points, message testing, polling or focus groups, embargo coordination, and agreed divisions of subject matter or audience.

q. Demand 13 seeks, for each Identified Claim, documents pertaining to any involvement by a renewable energy company, developer, trade association, or other entity engaged in solar, wind, geothermal, hydroelectric, biomass, biofuel, biogas, or hydrogen energy in the development, funding, review, approval, timing, publication, or distribution of the claim. Demand 13(a) seeks communications about the content, timing, funding, or distribution of an Identified Claim. Demand 13(b) seeks the total funding received that was earmarked for work producing an Identified Claim and which organization provided it.

Demand 13(c) seeks contracts, retainers, sponsorships, consulting arrangements, grant agreements, statements of work, or other arrangements related to the Identified Claim.

r. Demand 14 seeks documents pertaining to the recipient's financial, contractual, organizational, or governance relationships with renewable energy companies, developers, trade associations, or other entities engaged in solar, wind, geothermal, hydroelectric, biomass, biofuel, biogas, or hydrogen energy. Demand 14(a) seeks contracts, retainers, sponsorships, consulting arrangements, grant agreements, and other financial arrangements with such entities. Demand 14(b) seeks funding received from or provided to such entities, including its amount, purpose, and source. Demand 14(c) seeks documents pertaining to officers, directors, employees, contractors, consultants, or board members shared with such entities. Demand 14(d) seeks agreements or arrangements concerning joint projects, research, advocacy, communications, public relations, or other coordinated activity. Demand 14 does not refer to a Climate Claim.

s. Demand 15 concerns third-party studies, models, or datasets that the recipient cited or Published and that were not produced under Demands 1 through 14. It seeks documents pertaining to what they are and who produced them; communications with the author, publisher, or sponsor about method, assumptions, scenario choice, or conclusions and the recipient's "own assessment of their reliability or limits." Demand 15 does not refer to a Climate Claim.

t. Demand 16 seeks documents pertaining to dealings with "any coalition, advocacy group, or organization operating in or targeting West Virginia" about a WV Energy Business, an Identified Claim, or "advocacy on West Virginia energy facilities,

permitting, or regulation," including coalition agreements, joint work plans, shared budgets, grants, and funding given or received.

76. Demands 2, 3, 4, 6, 8, 9, 12, 14, 15, and 16 are not limited to documents concerning a Climate Claim. No demand is limited to statements made to consumers.

77. Instruction 2 defines "West Virginia Rivers Coalition" or "350.org," respectively to include its "predecessors, successors, divisions, subsidiaries, and affiliates," and "any officer, director, employee, contractor, or agent acting on its behalf." The instruction states that the subpoena does not reach materials those persons hold in their "individual/personal capacity" or materials "that solely reflect their private associations."

78. Instructions 4 and 5 require recipients, "[i]f necessary," to "assist the designated representative(s)" of the Attorney General's office in locating the demanded documents and, for documents kept outside West Virginia, in inspecting them "at their location."

79. Instruction 6 requires electronically stored data to be produced "in its native format (with all metadata intact) when reasonably practicable."

80. Instruction 8 states that the subpoena does not seek the identity of any individual donor, member, subscriber, or supporter "solely on the basis of that individual being a member, subscriber, or supporter," and does not require production of membership lists, donor lists, or records identifying individual supporters, members, subscribers, or volunteers in that capacity. The instruction excepts "organizational (not individual) funding sources" that are "specifically identified in a request," and states that where funding is requested, "totals and the names of organizations are sufficient." Instruction 8 does not exclude the names of organizations that have funded WV Rivers or 350.org, respectively, the total amounts they gave, the organizations the

recipient has paid, the officers, directors, employees, and board members the recipient shares with other entities, or the coalitions and organizations with which the recipient has worked.

81. Instruction 9 states that nothing in the subpoena requires production of attorney-client, work-product, or "First Amendment associational privilege material." It then requires Plaintiffs, if they withhold any document on those grounds, to produce by the return date a log identifying "the Document or category of Documents withheld," the privilege asserted, "the factual basis for the assertion," and the specific request to which the withheld document responds. To state the factual basis for withholding a document on associational grounds, Plaintiffs would have to disclose facts about the association the withholding and privilege is meant to protect.

82. The subpoena sets a return date of November 2, 2026, and directs production to Zachary Viglianco, Director of Strategic Litigation, at the State Capitol Complex, 1900 Kanawha Boulevard East, Charleston, West Virginia.

83. The subpoena does not describe any process by which the recipient may seek to quash or modify it. The Consumer Credit and Protection Act provides none.

84. Under W. Va. Code § 46A-7-104(3), if the recipient does not comply, Defendant may hale it into circuit court for an order compelling compliance. Violation of such an order is punishable as contempt. Defendant's office has petitioned for contempt against recipients of an investigative subpoena in at least one prior matter. *See Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 330–31 n.9 (2013).

85. Under W. Va. Code § 46A-7-104(4), the Attorney General may not make public the identity of a person he investigates or the facts disclosed in the investigation, except in actions or enforcement proceedings under the Act. That provision does not restrict the use of produced material within the Attorney General's office, its disclosure in any enforcement proceeding, or its

exposure through unauthorized disclosure. The subpoena itself states that the information produced "shall not be made public except upon the commencement of a subpoena enforcement proceeding" or "a civil action to enforce the WVCCPA" or "other law."

86. Defendant has not withdrawn the subpoena, narrowed it, or disclaimed any intention to enforce it.

87. Demand 12 reaches each recipient's efforts to coordinate with "any third party." Demand 16 reaches each recipient's dealings with "any coalition, advocacy group, or organization operating in or targeting West Virginia." To the extent the recipients of subpoenas have worked with one another in the past ten years, through coalition work or otherwise, production by any one of them under those demands would disclose the other's communications and associations.

***The Subpoena Serves No Legitimate Investigative Purpose***

88. The Consumer Credit and Protection Act prohibits unfair or deceptive acts or practices "in the conduct of any trade or commerce." W. Va. Code § 46A-6-104. The Act defines "'trade' or 'commerce'" as "the advertising, offering for sale, sale or distribution of any goods or services" and as including "any trade or commerce, directly or indirectly, affecting the people of this state." W. Va. Code § 46A-6-102(6). It defines "sale" to include a sale, offer for sale, or attempt to sell goods or services "for cash or credit." W. Va. Code § 46A-6-102(5).

89. WV Rivers's only sales of goods are incidental sales of stickers, t-shirts, and similar items bearing its name and artwork, which it no longer markets online but provides on request an at events. 350.org engages in similar de minimis sales of merchandise and, after searching it records, has only collected £32 GBP in merchandise sales from consumers in West Virginia. The subpoenas do not mention these merchandise sales. None of the sixteen demands concerns a sale

or an offer of goods or services, and the subpoenas identify no statement made in connection with any sale.

90. The only demand that concerns money from the public, Demand 5, concerns requests for charitable donations. A donor to either Plaintiff purchases nothing.

91. West Virginia regulates charitable solicitation under the Solicitation of Charitable Funds Act, W. Va. Code § 29-19-1 *et seq.*, which assigns the power to investigate charitable organizations to the West Virginia Secretary of State. W. Va. Code § 29-19-15(a). The subpoena does not invoke that Act.

92. The subpoena's stated statutory basis requires probable cause to believe that a person has engaged in an act subject to action by the Attorney General. The Supreme Court of Appeals of West Virginia has described that requirement as facts that would warrant a reasonable and prudent person's honest belief that an offense has been or is being committed and that information about the offense is in the possession of the person to whom the subpoena is directed. *Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 334 (2013). The subpoenas captions identify Plaintiffs themselves as the subjects of investigations.

93. The subpoenas recite no such facts supporting probably cause. Defendant served materially identical subpoenas on at least four other nonprofit organizations on or around the same day, showing that no particularized determination about either Plaintiff has been made.

94. The subpoena's demands do not correspond to any consumer-protection interest. They correspond to the subjects of Defendant's public campaign and his office's litigation against WV Rivers and 350.org: funding sources (Demands 13(b), 14(b), and 16), judicial education (Demand 7(d)), climate attribution science (Demands 7(a) and 7(b)), and advocacy by coalitions

on energy permitting (Demand 16), coordination among advocacy organizations (Demand 12), and the selection, qualification, and omission of data in public statements (Demands 4, 7, 10, and 11).

***The Subpoena's Premise***

95. The subpoena defines a "Climate Claim" as a statement asserting, "on a purportedly scientific or statistical basis," a connection between greenhouse gas emissions from fossil fuels and changes in climate, weather patterns, or extreme weather events. The investigation's stated premise is that such statements may be unfair or deceptive acts or practices.

96. Carbon dioxide and methane are greenhouse gases.

97. Greenhouse gases absorb infrared radiation emitted by the Earth's surface and re-emit it, warming the lower atmosphere.

98. That property of greenhouse gases has been known since the nineteenth century.

99. The combustion of coal, oil, and natural gas releases carbon dioxide into the atmosphere.

100. The extraction, processing, and transport of coal and natural gas release methane.

101. The concentration of carbon dioxide in the atmosphere has risen from approximately 280 parts per million before the industrial era to more than 420 parts per million today.

102. The National Oceanic and Atmospheric Administration's observatory at Mauna Loa, Hawaii, which has measured atmospheric carbon dioxide continuously since 1958, recorded a monthly mean of 426.07 parts per million in September 2026.

103. Human activity, chiefly the combustion of fossil fuels, is the principal cause of that increase.

104. The Earth's average surface temperature has risen by about 1 degree Celsius, or about 2 degrees Fahrenheit, since the late nineteenth century.

105. The National Aeronautics and Space Administration reports that human activity is the principal cause of that warming and that the warming is driven largely by increased carbon dioxide emissions into the atmosphere.

106. The Supreme Court of the United States has observed that "[a] well-documented rise in global temperatures has coincided with a significant increase in the concentration of carbon dioxide in the atmosphere," that "[r]espected scientists believe the two trends are related," and that "[t]he harms associated with climate change are serious and well recognized." *Massachusetts v. EPA*, 549 U.S. 497, 504–05, 521 (2007).

107. In 2009, EPA found that six greenhouse gases, including carbon dioxide and methane, endanger public health and welfare, and that emissions of those gases from motor vehicles contribute to that endangerment. 74 Fed. Reg. 66,496 (Dec. 15, 2009).

108. The United States Court of Appeals for the District of Columbia Circuit upheld the finding alleged in Paragraph 102. *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102 (D.C. Cir. 2012).

109. When EPA rescinded the finding described in Paragraph 102 on February 12, 2026, it rested the rescission on its interpretation of the Clean Air Act, declined to adopt the scientific rationale it had proposed, and made no finding that greenhouse gas emissions do not contribute to climate change.

110. In May 2026, in the brief that Defendant's office filed against WV Rivers in No. 25-1384, the State of West Virginia, through Defendant's office, told the Fourth Circuit that carbon-dioxide injection wells capture carbon dioxide from "fossil-fueled power plants or other emission

sources" and "reduce CO2 emissions [going into] the atmosphere and help mitigate climate change." Brief of Intervenors at 4, *West Virginia Surface Owners' Rights Organization v. Zeldin*, No. 25-1384 (4th Cir. May 18, 2026).

111. Businesses that fit within the subpoenas' definition of "WV Energy Businesses" have made similar statements.

112. The Gas and Oil Association of West Virginia, whose members extract and transport natural gas in West Virginia, publishes statements that its members are reducing greenhouse gas emissions to advance "a lower carbon future."

113. EQT Corporation, which produces natural gas in West Virginia, reports to investors and the public that it has achieved "net zero" greenhouse gas emissions in its upstream operations and that natural gas is "the most effective pathway to reducing global emissions through coal displacement."

114. FirstEnergy Corp., whose subsidiary Monongahela Power Company generates electricity from coal in West Virginia and sells it to West Virginia consumers, has announced a goal of carbon neutrality by 2050 and an interim goal of reducing the greenhouse gas emissions within its operational control by 30 percent by 2030, citing the need to mitigate the risks of climate change.

115. On information and belief, Defendant has not issued a subpoena under the Consumer Credit and Protection Act to any WV Energy Business concerning those statements.

116. Defendant does not dispute that greenhouse gas emissions from the combustion of fossil fuels contribute to changes in the Earth's climate.

117. Defendant has not identified, in the subpoenas or anywhere else, any statement by either Plaintiff asserting a connection between fossil-fuel emissions and climate change that he contends is false.

118. Defendant possesses no information that would warrant a reasonable and prudent person's belief that any such statement by either Plaintiff is false.

119. The subpoenas do not ask whether any Climate Claim is true. They ask who funded it, who reviewed it, which emissions scenario it used, with whom it was coordinated, and how its uncertainties were "described, simplified, emphasized, downplayed, qualified, or left out."

120. There is no basis on which to assert that drawing a connection between fossil fuel emissions and climate change is a deceptive practice. That premise is contradicted by the Supreme Court of the United States, by the federal government under administrations of both parties, by the State of West Virginia in a brief Defendant signed, by the businesses the subpoena is ostensibly meant to protect, and by the scientists the current federal administration selected to review the question. Plaintiffs plead the facts in paragraphs 95 through 120 to show that the subpoenas' premise is pretextual, that the investigation serves no governmental interest, and that Defendant lacks authority to conduct it.

121. Plaintiffs plead the facts in paragraphs 95 through 120 to show the absence of any substantial governmental interest served by the subpoena, to show its retaliatory purpose, and to show the Attorney General's lack of authority to issue the subpoena.

***Injury to Plaintiffs and Those Who Associate With Them***

122. Defendant's investigations have injured Plaintiffs from the day they learned about them and continue to injure them each day they are ongoing.

123. The subpoenas have injured Plaintiffs from the day they were served and continue to injure them each day they remain outstanding.

124. WV Rivers is self-censoring its internal communications because of the subpoena and investigation. The Executive Director specifically is self-censoring and she has instructed the staff to do so as well because she does not want the Attorney General to read their internal deliberations. This reduced communication amongst staff hinders WV Rivers' work.

125. WV Rivers's Executive Director has spoken with a majority of its organizational funders since the subpoena was served. WV Rivers depends on foundations and other organizational funders for more than eighty percent of its budget, and the subpoena demands the names of those funders and the amounts they gave (Demands 13(b), 14(b) and 16). WV Rivers cannot assure them that their support can remain confidential. The subpoenas have increased the risk of reduced or withdrawn funding, and WV Rivers expects the investigation and subpoena to scare off new funders.

126. WV Rivers's policy staff work with state agencies and legislators on water-infrastructure and other matters on which WV Rivers and the State agree. The investigation and attendant subpoena, pursued and issued by the State's chief legal officer, has put that cooperation in doubt. WV Rivers's Executive Director does not know whether its staff will be permitted to continue to work cooperatively with state agencies while the Attorney General's investigation is pending, and she expects the investigation to affect the receptiveness of legislators and local officials to WV Rivers's staff.

127. The subpoena and investigation have affected WV Rivers's staff in the way they were designed to. Within days of service, one staff member asked management whether WV Rivers should rewrite a public "story map" about petrochemical development along the Ohio River in

light of the subpoena. Another asked whether a planned public webinar should go forward or its content be changed. Just this week, staff were also questioning whether they should continue their practice of commenting on important water discharge permits. WV Rivers's deputy director has also reported second-guessing her own work.

128. The Executive Director has directed the staff to push on. But the subpoena reaches internal deliberations about climate and energy matters (Demands 2, 3, 4, 6(d), 7(a), 7(c), 8, 10, 11, and 15), a request for a Published item also seeks unreleased drafts, comments, and approval communications, and the Relevant Period runs through the date of compliance, so that everything the staff writes while the subpoena is outstanding is within its reach. The Executive Director is concerned that her staff will not continue to speak as forcefully as they did before they learned of the investigation and received the subpoena, and she expects that, even without intending to, they will be less assertive out of fear of further action by the state.

129. WV Rivers recently completed a major project: a story map about the petrochemical industry. It planned to publicize the story map (on social media, among other ways) but it has not done so because of the subpoena and investigation.

130. WV Rivers gives out community action mini-grants to small community groups or individuals each year, to further their important work defending headwaters, uplifting community voices, and improving water quality. With great reluctance, WV Rivers paused that program after receiving the subpoena so as to protect exposing any additional groups or individuals to the attorney general's investigation.

131. The subpoena is distracting WV Rivers from doing its other work. In the week after service, the subpoena and investigation consumed most of the Executive Director's time, including the time required to notify and communicate with WV Rivers's board. WV Rivers has fifteen staff

members and no capacity of its own to collect, review, and log nearly ten years of records. Compliance would require it to retain an outside vendor to do several months' worth of work, at a cost of $150 per hour, and would hinder its scheduled program work while its staff searched their files. In the Executive Director's assessment, compliance would completely overwhelm the organization.

132. The subpoena has injured 350.org in similar ways. 350.org was for years a leading voice speaking out against fossil fuel companies. Beginning in March 2025, as climate organizations became targets of the current administration and its allies, 350.org became more cautious in what it says about fossil fuel companies and in the associations it enters into. The Subpoena and Investigation have deepened that caution. It will delay any return to its prior outspoken positions and will shift its work toward different, less controversial topics. 350.org's effectiveness depends on being able to speak out as it once did without fear of reprisal from government officials, but doing so is not an option while the Investigation is pending.

133. To reduce its risk, 350.org's U.S. program team was instructed to submit all public facing documents and communications to the executive director, and sometimes the general counsel, for approval before release. 350.org put this screening in place after receiving the September 10, 2026 House letter. 350.org expected the measure to be short-lived, as the executive director does not ordinarily review the staff's day-to-day work and does not do so for any other region, but extended the process indefinitely after learning of the Subpoena and Investigation. The executive director is screening content with the Subpoena and Investigation in mind, and she has altered or withheld content as a result—specifically content 350.org believes will make it a further target of elected officials hostile to climate action This screening takes time from the executive director's and other staff members' work for 350.org.

134. While the Subpoena and Investigation are pending, 350.org will not undertake new work in West Virginia.

135. 350.org is no stranger to the effects that a hostile political environment can cause on its ability to fundraise. Since 2024, climate organizations have been targeted by conservative lawmakers in the United States, which has caused 350.org to experience a nearly 20% reduction in its funding. As a result, 350.org had to restructure and laid off its U.S. program staff. Since then, 350.org has regained some of its funding, which has allowed it to re-hire some U.S. program staff but expects the funding to once again be reduced once funders learn of the subpoena and investigation. In fact, funders understand that funding relationships are being used to target organizations; Defendant's February 12, 2026 letter identified 350.org because of a grant it received. Some funders will likely believe it is too risky to continue associating with 350.org.

136. Instruction 8's exclusion of individual donors, members, subscribers, and volunteers does not remove these injuries. The subpoena still demands the names of organizations that have funded Plaintiffs' work and the total amounts they gave (Demands 13(b), 14(b), and 16), the organizations Plaintiffs have paid (Demands 9(b), 14(b), and 16), the officers, directors, employees, and board members it shares with renewable energy entities (Demand 14(c)), and the coalitions and organizations with which they have worked (Demands 12, 14(d) and 16).

137. The confidentiality provision of W. Va. Code § 46A-7-104(4) does not remove those injuries. Funders and partners do not know whether their information will be protected, and disclosure within the Attorney General's office, in enforcement proceedings, or through leak or breach remains possible.

138. The possibility that Defendant may later narrow the subpoena, or that a court may later decline to enforce it in full, does not remove these injuries. Plaintiffs cannot tell their funders and partners what will or will not will be disclosed.

139. Plaintiffs face a credible threat that Defendant will apply for an order compelling compliance under W. Va. Code § 46A-7-104(3) if they do not produce the demanded material by November 2, 2026, and that contempt sanctions will follow.

140. Plaintiffs face a credible threat that Defendant will further escalate the investigation by commencing additional proceedings in retaliation for Plaintiffs seeking relief from the subpoena.

141. Plaintiffs have no adequate remedy at law. The Consumer Credit and Protection Act provides no procedure by which a recipient may challenge the subpoena before Defendant seeks to enforce it, and any state proceeding would begin only after the injuries described above had continued for weeks or months.

142. Unless enjoined, Defendant will continue the investigations and Plaintiffs will continue to suffer irreparable injury to their First and Fourth Amendment rights.

## CLAIMS FOR RELIEF

### Count I – Retaliation for Protected Speech, Association, and Petitioning (First and Fourteenth Amendments; 42 U.S.C. § 1983)

143. Plaintiffs incorporate paragraphs 1 through 142.

144. WV Rivers's public statements on climate and energy, its comments and testimony to agencies and legislative bodies, its litigation challenging permitting decisions, its coalition work, and its solicitation of support for those activities are protected by the First Amendment. 350.org's public statements on climate and energy, its divestment campaigns, its organization of public demonstrations, its coalition work, and its solicitation of support for those activities are likewise

protected. Speech about climate change and energy policy is speech on a matter of public concern, which occupies the highest rung of First Amendment protection. *Snyder v. Phelps*, 562 U.S. 443, 451–53 (2011).

145. A government official may not take action against a person because of that person's protected activity where the action would deter a person of ordinary firmness from continuing to exercise First Amendment rights. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499–500 (4th Cir. 2005).

146. The investigations and subpoenas are such actions. They are state inquisitions and formal commands, backed by the threat of court orders and contempt, that demand*, inter alia*, disclosure of the targets'/recipients' organizational funders, coalition partners, shared board members and staff, internal deliberations, and dealings with other organizations about permitting advocacy. It would deter a person of ordinary firmness from engaging in the speech, petitioning, and association that the subpoena targets. Given Defendant's pattern of public statements against climate advocacy organizations and his service of materially identical subpoenas on other organizations, a person of ordinary firmness would reasonably expect that continued advocacy of the same kind would draw a similar demand.

147. Not only would a person of ordinary firmness be deterred, but WV Rivers and 350.org have, in fact, been deterred as a result of Defendant's subpoenas and investigations. WV Rivers has paused its mini-grant program after receiving the subpoena, and is self-censoring its own internal communications, which hinders their work. 350.org has implemented a special review process for any public statements or documents from the U.S. team before they are published, and will not work in West Virginia at least while the investigation remains open.

148. Defendant commenced the investigations and issued the subpoenas because of Plaintiffs' protected activity. The subpoenas' demands track the subjects of Defendant's public statements, letters, and filings described in paragraphs 35 through 64: climate attribution science, judicial education, funding of climate advocacy, coordination among advocacy organizations, advocacy by coalitions on energy permitting, and the selection and presentation of data. Defendant signed a letter asking the Department of Justice to investigate 350.org by name seven months before he issued a subpoena to it. His office was litigating against WV Rivers, and had accused it of relying on slanted and deceiving data, when he issued a subpoena to WV Rivers. The subpoenas identify no consumer-protection basis. Defendant served materially identical subpoenas on other nonprofit environmental organizations engaged in the same protected activity on or around the same day.

149. But for Plaintiffs' protected activity, Defendant would not have commenced the investigations or issued the subpoenas. Defendant cannot show that he would have commenced the investigations or issued the subpoenas in the absence of that activity.

150. Defendant's retaliatory purpose is further shown by the absence of any complaint, transaction, or act within the Consumer Credit and Protection Act, by the departure from the statutory requirement of individualized probable cause, and by the subpoena's demands for information that has no relationship to any consumer-protection purpose. To the extent a retaliation claim arising from an investigation requires a showing that the investigation lacked probable cause, Plaintiffs allege that Defendant lacked probable cause under W. Va. Code. § 46A-7-104(1) to believe that either Plaintiff, or anyone else, had engaged in any act subject to the Act, and that Defendant has identified none. Plaintiffs further allege, for the reasons stated in Paragraphs 35

through 64 and 88 through 121, that the stated premises for the investigations and subpoenas are pretextual.

151. Defendant acted under color of state law.

152. Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

**Count II – Freedom of Association (First and Fourteenth Amendments; 42 U.S.C. § 1983)**

153. Plaintiffs incorporate paragraphs 1 through 152.

154. The First Amendment, applicable to the States through the Fourteenth Amendment, protects the right to associate with others for the advancement of beliefs and ideas, including through financial support, board service, and coalition work. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–63 (1958).

155. A government demand that an advocacy organization disclose its funders, its board members, its partners, or its internal communications burdens that right, whether or not the information is later made public. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606–07, 616 (2021); *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174, 189, 198–99 (2026).

156. Such a demand must survive exacting scrutiny: it must be narrowly tailored to a sufficiently important governmental interest. *Bonta*, 594 U.S. at 607–08; *First Choice*, 608 U.S. at 187.

157. The investigations and the attendant subpoenas impair Plaintiffs' freedom to associate. Demands 13(b), 14(b), and 16 compel disclosure of organizations that have funded each Plaintiff's work and the amounts they gave. Demands 9(b), 14(b), and 16 compel disclosure of organizations each Plaintiff has paid and the amounts. Demand 14(c) compels the disclosure of officers, directors, employees, contractors, consultants, and board members whom each Plaintiff

shares with renewable energy entities. Demands 12, 14(d), and 16 compel disclosure of the organizations with which each Plaintiff has coordinated and its communications with them Demands 2, 3, 4, 6(d), 7(a), 8, 10, 11, and 15 compel disclosure of internal deliberations. Instruction 9 compels disclosure of the factual basis for every claim that a withheld document is protected by the right of association.

158. The subpoena serves no sufficiently important governmental interest. Defendant has identified no consumer, transaction, complaint, or act in the conduct of trade or commerce that is subject to the Consumer Credit and Protection Act, and none of the demands concern any sale of goods or services.

159. The subpoena is not tailored to any interest. It reaches nearly ten years of records, extends through the date of compliance, and demands categories of associational information that bear no relationship to any consumer-protection purpose.

160. Defendant issued the subpoena under color of state law and, by maintaining it and threatening enforcement, is depriving Plaintiffs of rights secured by the First and Fourteenth Amendments.

161. Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

**Count III – Right to Petition and to Associate for Litigation (First and Fourteenth Amendments; 42 U.S.C. § 1983)**

162. Plaintiffs incorporate paragraphs 1 through 161.

163. The First Amendment protects the right to petition the government for redress of grievances, including through comments to agencies, testimony, and litigation, and the right to associate with others and with counsel for the purpose of litigation. *NAACP v. Button*, 371 U.S. 415, 429–31 (1963).

164. Demand 7(d) compels disclosure of each Plaintiff's regulatory comments, agency submissions, and testimony that repeat, discuss, reply upon, or otherwise concern an Identified Claim, including drafts, approvals, amendments, and withdrawals. Demand 16 compels disclosure of each Plaintiff's dealings with coalitions, advocacy groups, and other organizations about "advocacy on West Virginia energy facilities, permitting, or regulation," and contains no exclusion for dealings with co-plaintiffs or co-petitioners in litigation over permits. Instruction 9 requires a log stating the factual basis of withholding any such document.

165. Those demands burden Plaintiffs' petitioning and their association with counsel and co-plaintiffs, and they were issued because of that petitioning.

166. No governmental interest justifies a consumer-protection subpoena directed at an organization's submissions to regulatory agencies or its dealings with co-plaintiffs about permitting litigation.

167. Defendant acted under color of state law.

168. Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

**Count IV – Unreasonable Demand (Fourth and Fourteenth Amendments; 42 U.S.C. § 1983)**

169. Plaintiffs incorporate paragraphs 1 through 168.

170. The Fourth Amendment, applicable to the States through the Fourteenth Amendment, protects against baseless investigations and unreasonable demands for private papers. An investigative subpoena is reasonable only if it is authorized for a legitimate governmental purpose, limited in scope to reasonably relate to and further that purpose, sufficiently specific, and not overly broad. *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000); *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 208–09 (1946); *See v. City of Seattle*, 387 U.S. 541, 544

(1967). The Fourth Amendment protects corporations and associations against unreasonable subpoenas duces tecum for their papers. *Hale v. Henkel*, 201 U.S. 43, 76 (1906).

171. Investigations and subpoenas are authorized only if they meet the prerequisites prescribed by the legislature. In the case of a subpoena, the Fourth Amendment's requirement of reasonableness is satisfied by a court's determination that the investigation is one the legislature has authorized, is for a purpose the legislature can order, and seeks documents relevant to that inquiry. *Oklahoma Press*, 327 U.S. at 209.

172. Whether an inquiry is one the Legislature has authorized is a question this Court decides for itself. Plaintiffs do not assert state law claims in this proceeding. They plead the limits of W. Va. Code § 46A-7-104(1) and of the Consumer Credit Protection Act as the measure of the authorities and purposes prescribed the Legislature, which are the measures the Fourth Amendment applies. *Oklahoma Press*, 327 U.S. at 209; *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

173. The Attorney General's power to investigate under the Act is no broader than his power to enforce it. "If the defendant is prohibited from enforcing the Act against [a person], it follows that the defendant cannot use a subpoena to investigate whether [that person] violated the Act." *Capital One Bank (USA), N.A. v. McGraw*, 563 F.Supp.2d 613, 618 (S.D. W. Va. 2008). In *Capital One*, this Court permanently enjoined the Attorney General from issuing subpoenas or demanding records in connection with an investigation under the Act of conduct he had no authority to reach, and from seeking to enforce, in a state proceeding he had already begun, a subpoena he had already issued.

174. An investigation premised solely on lawful activity is a fishing expedition that the Fourth Amendment forbids. *Major League Baseball v. Crist*, 331 F.3d 1177, 1182, 1187–89 (11th

Cir. 2003). In *Crist*, the Attorney General of Florida issued investigative demands to Major League Baseball concerning a decision that, because of baseball's exemption from the antitrust laws, could not violate the law he was charged with enforcing. The Eleventh Circuit held that the demands violated the Fourth Amendment; rejected the argument that the investigation might uncover something else, because an investigator must have "something" to justify an inquiry; and affirmed a judgment declaring that the Attorney General "cannot proceed with the investigation." *Id.* at 1179 & 1187 n.23.

175. The Legislature has authorized the Attorney General to investigate, and to subpoena, only "[i]f the Attorney General has probable cause to believe that a person has engaged in an act which is subject to action by the Attorney General." W. Va. Code § 46A-7-104(1). The Supreme Court of Appeals of West Virginia has held that "the existence of probable cause is a necessary prerequisite to the issuance of an investigative subpoena" under that provision, and it declined to follow authorities from other jurisdictions that do not require probable cause for administrative subpoenas. *Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 334–35 & n.13 (2013).

176. The investigations and subpoenas here are not authorized. They identify no act by either Plaintiffs subject to the Consumer Credit and Protection Act, no consumer, no transaction, and no complaint. Defendant served materially identical subpoenas on other organizations on or around the same day. An investigation begun without probable cause is not one the Legislature has authorized, and a subpoena issued in it is not authorized for a legitimate governmental purpose.

177. The activity the subpoenas target cannot violate the Act, for two independent reasons. First, it is not conduct in "trade or commerce." Public statements about climate and energy, comments and testimony to agencies and legislative bodies, litigation, coalition work, public demonstrations, and the solicitation of charitable contributions are not "the advertising, offering

for sale, sale or distribution of any goods or services." W. Va. Code § 46A-6-102(6). Second, the First Amendment forbids the State to treat that activity as a deceptive trade practice. Speech on climate change and energy policy is speech on a matter of public concern, at the highest rung of First Amendment protection, *Snyder v. Phelps*, 562 U.S. 443, 451–53 (2011); charitable solicitation is protected speech, not commercial speech, *Riley*, 487 U.S. at 787–89; litigation to advance a cause is "a form of political expression," *Button*, 371 U.S. at 429; and petitioning the government is immune from liability under state law, *IGEN International, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003). A State may proceed against a knowingly false statement of material fact made to mislead donors, *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 620 (2003), but Defendant has identified no such statement, and a statement's alleged falsity alone does not strip it of protection, *United States v. Alvarez*, 567 U.S. 709, 718–22 (2012) (plurality opinion).

178. Because Defendant has no authority to enforce the Act against the activity the subpoenas target, he has no authority to investigate it, and the subpoenas serve no purpose the Legislature has authorized. That conclusion follows with particular force here, where the materials demanded are themselves protected by the First Amendment and the Fourth Amendment's requirements must be applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978).

179. Narrowing the subpoenas would not cure the defect. The defect is not only that the demands are too broad, though they are. It is that the investigation has no lawful subject. Any demand issued in it, however narrow, would serve the same unauthorized purpose. The relief to which Plaintiffs are entitled therefore runs to the investigation, not only to the subpoenas.

180. The subpoena is not limited in scope to any purpose and is not relevant to any lawful inquiry. Because the subpoena identifies no inquiry, no document can be relevant to it. Demands 2, 3, 4, 6, 8, 9, 12, 14, 15, and 16 are not limited to any Climate Claim, no demand is tied to any statement to a consumer, and no demand concerns a sale or offer of goods or services. A demand for records "in the hope that something will turn up" is unreasonable. *FTC v. American Tobacco Co.*, 264 U.S. 298, 306 (1924).

181. The subpoena is overbroad and indefinite. It reaches nearly ten years of records, extends through the date of compliance, defines "WV Energy Business" to include any entity that burns natural gas or petroleum in West Virginia, defines "Published" to include any communication to one outside person, defines "Pertaining" to include "alluding to" or "mentioning" a subject "either directly or indirectly, in whole or in part," and demands all documents pertaining to Plaintiffs' dealings with any coalition, advocacy group, or organization operating in or targeting West Virginia about advocacy on West Virginia energy facilities, permitting or regulation.

182. The demand is itself an intrusion. It would require each Plaintiff to identify, review, and segregate nearly ten years of records, and it imposes that burden, and the threat of court-ordered compliance, for as long as it remains outstanding.

183. Defendant acted under color of state law.

184. Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

**Count V – Charitable Solicitation as Protected Speech (First and Fourteenth Amendments; 42 U.S.C. § 1983)**

185. Plaintiffs incorporate paragraphs 1 through 184.

186. Charitable solicitation is protected speech. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632–33 (1980); *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 787–89 (1988); *First Choice*, 608 U.S. at 190 n.2.

187. The right to charitable solicitation "limits a government's ability to make demands of charities that would have the 'predictable result' of rendering their 'solicitations ... unsuccessful.'" *First Choice*, 608 U.S. at 190 (quoting *Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781, 799–800 (1988)).

188. Courts "may make 'commonsense inferences' . . . , including inferences about 'third party behavior.'" *First Choice*, 608 U.S. at 189 (quoting *Diamond Alternative Energy,* 606 U.S. at 116). In the First Amendment context, it is reasonable inference that a subpoena request for private donor information will "give its targets a very good reason to clam up [and] give the target organization's members and supporters a very good reason to abandon the cause" and that state officials "sometimes issue[] subpoenas and other investigatory demands in order to secure just these results." *Id.* at 189–90 (citations and internal quotations omitted)

189. Demand 5 targets each Plaintiffs' donation requests that contain a Climate Claim and were aimed, in whole or in part, at West Virginia Recipients. It singles out solicitations by what they say. A request asserting a connection between fossil-fuel emissions and climate harm is covered. A request that is silent on that connection, or denies it, is not.

190. A donor to either Plaintiff purchases no goods or services. A request for a donation is not the "advertising, offering for sale, sale or distribution of any goods or services" that the Consumer Credit and Protection Act regulates, and Defendant has no consumer-protection interest in the content of Plaintiffs' donor appeals.

191. Defendant opened an investigation into Plaintiffs and sought donor information from them in order to chill their funding. From Plaintiffs' prior experience, Defendant's tactics will cause funders to reduce their funding or stop funding them altogether.

192. Defendant acted under color of state law.

193. Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

**Count VI – Viewpoint Discrimination and Selective Enforcement (First and Fourteenth Amendments; 42 U.S.C. § 1983)**

194. Plaintiffs incorporate paragraphs 1 through 193.

195. The First Amendment forbids the government to direct its investigative power at a speaker because of the viewpoint the speaker expresses. The Fourteenth Amendment forbids selective enforcement of the law on the basis of protected expression.

196. The subpoena defines its subject by viewpoint. A "Climate Claim" is a statement "asserting" a connection between greenhouse gas emissions from fossil fuels and changes in climate or weather, including resulting harm to public health and the economy. A statement denying that connection is not a Climate Claim. The subpoena also demands documents concerning each Plaintiff's relationships with renewable-energy entities and its dealings with other organizations about advocacy on energy permitting and regulation. It demands nothing concerning statements on the other side of those questions.

197. Entities engaged in trade or commerce in West Virginia make statements about climate change, energy, and the environmental effects of fossil fuels in advertising and in soliciting customers and investors, including the statements by the Gas and Oil Association of West Virginia, EQT Corporation, and FirstEnergy Corp. described in paragraphs 112 through 114. On information and belief, Defendant in not investigating has not issued subpoenas under the Consumer Credit and Protection Act to any of them concerning those statements.

198. Defendant issued subpoenas to WV Rivers, 350.org, and certain other organizations that share their viewpoint on climate and energy.

199. Defendant's selection of Plaintiffs for investigation on the basis of their viewpoint serves no legitimate governmental interest and is not narrowly tailored to any.

200. Defendant acted under color of state law.

201. Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1. Set Plaintiffs' motion for a preliminary injunction for hearing at the earliest opportunity, and before November 2, 2026;
2. Declare that the subpoenas served on Plaintiffs on or about September 16, 2026, and the investigations of which they are a part, violate the First and Fourteenth Amendments to the United States Constitution;
3. Declare that the subpoenas and the underlying investigations violate the Fourth and Fourteenth Amendments to the United States Constitution, and that the Fourth Amendment bars Defendant from compelling the production of Plaintiffs' records to investigate, under the Consumer Credit and Protection Act, their public advocacy, litigation, submissions to government agencies and legislative bodies, coalition communications, charitable solicitations, or the funding of those activities;
4. Preliminarily and permanently enjoin Defendant, his successors in office, and his officers, agents, and employees from enforcing the subpoenas or proceeding with the underlying investigations, including by applying for an order compelling compliance under W. Va. Code § 46A-7-104(3), by issuing any further subpoena or demand for documents or testimony in connection with the investigations, or by any other proceeding;
5. In the alternative, preliminarily and permanently enjoin enforcement of the subpoena to the extent they demand the identities of organizations that have funded Plaintiffs or that Plaintiffs have paid, and amounts of that funding; the identities of officers, directors,

employees, and board members that a Plaintiff shares with other entities; its communications and dealings with coalitions, advocacy groups, other organizations, co-plaintiffs, and counsel; its internal deliberations; its regulatory submissions and testimony; and its charitable solicitations; and to the extent Instruction 9 requires a log disclosing any of that information.

6. Preliminarily and permanently enjoin Defendant, his successors in office, and his officers, agents, and employees from issuing to either Plaintiff any subpoena or demand that is substantially similar to the subpoenas or that is based on the protected activity described in this Complaint;
7. Award Plaintiffs their reasonable attorney's fees and costs under 42 U.S.C. § 1988(b); and
8. Grant such other relief as the Court deems just.

DATE: October 22, 2026

Respectfully submitted,

***s/ Derek Teaney***

DEREK TEANEY (WVBN 10223)
AMANDA DEMMERLE (WVBN 13930)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org
ademmerle@appalmad.org

*Counsel for Plaintiffs*