# Ex. 1

**JB McCuskey**
@mccuskeyforwv

Want to know the difference between carbon fuel advocates and insane leftist greeno's? Read this.

We support American energy. We understand rational energy policy maximizes all of our incredible resources. We stand up for American consumers to ensure they have access to low cost energy. We stand up for the amazing American energy producers and their millions of employees. And we understand that legislation requires compromise.

They are willing to destroy our economy, and harm our citizens in the name of a quasi religion and adherence to the doctrine of climate insanity.

Pass this bill now, America needs it. I'm proud to stand with my friends @APIenergy , @USChamber , @GasOilWV , @WV_coal1 , @wvmanufacturers and all of my @RepublicanAGs colleagues to fight to get permitting reform across the line.

**Joshua Siegel** @SiegelScribe · Oct 2

Scoop: Enviros held a call Thurs in which progressive opponents tried to rally fence-sitters against the permitting bill. I obtained the transcript.

"We really have to have a pretty clear agreement by all parties that this is an effort to stop this bill, not to make it better"

**Greens plot.** Environmental groups are split over how to handle a permitting bill negotiated by two longtime allies of the movement: Sen. **Sheldon Whitehouse** (D-R.I.) and Sen. **Martin Heinrich** (D-N.M.), the ENR ranking member.

**On a Thursday call** organized in part by the Sierra Club, a transcript of which was leaked to us, progressive opponents tried to rally fence-sitters against the bill. Some of the 89 participants said they hadn't fully reviewed it yet.

**At the outset** of the call, one speaker, **Brett Hartl,** government affairs director at the Center for Biological Diversity, stressed he wanted to keep their strategy a secret from Whitehouse and Heinrich.

**"Our tactics and** information cannot get back to Dan Dudis and Whitehouse and Heinrich. We really have to have a pretty clear agreement by all parties that this is an effort to stop this bill, not to make it better," Hartl said.

**Hartl later confirmed** the transcript's authenticity with us and said he had no regrets for calling out Whitehouse and his staff director, Dudis, along with Heinrich.

**"I don't want** our strategy being relayed back to them, and now it is. Someone on the call decided to betray all of us," Hartl said.

*– Josh Siegel*

10:26 AM · Oct 2, 2026 · **756** Views

7 1

# Ex. 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**WEST VIRGINIA RIVERS COALITION, INC.,**
**and 350.ORG,**

**Plaintiffs,**

**v.** **Civil Action No. 2:26-cv-______**

**JOHN B. McCUSKEY, in his official capacity as**
**Attorney General of the State of West Virginia,**

**Defendant.**

**DECLARATION OF WV RIVERS' EXECUTIVE DIRECTOR JENNIE SMITH**

I, Jennie Smith, hereby declare and state as follows:

1. I am employed as the executive director of West Virginia Rivers Coalition, Inc. ("WV Rivers"). I have held this position since September 9, 2024. As executive director, I oversee the daily operations of WV Rivers, I am the primary spokesperson, fundraiser, and strategic director for the organization, and I support the board and organization's governance. Approximately 30 to 50 percent of my time as executive director is devoted to fundraising.

2. Before becoming the executive director of WV Rivers, I was the executive director of Philanthropy West Virginia.

3. I completed an MBA program at the University of Maryland in 2024. My education, as well as my training, professional development, and mentoring during my education and prior jobs over the past twenty years, has helped me understand how to build fundraising systems that create long-term sustainable cash flow for organizations. Fundraising is about prioritizing relationships, figuring out what drives or motivates them, and understanding how donors' interests align with the organization's mission. Building trust with donors and actually following through

with promises made is critical to retaining a sustainable funding base. Cultivating a donor is time-consuming work. It requires constant care to understand what motivates the donor and to make sure the donor's interests are aligned with the organization's interests.

4. I have personal knowledge of the facts set out below.

5. WV Rivers is a nonprofit environmental advocacy organization in West Virginia, whose mission is to promote clean and healthy West Virginia waters for all. WV Rivers has 15 staff members and an annual budget of approximately $2 million.

6. On or about September 21, 2026, I received a subpoena issued to WV Rivers from West Virginia Attorney General John B. McCuskey seeking a broad range of documents and communications from WV Rivers since January 1, 2017, to be produced by November 2, 2026 (the "Subpoena").

7. The Subpoena seeks records concerning WV Rivers' public statements on climate and energy, its internal deliberations about those statements, its requests for donations, the organizations that have funded its work and the amounts they gave, the organizations it has paid, the officers, directors, staff, and board members it shares with renewable energy entities, its dealings with coalitions and other advocacy organizations on energy permitting and regulation in West Virginia, and its submissions to regulatory agencies.

8. The Subpoena seeks this information under the West Virginia Consumer Credit and Protection Act. It is my understanding that this Act only applies to the sale of goods or services or organizations that are engaged in trade or commerce. WV Rivers does not sell any goods or services but for a small amount of merchandise that bears our name or logo. WV Rivers used to have an online store to sell this merchandise, but discontinued it at the end of 2025 and only sells a small amount of merchandise at events or when people specifically inquire. Such merchandise

sales comprise less than 0.10% of our annual budget. The merchandise sales are not related to any requests made in the Subpoena.

9. According to the Subpoena, it seeks this information as part of an investigation of WV Rivers (the "Investigation").

10. It is my understanding that at least five other nonprofit organizations have also received materially similar subpoenas from the West Virginia Attorney General seeking the same information pursuant to similar investigations.

11. I received a call from a reporter who knows about the subpoenas and investigations.

12. Pursuant to contracts with certain donors that require disclosure of government investigation, I have had to alert these donors about the Subpoena and Investigation. I have voluntarily notified the rest so they heard it from me first, to hopefully keep their trust and support.

13. The Subpoena and related Investigation have and will impact WV Rivers as follows:

***Impact on WV Rivers' Speech***

14. The Subpoena and Investigation has and will continue to impact our ability to carry out our normal day-to-day activities. As the West Virginia Legislative session nears, the Subpoena and Investigations are detracting from our ability to adequately prepare for our lobbying and advocacy efforts, as my time is being devoted to the Subpoena and how to respond instead. In the first week after we received the Subpoena, responding to it consumed most of my time, including the time required to notify and advise WV Rivers' board and funders. My staff has also been distracted by the Investigation and worrying about what it means for their work going forward.

15. Our year-end fundraising appeal is about to be sent out, and the Subpoena and Investigation are making me second-guess its language. These events have added a second layer

of scrutiny. I intend to review the appeal with the Subpoena and Investigation in mind before it is sent. Other staff are also rethinking their communications strategy in light of the Subpoena and Investigation.

16. Since learning of the Investigation, the staff have asked me whether WV Rivers should continue doing public events related to controversial topics, like the petrochemical industry, data centers, flooding and fracking, as it increases their visibility and risk.

17. I have been self-censoring my speech in internal work chats since receiving the Subpoena now that I know the Attorney General may read what I write. I have also instructed the staff to say less in work chats in light of the Subpoena and Investigation. These restrictions impede our ability to communicate candidly and without fear of repercussions and ultimately hamper our ability to carry out our work effectively.

18. Staff are also second-guessing current projects. They have asked me whether we should delay the roll out of certain projects, or re-write portions of the project in light of the Subpoena and Investigation. For example, one staff member asked me whether WV Rivers should revisit or potentially even rewrite portions a soon-to-be-published public “story map” concerning the petrochemical industry in West Virginia in light of the Subpoena. They have also inquired whether they should refrain from attending public permit hearings and providing public comments on behalf of WV Rivers, as is our normal practice for many projects that are receiving a controversial water discharge permit. While I have told them not to delay or hold back, I do not have confidence that they will be as steadfast as they otherwise would have been. Even if they do not intentionally pull their punches or water down their work, I fear that they will be less assertive than they would otherwise be, out of fear of retaliation from the government.

19. Once a project is complete, we would normally publicize our work but, until the Subpoena and Investigation are resolved, we are withholding doing any press on the Petrochem storymap, in part to hopefully protect the citizens whose stories are included in the story map from any political retribution or harassment.

20. Another staff member asked me whether we should go forward with a public webinar related to WV Rivers's petrochemical work in light of the Subpoena. I directed the staff member to proceed with the webinar as planned.

21. The staff have expressed the emotional weight the Subpoena and Investigation has burdened them with. My deputy director has expressed concerns that she is now second-guessing herself and her work. The staff have continued to show up and do their work, and I check in with them, but this Investigation is a source of stress and anxiety for them.

***Impact on WV Rivers' Associations***

22. WV Rivers regularly works with groups across the ideological spectrum to advance sound environmental solutions that are grounded in science. For instance, we meet regularly with the West Virginia Department of Environmental Protection (DEP) on behalf of communities to advocate for local concerns, discuss ongoing environmental priorities, identify critical watershed issues, and strengthen environmental permits. As part of this cooperative relationship, we serve on the DEP's Environmental Protection Advisory Council (EPAC) and host the WV Stream Watch app to vet citizen complaints, allowing us to forward credible concerns to DEP Environmental Enforcement and serve as a vital liaison between the DEP and the public. Furthermore, WV Rivers collaborates closely with the West Virginia Department of Commerce, the West Virginia Department of Agriculture, and other state agencies. Our community engagement staff also reach out to and work with local stakeholders, including community groups, churches, local watershed

groups, county commissioners, local development authorities, and public service districts. Much of this outreach relies on overcoming initial skepticism to demonstrate that WV Rivers is a reasonable, reliable, fact-based and trusted partner. Beyond agency collaboration, WV Rivers actively lobbies lawmakers across the political spectrum in the West Virginia Legislature. I believe our work with these more neutral or conservative groups will be negatively affected, or will even end, once they hear that our organization is being investigated for consumer protection violations by the state attorney general. I am particularly concerned about how our policy team will be received by the legislature, the Department of Commerce and other agencies, and whether they will be permitted to continue working cooperatively with those agencies while the Attorney General's investigation is pending. I also expect the investigation to erode the receptiveness of legislators to our staff and our message, and to hinder our community engagement staff's ability to build trust with communities. A core strength is our proven ability to work across the aisle, and I believe this sham investigation will lead groups to wrongly believe we are a partisan organization.

23. The Subpoena and Investigation have also made me reevaluate our associations with other organizations and individuals that we work with if we continue to work on the issues addressed in the Subpoena. I do not want to expose those groups or individuals to subpoenas like the one we received, as it could cripple their organization and prevent them from carrying out their own missions. The Subpoena and Investigation has already changed how I think about whom we bring into our work and with whom we build coalitions. For instance, I have considered asking the community engagement team to stop building new partnerships until the Subpoena is resolved, but that would hamper their work and put them in an impossible place, as a substantial part of their work is coalition building.

24. One important aspect of WV Rivers' relationship with these small community groups is its community action mini-grant program. In 2026, WV Rivers planned to give out $50,000 in mini-grants. Recipients receive $2,500 with a possible additional $1,000 in funding to further their important work defending headwaters, uplifting community voices, and improving water quality. WV Rivers is obligated to disperse this funding pursuant to some of the grants it receives, and it will be out of compliance if it does not disperse the remaining funding by the end of the year. WV Rivers has dispersed most of its mini-grants for 2026, and was set to dole out the remaining funding this week. However, the Subpoena and Investigation have caused us to pause that program. I am worried that, by giving these mini-grants to new recipients, I will be exposing them to similar harassment by the West Virginia Attorney General, and I cannot do that. I do not want to pause these mini-grants, as we may get blowback and break trust with partners and communities that rely on grants like these as one of their only funding sources, but I cannot in good conscience expose these groups to what WV Rivers is going through as a result of the Subpoena and Investigation. Simply put, it would cripple them. We are pausing indefinitely our mini-grant program in light of the Subpoena and Investigation. Not knowing when we can safely reinstate it creates undue burden and stress for the communities that rely on these funds as their projects are time sensitive.

25. I also expect the Subpoena and Investigation may cause staff members to leave or will make it harder to attract new staff members.

26. WV Rivers' funding will likely be negatively affected by the Subpoena and Investigation. We are a nonprofit, and more than 80 percent of our funding comes from foundations and government funders; most of the rest comes from individual donors. The Investigation could

create a funding cliff: funders who pause or withdraw their support in response to it may never return.

27. From numerous conversations I have had with donors, they like giving to WV Rivers because they see it as a neutral organization that is grounded in science and works in coalition with others around common values we all share and avoids political polarization. I believe that the Investigation will change these donors' opinion of WV Rivers and lead them to abandon their donations and associations with WV Rivers. I expect the Subpoena and Investigation to be off-putting to a number of donors. My experience bears this out. In my prior role at Philanthropy West Virginia, I saw that work perceived as politically unpopular or contrary to the position of government was much harder to fund.

28. The Subpoena is asking WV Rivers to disclose its donor names and amounts, but some donors give with the understanding that their name and/or the amount they have donated will not be disclosed. This is for many reasons, including to keep the focus on the organization receiving the funds rather than on them or their organization. It also protects them from getting unwarranted and unsolicited inquiries from organizations who also want that same funding. It is common for environmental organizations to keep their funding sources private for safety and security reasons as well, as environmental organizations can be targeted by those who are dissatisfied with their work or are opposed to their mission. WV Rivers' own staff has been the target of threats, both online and in person, because of the positions WV Rivers has taken. WV Rivers has provided safety training to its staff because of these threats. Because of them, public association with WV Rivers carries risk, and anonymity helps reduce that risk for our founders.

29. I also expect that disclosing names of donors could open those donors up to similar investigations, which will deter their continued financial support.

30. Both institutional donors and individual donors will be less likely to donate to WV Rivers once they learn of the Subpoena and Investigation.

31. If WV Rivers experiences a decrease in funding, we will be forced to scale back our work. While our immediate funding for a 16th staff member remains secure, any budget reductions will force us to reevaluate our overall staffing structure and operational costs. A significant loss of funding would prevent future organizational growth, necessitate staff layoffs, and in a severe case threaten the long-term survival of WV Rivers.

***Impact on WV Rivers If Subjected to Document Discovery***

32. If WV Rivers had to comply with the Subpoena, it would require an extensive search of WV Rivers' system and would likely require searching on multiple devices.

33. I have already spent 50 hours since receiving the Subpoena, and expect it to take up even more of my time if we had to comply.

34. I expect it would take at least 10 hours of my week each week, as well as 5 to 10 hours of staff members' time each week—including Autumn Crowe (Deputy Director), Shannon Cunningham-Snead (Director of Finance and Operations), Carrie Decker (Community Engagement Manager) and/or Maggie Stange (Communications Manager)—to sort through and organize everything being requested. That would take us away from meeting directly with donors, focusing on our end-of-year fundraising campaign, and participating in legislative interims; stalls our work on financial oversight; and delays the creation of sustainable organizational systems, delays working on our end of year annual report; hinders our ability to run community meetings and educate residents on clear water issues, and delays the creation and preparation of materials and communications for the upcoming legislative session. It would make overseeing and supporting the Board difficult because my plate would be too full to support them, make going to

the legislative session difficult and burdensome, and would impact all of the supervisors' ability to manage our staff effectively, and could even create burnout.

35. Complying with the Subpoena would also impose a financial burden. WV Rivers would likely have to hire an outside vendor to collect and process nearly ten years of records, at a cost of $150 per hour. I expect this to be a full-time job for someone for several months. WV Rivers does not have in-house counsel capable of completing this review and so would also have to hire an attorney to review the documents for relevance and privilege. WV Rivers maintains a financial reserve as a safety net, and it is critical to the organization that we not spend that reserve down rapidly, as it supports the organization's long-term viability and health.

36. Because WV Rivers is a small organization, complying with the Subpoena would divert significant staff time and financial resources away from our critical work to complying with this Subpoena. Put simply, it would drown us.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 22, 2026

Jennie Smith

# Ex. 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**WEST VIRGINIA RIVERS COALITION, INC.,**
**and 350.ORG,**

**Plaintiffs,**

**v.** **Civil Action No. 2:26-cv-_____**

**JOHN B. McCUSKEY, in his official capacity as**
**Attorney General of the State of West Virginia,**

**Defendant.**

**DECLARATION OF 350.ORG'S BOARD CHAIR TERESA ODENDAHL**

I, Teresa Odendahl, hereby declare and state as follows:

1. I am the board chair of 350.org, an unpaid position. I reside in Sante Fe, New Mexico, and I am retired. I have been the board chair since October 1, 2026, and have served on the board of 350.org for over six years. I was previously the chair of the board's fundraising committee and I have also served on the executive committee and the finance and risk committee.

2. The facts set out below are based on my personal knowledge or information I have received in my capacity as chair of the fundraising committee, member of the finance and risk committee, and more recently board chair from 350.org's executive director, managing director, general counsel, and staff, and from the reports described below. I believe them to be true.

3. 350.org is a nonprofit organization incorporated in the District of Columbia. Its mission is to build a grassroots movement to transition from fossil fuels to renewable energy because of the effects of climate change. 350.org has no office, employees, or property in West

Virginia, and it has no West Virginia chapter or affiliate. It is registered with the West Virginia Secretary of State to solicit charitable contributions. 350.org has approximately 94 staff members worldwide. Nine staff members and two contractors are in the United States; only two of the eleven are program staff although it is in the process of hiring an additional member of the U.S. program team. 350.org's annual budget is approximately $17 million.

4. 350.org pursues its mission through public education, coalition building, grassroots organizing, and advocacy directed at governments and international bodies. It publishes statements about the causes and effects of climate change and about the role of fossil fuels in causing it; it organizes and supports public events concerning climate and energy policy; it has organized campaigns urging institutions to divest from fossil fuels; it makes modest grants to other organizations that share its aims; and it works in coalition with other organizations in the United States and abroad. 350.org is funded by contributions from individuals, foundations, and other organizations. Its policy is not to accept any corporate or government funding, and it receives no funding from renewable-energy companies.

5. I am familiar with the operations of 350.org. My knowledge of them comes through quarterly board meetings, regular executive and finance committee meetings, and separate bi-weekly meetings with the executive director and managing director of 350.org. I receive monthly finance, fundraising, and risk reports, and quarterly reports to the board. I also regularly converse with 350.org's general counsel, who is responsible for the organization's risk management. I was involved in the search for and hiring of the current executive director approximately eighteen months ago. I am in 350.org meetings at least once a week, and I have participated in 350.org's internal meetings concerning the Subpoena and Investigation described below.

6. I have an extensive background in fundraising and philanthropy. I was the president of the Global Greengrants Fund, a grantmaking organization, for more than a decade. Before that, I worked for the Wyss Foundation in New Mexico, was Executive Director of the New Mexico Association of Grantmakers and earlier, the National Network of Grantmakers. I have conducted and published scholarly research on philanthropy and fundraising. From that experience, I am familiar with how the political climate affects organizations' abilities to raise funds. When organizations are targeted by officials in power, even the most progressive foundations become more risk averse and try to reduce their exposure to political harassment by pulling their funding back or shifting away from funding controversial groups. Funders talk to one another and follow each other's lead, and a general panic can ensue when funders believe that they themselves may become targets. Since President Trump began his second term, his administration and his allies have targeted environmental organizations like 350.org, decrying their work on climate change and a just transition, which has diminished funding opportunities for organizations in this field. I know from philanthropic advisors with whom I have spoken, and from reporting in the philanthropic press, that newer foundations are staying away from climate funding altogether because they want to remain in good standing with the federal government. They have identified less controversial topics and groups to associate with.

7. 350.org is no stranger to these effects. Because the political climate has become more hostile to organizations with messages such as ours, funders have become more hesitant to associate with us, and 350.org's funding has fallen significantly. Since President Trump's second term began in January 2025, 350.org's annual budget has fallen from approximately $21 million to under $17 million, a decrease of nearly 20 percent. Both U.S. and non-U.S. funders have reduced their support, and non-U.S. funders have become markedly more reluctant to send

money to U.S. organizations. 350.org has also received less general-support funding and has had to rely more on funding restricted to specific programs. In response, 350.org restructured, laying off most U.S. program staff.

8. 350.org has also been singled out by name by government officials. On February 12, 2026, the West Virginia Attorney General joined a letter from 19 state attorneys general asking the United States Department of Justice to investigate more than 150 U.S.-based organizations that, according to the letter, had received money from foreign funders of climate advocacy. The letter identified 350.org by name, citing a grant of "over $300,000 to 350.org for fossil-fuel-divestment campaigns." It described the conduct it asked the Department to investigate as including policy advocacy, media campaigns, "grassroots organizing[,] and planning and funding climate protests"; stated that it highlighted organizations that had "engaged in particularly extreme climate-related activism"; and concluded that the organizations were "engaging in coordinated funding and advocacy efforts to influence U.S. energy policy." More recently, on September 10, 2026, U.S. House Science, Space, and Technology Committee Chairman Brian Babin (R-Texas) and Investigations and Oversight Subcommittee Chairman Rich McCormick (R-Georgia) sent 350.org, among other organizations, a letter requesting documents concerning its foreign funding and affiliations and its activities relating to opposition to data centers. 350.org received that letter about two weeks before it received the Subpoena described below. Such letters and investigations are baseless and meant to harass and chill our speech and association. They have been successful in chilling both.

9. On or about September 22, 2026, 350.org received a subpoena dated September 16, 2026, from West Virginia Attorney General John B. McCuskey. The Subpoena demands a broad range of documents and communications from January 1, 2017, through the date of

compliance, to be produced by November 2, 2026 (the "Subpoena"). Its caption identifies it as issued in the matter of an investigation of 350.org (the "Investigation").

10. The Subpoena seeks records concerning 350.org's public statements on climate and energy, its internal deliberations about those statements, its requests for donations, the organizations that have funded its work and the amounts they gave, the organizations it has paid, the officers, directors, staff, and board members it shares with renewable energy entities, its dealings with coalitions and other advocacy organizations on energy permitting and regulation in West Virginia, and its submissions to regulatory agencies.

11. The Subpoena states that it is issued under the West Virginia Consumer Credit and Protection Act. 350.org does not sell any goods or services, except for a small amount of merchandise that bears our name or logo. Merchandise sales are a de minimis source of income. 350.org's staff searched its records and found one merchandise sale to a purchaser with a West Virginia address: a single sale in 2024 for £32 GBP. 350.org has never charged for any service in West Virginia. The merchandise sales that 350.org makes are not related to any requests made in the Subpoena.

12. It is my understanding that at least five other nonprofit organizations have also received materially similar subpoenas from the West Virginia Attorney General seeking the same information pursuant to similar investigations.

13. The Subpoena and related Investigation have affected 350.org and will continue to affect it, as follows:

***Impact on 350.org's Speech***

14. The Subpoena and Investigation have affected, and will continue to affect, 350.org's ability to carry out its day-to-day work. Since the Subpoena was received, responding

to the Investigation has been a main focus of the work of 350.org's senior leadership, including the executive director and the general counsel, and it will continue to take their time until the Investigation is resolved. 350.org has a small operation in the United States, and the time its leadership and U.S. staff spend on the Subpoena and Investigation is time taken from the work the organization was founded and funded to do.

15. 350.org was for years a leading voice speaking out against fossil fuel companies. Beginning in March 2025, as climate organizations became targets of the current administration and its allies, 350.org became more cautious in what it says about fossil fuel companies and in the associations it enters into. The Subpoena and Investigation have deepened that caution. They will delay any return to our prior outspoken positions and will shift our work toward different, less controversial topics. 350.org's effectiveness depends on being able to speak out as we once did without fear of reprisal from government officials, but doing so is not an option while the Investigation is pending.

16. To reduce our risk, the U.S. program team has been instructed to submit all public facing documents and communications to the executive director, and sometimes the general counsel, for approval before release. We put this screening in place after receiving the September 10, 2026 House letter. We expected it to be short-lived, as the executive director does not ordinarily review the staff's day-to-day work and does not do so for any other region, but after the Subpoena and Investigation we have extended it indefinitely. This screening takes time from the executive director's and other staff members' work for 350.org.

17. In reviewing the U.S. team's public-facing documents and communications, the executive director screens their content with the Subpoena and Investigation in mind, and she has altered or withheld content as a result. Senior leadership has repeatedly vetoed or toned down

messages that we believe could cause 350.org to be targeted by elected officials hostile to climate action.

18. The Subpoena and Investigation have made us more cautious about what work we do in the United States, and where. 350.org still works in states with Republican attorneys general and plans to continue that work. But 350.org now evaluates any proposed work in West Virginia or with West Virginia partners, in light of the risk of further investigation and the risk of a subpoena is now part of its evaluation of any proposed work in the United States. While the Subpoena and Investigation are pending, 350.org will not undertake new work in West Virginia.

19. Some staff have expressed anxiety about the Subpoena and Investigation, and it has made their work harder. I have been directly told this by two senior staff members. Staff have asked the General Counsel questions about what they put in emails and internal messages, with anxiety knowing that those messages may be searched and produced. They are more likely to clam up and say less than they otherwise would for fear of saying the wrong thing. There is a general chilling effect on their work.

***Impact on 350.org's Associations***

20. The Subpoena and Investigation are affecting, and will affect, 350.org's associations. I expect that the Subpoena and Investigation may make it harder to attract new staff members in the United States. 350.org currently has two open seats on its board of directors and is recruiting to fill them. I expect the Subpoena and Investigation to reduce the number of qualified candidates willing to serve, by deterring them from associating with an organization that is the target of a state consumer protection investigation, even though it is baseless.

21. The Subpoena demands the names of the organizations that have funded 350.org's work and the amounts they gave, the terms of 350.org's grant agreements and other funding

arrangements, and the organizations 350.org has paid. Some funders give on the understanding that their identity, or the amount they gave, will not be disclosed. 350.org has a small number of grant agreements with confidentiality terms, and some of its support comes through donor-advised funds, which are not required to disclose their donors. Funders have asked for confidentiality for reasons that include disagreement within a family about the gift and concern about the funder's own standing with the government. Even funders willing to be named publicly do not expect the terms of their grants to be disclosed to a government investigator. Funders also understand that funding relationships are being used to target organizations; the February 12, 2026 letter identified 350.org because of a grant it received. I expect that disclosure of this information to the Attorney General would cause some current funders to reduce or end their support and would deter prospective funders.

22. 350.org has prided itself on transparency about its funding, and it voluntarily lists all institutional funders, who have given consent, by name in its Annual Report which is publicly available on our website. Because of the Subpoena and Investigation, 350.org is reconsidering whether to continue that practice, in order to protect its funders from harassment and to keep their support.

23. 350.org has identified one funder whose grant agreement requires 350.org to notify it of a government investigation, and five other funders that 350.org has determined it should notify. The funder that it has already notified would like to have a further discussion with the organization about the Subpoena and Investigation, which is scheduled. In addition, the application materials of many funders ask whether the applicant is the subject of any government investigation. For as long as the Investigation is pending, 350.org will have to disclose it to every

prospective funder that asks and to existing funders at renewal. I believe funders ask the question because the answer is a factor in their decisions.

24. Based on my experience, I expect that both institutional and individual donors will be less likely to give to 350.org once they learn of the Subpoena and Investigation.

25. One funder has already contacted 350.org after learning of the September 10, 2026 House letter, to express concern about its own risk if it continues to fund 350.org. I expect other funders to raise similar concerns once they learn of the Subpoena and Investigation.

26. If 350.org's funding decreases further, it will have to cut back even further on its work in the United States. For example, 350.org is currently recruiting a manager for its U.S. program. The position is being offered for a fixed term because 350.org cannot commit funding beyond that, and whether it can be continued depends on future funding.

***Impact on 350.org If Subjected to Document Discovery***

27. 350.org does not have the capacity to collect, review, and log nearly ten years of records with its own staff. If 350.org had to comply with the Subpoena, it would have to hire an outside consultant for at least two weeks of work, at a rate of at least $800 per day. If 350.org had to retain outside counsel to review the documents before production, the cost would be far greater.

28. Complying with the Subpoena would also divert significant board and staff time and financial resources from 350.org's already reduced work in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 22, 2026

Teresa Odendahl

Teresa Odendahl

# Ex. 4

**State of West Virginia**
**Office of the Attorney General**
*John B. McCuskey*
Attorney General

# INVESTIGATORY SUBPOENA

**IN THE MATTER OF THE INVESTIGATION OF**

West Virginia Rivers Coalition, Inc.[1]
1000 Elkins Dr.
Morgantown, WV 26505

YOU ARE HEREBY COMMANDED to answer this Subpoena and produce the documentary material in your possession, custody, or control described below for examination and copying on or before the **Return Date, November 2, 2026** to Zachary Viglianco, Director of Strategic Litigation, 1900 Kanawha Boulevard, East, State Capitol Complex, Charleston, West Virginia 25305. Copies may also be provided by mail to Post Office Box 1789, Charleston, West Virginia 25326.

This Subpoena is issued pursuant to W. Va. Code § 46A-7-104(1) and concerns an investigation into alleged unfair or deceptive acts or practices and other possible violations of the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W. Va. Code §§ 46A-1-101 *et seq.* by the persons and entities that are the subject of this investigation. All information provided to the Office of the Attorney General pursuant to this Subpoena shall be retained in a confidential manner consistent with the provisions of W. Va. Code § 46A-7-104(4) and shall not be made

[1] **Notice of Process Address:** Jennie Smith.
3501 MacCorkle Ave. SE, #129
Charleston, WV 25304

public except upon the commencement of a subpoena enforcement proceeding as authorized by W. Va. Code § 46A-7-104(4) or a civil action to enforce the WVCCPA, W. Va. Code §§ 46A-1-101 *et seq.* or other law.

## INSTRUCTIONS AND DEFINITIONS

The following Instructions and Definitions shall apply when responding to this Subpoena:

### *Instructions*

**1.** The scope of this Subpoena is the Relevant Period, which began January 1, 2017 and continues up through the date of full compliance with this Subpoena, unless otherwise noted.

**2.** The term "West Virginia Rivers Coalition" shall mean and refer collectively to the recipient of this subpoena, including any of its corporate or trade names, predecessors, successors, divisions, subsidiaries, and affiliates, and any officer, director, employee, contractor, or agent acting on its behalf and not in a personal capacity only. For the avoidance of doubt, this subpoena is not intended to and does not reach materials held by any officer, director, employee, contractor, or agent of West Virginia Rivers Coalition in their individual/personal capacity or materials that solely reflect their private associations.

**3.** The Subpoena encompasses all of the Documents, as defined in this Subpoena, that are within West Virginia Rivers Coalition's possession, custody, or control, wherever situated, including in the possession, custody, or control of one of its owners, officers, operators, managers, employees, agents, subcontractors, successors in interest, and assigns.

**4.** If necessary, West Virginia Rivers Coalition shall assist the designated representative(s) from the West Virginia Attorney General's Office in locating the Documents and information that are required to be produced in response to this Subpoena.

**5.** If the Documents requested are located or maintained outside the State of West Virginia, the West Virginia Office of the Attorney General may designate representatives to

inspect the Documents at their location and, if necessary, West Virginia Rivers Coalition shall assist the designated representative(s) to inspect the Documents that are required to be produced by this Subpoena.

6. Whenever data requested by this Subpoena is stored electronically, you shall produce the data electronically in its native format (with all metadata intact) when reasonably practicable and when doing so will not hinder or frustrate accessibility, and if not practicable or accessible, in a manner and format such as Microsoft Excel, Access, or in another mutually agreeable, electronic format with all metadata intact.

7. When asked to produce Documents in your "possession, custody or control," you must produce the Documents if you have the legal right to control the Documents or things even if you do not have actual possession at the time of this request. *See Buckley v. Vidal*, 50 F.R.D. 271, 274 (E.D.N.Y. 1970) and *Colon v. Blades*, 268 F.R.D. 129, 132 (D. Puerto Rico 2010) ("Legal ownership or actual possession is not required; Documents are considered to be under a party's 'control' when that party has the right, authority or ability to obtain those Documents upon demand.")

8. This subpoena does not seek the identity of any individual donor, member, subscriber, or supporter solely on the basis of that individual being a member, subscriber, or supporter and does not require production of: (i) membership lists, (ii) donor lists, or (iii) records identifying individual supporters, members, subscribers, or volunteers in that capacity, except to the extent that organizational (not individual) funding sources are specifically identified in a request below. Where funding is requested, totals and the names of organizations are sufficient.

9. Nothing here requires production of attorney-client, work-product, or First Amendment associational privilege material. In the event that West Virginia Rivers Coalition

declines to produce any Documents required by this Subpoena on the grounds of privilege, you shall specifically identify such Documents and timely disclose the grounds for such claim of privilege. To the extent West Virginia Rivers Coalition asserts any privilege, it shall produce a privilege log by the Return Date identifying: (1) the Document or category of Documents withheld; (2) the privilege asserted; (3) the factual basis for the assertion; and (4) the specific request(s) to which the withheld Document is responsive. Where only a portion of a responsive Document is privileged, West Virginia Rivers Coalition shall redact the privileged portion, produce the remainder, note each redaction on the privilege log, and mark the location of each redaction on the face of the produced Document.

### *Definitions*

1. "Document" shall mean and include, but shall not be limited to, the original and all drafts or non-identical copies of all written or graphic matter of any kind, however produced or reproduced, including facsimiles, summaries, financial statements, diaries, communications, invoices, receipts, log books, e-mails, telegrams, ledgers, accounts, press releases, reports, white papers, paid advertising, website and social media content (including posts, reposts, comments, and videos on organizational or work-related individual accounts), minutes, pamphlets, notes, interoffice communications, training materials, records of meetings, conferences, and telephone or other conversations or communications, and any electronic or magnetic record of the foregoing, or non-identical copies thereof, whether prepared by you or by any other person, that are in your possession, custody, or control.

2. The word "Pertaining" includes relating to, containing, alluding to, responding to, commenting upon, discussing, showing, disclosing, explaining, mentioning, analyzing,

constituting, comprising, evidencing, setting forth, summarizing or characterizing, either directly or indirectly, in whole or in part.

3. The word "Published" means distributed, disseminated, made available, or otherwise conveyed by West Virginia Rivers Coalition, or anyone acting on its behalf, to any person outside West Virginia Rivers Coalition's own personnel, whether to one recipient or many and in any medium. It includes content that was access-restricted, embargoed, later deleted or retracted, Published anonymously or under a coalition or trade name, or authored by a third party that West Virginia Rivers Coalition funded, commissioned, approved, or reposted. A request for a Published item also seeks all drafts and versions of it, including drafts never released, redlines, comments, and approval communications.

4. The word "West Virginia Recipient" means any natural person or legal entity associated with a West Virginia mailing address, billing address, IP geolocation, or telephone number.

5. "Climate Claim" means a statement asserting, on a purportedly scientific or statistical basis, a demonstrable or otherwise traceable connection between emissions of greenhouse gases from the extraction, processing, transport, combustion, or petrochemical conversion of fossil fuels (including, but not limited to, coal, lignite, oil, and natural gas) to changes in climate, weather patterns, and/or extreme weather events, including, but not limited to, climate/weather event attribution, impacts to public health, and economic harm (i) allegedly or purportedly caused by energy companies and/or projects or (ii) linked by name, or by clear and specific implication, with sufficient clarity that a reasonable recipient would understand the statement to refer to a specific WV Energy Business. This term does not include: (i) statements expressed as personal opinion or political opinion; (ii) statements made exclusively in the context

of litigation as part of advocacy before a court; or (iii) pure scientific research published in peer-reviewed academic journals, absent evidence of knowing misrepresentation.

6. "Identified Claim" means a Climate Claim that appears in a Published item that is responsive to Demands Nos. 1, 2, 4, or 5.

7. "WV Energy Business" means any entity that, during the Relevant Period, is or was engaged, in any way, in extracting, processing, transporting, storing, burning, or petrochemically converting coal, lignite, natural gas, natural gas liquids, or petroleum in or from West Virginia and any predecessor, successor, parent, subsidiary, or affiliate of one.

## MATERIALS DEMANDED

*Public Statements and Climate Projections*

1. All Documents Pertaining to every statement West Virginia Rivers Coalition Published that: (a) names a WV Energy Business, or a facility, mine, well, pipeline, plant, or project it owns or operates; and (b) makes a Climate Claim about it.

2. All Documents Pertaining to everything West Virginia Rivers Coalition Published that uses Representative Concentration Pathway ("RCP") 8.5 or Shared Socioeconomic Pathway 5 ("SSP5") 8.5; Documents Pertaining to which organizations supplied those projections; and Documents Pertaining to communications regarding RCP 8.5 or SSP5 8.5 to any third parties. Documents Pertaining to whether to maintain, retire, replace, or qualify RCP 8.5 or SSP5 8.5, including any assessment of its plausibility or suitability as a baseline, any recommendation to switch scenarios, and any decision to retain the model notwithstanding such assessment(s) or recommendation. Documents Pertaining to RCP 8.5 or SSP5 8.5 being described as "business as usual," "baseline," "current policy," "reference," "no-policy," or anything similar, including

whether that description was accurate, any objection to it, and any decision to retain or abandon that description.

3. All Documents relied upon, consulted, Pertaining to or referenced in preparing, reviewing, approving, or Publishing any of the materials identified in Demand No. 2.

4. For each Published projection concerning West Virginia: all Documents Pertaining to the emissions scenario chosen, why it was chosen, the key assumptions applied, and whether it was reviewed for technical accuracy before publication and the outcome of any such review.

*Solicitations to West Virginia Recipients & West Virginia Specific Material*

5. For each donation request containing a Climate Claim that West Virginia Rivers Coalition aimed, in whole or in part, at West Virginia Recipients, Documents Pertaining to:

a. each version sent;

b. how West Virginia Recipients were selected and the targeting criteria and audience segments;

c. total amounts solicited and received from West Virginia Recipients.

6. For each climate model that West Virginia Rivers Coalition used, licensed, funded or commissioned, in whole or in part, or otherwise institutionally supported, and that produced a West Virginia-specific output, Documents Pertaining to:

a. the model, its version, and its source;

b. the West Virginia inputs, assumptions, and scenarios used;

c. the outputs, whether Published or not; and

d. communications about any gap between model output and a Published figure.

*Scientific Basis, Knowledge, and Contrary Evidence*

7. For any Identified Claim, Documents Pertaining to:

a. West Virginia Rivers Coalition or any person, including but not limited to officers, directors, employees, contractors, or agents, disputing, contradicting, or qualifying the attribution model, study, or method behind it;

b. communications with World Weather Attribution or any other climate attribution organization about it;

c. internal objection or disagreement about its accuracy or confidence level; and

d. regulatory comments, agency submissions, testimony, and materials prepared for judicial education programs on climate science or climate litigation that repeat, discuss, rely upon, or otherwise concern the Identified Claim, including drafts, approvals, amendments, and withdrawals.

**8.** For each Published Document quantifying fossil-fuel subsidies, externalities, social cost of carbon, health costs, or economic damages: Documents Pertaining to the underlying data, the method, the discount rate, the damage function, and any pre-publication review.

**9.** For each study, report, model, or paper West Virginia Rivers Coalition funded, commissioned, in whole or in part, or otherwise institutionally supported that concerns West Virginia, a WV Energy Business, or an Identified Claim, Documents Pertaining to:

a. funding agreements, statements of work, or contracts;

b. the amount paid and the organization paid;

c. communications about scope, method, assumptions, or scenario choice;

d. communications about review, revision, approval, or publication timing; and

e. whether and how the sponsorship was disclosed in any Published work.

10. Documents Pertaining to how any assumption, uncertainty range, confidence interval, model limitation, or contrary finding behind an Identified Claim should be described, simplified, emphasized, downplayed, qualified, or left out of public materials.

11. Documents Pertaining to:

a. any review, discussion, or analysis of new or updated evidence, data, or technical studies that may have contradicted, undermined, limited, or otherwise lowered confidence in previous Identified Claims of West Virginia Rivers Coalition with regard to climate science and related Climate Claims; and

b. any decisions or other actions whereby West Virginia Rivers Coalition actually withdrew, qualified, or reconsidered previous Identified Claims on the basis of new evidence, data, or studies.

*Third-Party Relationships & Coordination Efforts*

12. Documents Pertaining to efforts to coordinate with any third party to develop communications, strategies, or public relations campaigns or messaging about an Identified Claim or a WV Energy Business, including but not limited to strategy memos, campaign plans, communications calendars, talking points, message testing, polling or focus groups, embargo coordination, and agreed divisions of subject matter or audience.

13. For each Identified Claim, Documents Pertaining to any involvement by a renewable energy company, developer, trade association, or other entity engaged in solar, wind, geothermal, hydroelectric, biomass, biofuel, biogas, or hydrogen energy in the development, funding, review, approval, timing, publication, or distribution of the Identified Claim, including:

a. communications about the content, timing, funding, or distribution of an Identified Claim;

b. total funding received that was earmarked for work producing an Identified Claim, and which organization provided it; and

c. contracts, retainers, sponsorships, consulting arrangements, grant agreements, statements of work, or other arrangements relating to the Identified Claim.

**14.** Documents Pertaining to West Virginia Rivers Coalition's financial, contractual, organizational, or governance relationships during the Relevant Period with renewable energy companies, developers, trade associations, or other entities engaged in solar, wind, geothermal, hydroelectric, biomass, biofuel, biogas, or hydrogen energy, including:

a. contracts, retainers, sponsorships, consulting arrangements, grant agreements, or other financial arrangements;

b. funding received from or provided to such entities, including the amount, purpose, and source of such funding;

c. shared officers, directors, employees, contractors, consultants, or board members; and

d. agreements or arrangements concerning joint projects, research, advocacy, communications, public relations, or other coordinated activity.

**15.** For third-party studies, models, or datasets West Virginia Rivers Coalition cited or Published but not previously produced under Demand Nos. 1 through 14, Documents Pertaining to what they are and who produced them; communications with the author, publisher, or sponsor about method, assumptions, scenario choice, or conclusions; and West Virginia Rivers Coalition' own assessment of their reliability or limits.

16. Documents Pertaining to dealings with any coalition, advocacy group, or organization operating in or targeting West Virginia about a WV Energy Business, an Identified Claim, or advocacy on West Virginia energy facilities, permitting, or regulation, including coalition agreements, joint work plans, shared budgets, grants, and funding given or received.

**Given under my hand this 16th day of September, 2026.**

John B. McCuskey
*Attorney General*

BY: ______________________________
Zachary A. Vigliance (WVSB No. 12579)
*Director of Strategic Litigation*
Office of the West Virginia Attorney General
State Capitol Complex
1900 Kanawha Blvd, East
Charleston, WV 25305
(304) 558-8986 | Fax: (304) 558-0184

# Ex. 5

**State of West Virginia**
**Office of the Attorney General**
*John B. McCuskey*
Attorney General

# INVESTIGATORY SUBPOENA

**IN THE MATTER OF THE INVESTIGATION OF**

350.org[1]
P.O. Box 843004
Boston, MA 02284

YOU ARE HEREBY COMMANDED to answer this Subpoena and produce the documentary material in your possession, custody, or control described below for examination and copying on or before the **Return Date, November 2, 2026** to Zachary Viglianco, Director of Strategic Litigation, 1900 Kanawha Boulevard, East, State Capitol Complex, Charleston, West Virginia 25305. Copies may also be provided by mail to Post Office Box 1789, Charleston, West Virginia 25326.

This Subpoena is issued pursuant to W. Va. Code § 46A-7-104(1) and concerns an investigation into alleged unfair or deceptive acts or practices and other possible violations of the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W. Va. Code §§ 46A-1-101 *et seq.* by the persons and entities that are the subject of this investigation. All information provided to the Office of the Attorney General pursuant to this Subpoena shall be retained in a confidential manner consistent with the provisions of W. Va. Code § 46A-7-104(4) and shall not be made

[1] **Notice of Process (WV):** Humphreys Munai, 20 Jay Street, Suite 732, Brooklyn, NY 11201 **(DC):** Corporate Creations Network, Inc., 1629 K Street NW, Suite 300, Washington, D.C. 20006

public except upon the commencement of a subpoena enforcement proceeding as authorized by W. Va. Code § 46A-7-104(4) or a civil action to enforce the WVCCPA, W. Va. Code §§ 46A-1-101 *et seq.* or other law.

## INSTRUCTIONS AND DEFINITIONS

The following Instructions and Definitions shall apply when responding to this Subpoena:

### *Instructions*

**1.** The scope of this Subpoena is the Relevant Period, which began January 1, 2017 and continues up through the date of full compliance with this Subpoena, unless otherwise noted.

**2.** The term "350.org" shall mean and refer collectively to the recipient of this subpoena, including any of its corporate or trade names, predecessors, successors, divisions, subsidiaries, and affiliates, and any officer, director, employee, contractor, or agent acting on its behalf and not in a personal capacity only. For the avoidance of doubt, this subpoena is not intended to and does not reach materials held by any officer, director, employee, contractor, or agent of 350.org in their individual/personal capacity or materials that solely reflect their private associations.

**3.** The Subpoena encompasses all of the Documents, as defined in this Subpoena, that are within 350.org's possession, custody, or control, wherever situated, including in the possession, custody, or control of one of its owners, officers, operators, managers, employees, agents, subcontractors, successors in interest, and assigns.

**4.** If necessary, 350.org shall assist the designated representative(s) from the West Virginia Attorney General's Office in locating the Documents and information that are required to be produced in response to this Subpoena.

**5.** If the Documents requested are located or maintained outside the State of West Virginia, the West Virginia Office of the Attorney General may designate representatives to

inspect the Documents at their location and, if necessary, 350.org shall assist the designated representative(s) to inspect the Documents that are required to be produced by this Subpoena.

**6.** Whenever data requested by this Subpoena is stored electronically, you shall produce the data electronically in its native format (with all metadata intact) when reasonably practicable and when doing so will not hinder or frustrate accessibility, and if not practicable or accessible, in a manner and format such as Microsoft Excel, Access, or in another mutually agreeable, electronic format with all metadata intact.

**7.** When asked to produce Documents in your "possession, custody or control," you must produce the Documents if you have the legal right to control the Documents or things even if you do not have actual possession at the time of this request. *See Buckley v. Vidal,* 50 F.R.D. 271, 274 (E.D.N.Y. 1970) and *Colon v. Blades,* 268 F.R.D. 129, 132 (D. Puerto Rico 2010) ("Legal ownership or actual possession is not required; Documents are considered to be under a party's 'control' when that party has the right, authority or ability to obtain those Documents upon demand.")

**8.** This subpoena does not seek the identity of any individual donor, member, subscriber, or supporter solely on the basis of that individual being a member, subscriber, or supporter and does not require production of: (i) membership lists, (ii) donor lists, or (iii) records identifying individual supporters, members, subscribers, or volunteers in that capacity, except to the extent that organizational (not individual) funding sources are specifically identified in a request below. Where funding is requested, totals and the names of organizations are sufficient.

**9.** Nothing here requires production of attorney-client, work-product, or First Amendment associational privilege material. In the event that 350.org declines to produce any Documents required by this Subpoena on the grounds of privilege, you shall specifically identify

such Documents and timely disclose the grounds for such claim of privilege. To the extent 350.org asserts any privilege, it shall produce a privilege log by the Return Date identifying: (1) the Document or category of Documents withheld; (2) the privilege asserted; (3) the factual basis for the assertion; and (4) the specific request(s) to which the withheld Document is responsive. Where only a portion of a responsive Document is privileged, 350.org shall redact the privileged portion, produce the remainder, note each redaction on the privilege log, and mark the location of each redaction on the face of the produced Document.

***Definitions***

**1.** "Document" shall mean and include, but shall not be limited to, the original and all drafts or non-identical copies of all written or graphic matter of any kind, however produced or reproduced, including facsimiles, summaries, financial statements, diaries, communications, invoices, receipts, log books, e-mails, telegrams, ledgers, accounts, press releases, reports, white papers, paid advertising, website and social media content (including posts, reposts, comments, and videos on organizational or work-related individual accounts), minutes, pamphlets, notes, interoffice communications, training materials, records of meetings, conferences, and telephone or other conversations or communications, and any electronic or magnetic record of the foregoing, or non-identical copies thereof, whether prepared by you or by any other person, that are in your possession, custody, or control.

**2.** The word "Pertaining" includes relating to, containing, alluding to, responding to, commenting upon, discussing, showing, disclosing, explaining, mentioning, analyzing, constituting, comprising, evidencing, setting forth, summarizing or characterizing, either directly or indirectly, in whole or in part.

3. The word "Published" means distributed, disseminated, made available, or otherwise conveyed by 350.org, or anyone acting on its behalf, to any person outside 350.org's own personnel, whether to one recipient or many and in any medium. It includes content that was access-restricted, embargoed, later deleted or retracted, Published anonymously or under a coalition or trade name, or authored by a third party that 350.org funded, commissioned, approved, or reposted. A request for a Published item also seeks all drafts and versions of it, including drafts never released, redlines, comments, and approval communications.

4. The word "West Virginia Recipient" means any natural person or legal entity associated with a West Virginia mailing address, billing address, IP geolocation, or telephone number.

5. "Climate Claim" means a statement asserting, on a purportedly scientific or statistical basis, a demonstrable or otherwise traceable connection between emissions of greenhouse gases from the extraction, processing, transport, combustion, or petrochemical conversion of fossil fuels (including, but not limited to, coal, lignite, oil, and natural gas) to changes in climate, weather patterns, and/or extreme weather events, including, but not limited to, climate/weather event attribution, impacts to public health, and economic harm (i) allegedly or purportedly caused by energy companies and/or projects or (ii) linked by name, or by clear and specific implication, with sufficient clarity that a reasonable recipient would understand the statement to refer to a specific WV Energy Business. This term does not include: (i) statements expressed as personal opinion or political opinion; (ii) statements made exclusively in the context of litigation as part of advocacy before a court; or (iii) pure scientific research published in peer-reviewed academic journals, absent evidence of knowing misrepresentation.

**6.** "Identified Claim" means a Climate Claim that appears in a Published item that is responsive to Demands Nos. 1, 2, 4, or 5.

**7.** "WV Energy Business" means any entity that, during the Relevant Period, is or was engaged, in any way, in extracting, processing, transporting, storing, burning, or petrochemically converting coal, lignite, natural gas, natural gas liquids, or petroleum in or from West Virginia and any predecessor, successor, parent, subsidiary, or affiliate of one.

## MATERIALS DEMANDED

### *Public Statements and Climate Projections*

**1.** All Documents Pertaining to every statement 350.org Published that: (a) names a WV Energy Business, or a facility, mine, well, pipeline, plant, or project it owns or operates; and (b) makes a Climate Claim about it.

**2.** All Documents Pertaining to everything 350.org Published that uses Representative Concentration Pathway ("RCP") 8.5 or Shared Socioeconomic Pathway 5 ("SSP5") 8.5; Documents Pertaining to which organizations supplied those projections; and Documents Pertaining to communications regarding RCP 8.5 or SSP5 8.5 to any third parties. Documents Pertaining to whether to maintain, retire, replace, or qualify RCP 8.5 or SSP5 8.5, including any assessment of its plausibility or suitability as a baseline, any recommendation to switch scenarios, and any decision to retain the model notwithstanding such assessment(s) or recommendation. Documents Pertaining to RCP 8.5 or SSP5 8.5 being described as "business as usual," "baseline," "current policy," "reference," "no-policy," or anything similar, including whether that description was accurate, any objection to it, and any decision to retain or abandon that description.

**3.** All Documents relied upon, consulted, Pertaining to or referenced in preparing, reviewing, approving, or Publishing any of the materials identified in Demand No. 2.

**4.** For each Published projection concerning West Virginia: all Documents Pertaining to the emissions scenario chosen, why it was chosen, the key assumptions applied, and whether it was reviewed for technical accuracy before publication and the outcome of any such review.

*Solicitations to West Virginia Recipients &*
*West Virginia Specific Material*

**5.** For each donation request containing a Climate Claim that 350.org aimed, in whole or in part, at West Virginia Recipients, Documents Pertaining to:

a. each version sent;

b. how West Virginia Recipients were selected and the targeting criteria and audience segments;

c. total amounts solicited and received from West Virginia Recipients.

**6.** For each climate model that 350.org used, licensed, funded or commissioned, in whole or in part, or otherwise institutionally supported, and that produced a West Virginia-specific output, Documents Pertaining to:

a. the model, its version, and its source;

b. the West Virginia inputs, assumptions, and scenarios used;

c. the outputs, whether Published or not; and

d. communications about any gap between model output and a Published figure.

*Scientific Basis, Knowledge, and Contrary Evidence*

**7.** For any Identified Claim, Documents Pertaining to:

a. 350.org or any person, including but not limited to officers, directors, employees, contractors, or agents, disputing, contradicting, or qualifying the attribution model, study, or method behind it;

b. communications with World Weather Attribution or any other climate attribution organization about it;

c. internal objection or disagreement about its accuracy or confidence level; and

d. regulatory comments, agency submissions, testimony, and materials prepared for judicial education programs on climate science or climate litigation that repeat, discuss, rely upon, or otherwise concern the Identified Claim, including drafts, approvals, amendments, and withdrawals.

**8.** For each Published Document quantifying fossil-fuel subsidies, externalities, social cost of carbon, health costs, or economic damages: Documents Pertaining to the underlying data, the method, the discount rate, the damage function, and any pre-publication review.

**9.** For each study, report, model, or paper 350.org funded, commissioned, in whole or in part, or otherwise institutionally supported that concerns West Virginia, a WV Energy Business, or an Identified Claim, Documents Pertaining to:

a. funding agreements, statements of work, or contracts;

b. the amount paid and the organization paid;

c. communications about scope, method, assumptions, or scenario choice;

d. communications about review, revision, approval, or publication timing; and

e. whether and how the sponsorship was disclosed in any Published work.

**10.** Documents Pertaining to how any assumption, uncertainty range, confidence interval, model limitation, or contrary finding behind an Identified Claim should be described, simplified, emphasized, downplayed, qualified, or left out of public materials.

**11.** Documents Pertaining to:

a. any review, discussion, or analysis of new or updated evidence, data, or technical studies that may have contradicted, undermined, limited, or otherwise lowered confidence in previous Identified Claims of 350.org with regard to climate science and related Climate Claims; and

b. any decisions or other actions whereby 350.org actually withdrew, qualified, or reconsidered previous Identified Claims on the basis of new evidence, data, or studies.

*Third-Party Relationships & Coordination Efforts*

**12.** Documents Pertaining to efforts to coordinate with any third party to develop communications, strategies, or public relations campaigns or messaging about an Identified Claim or a WV Energy Business, including but not limited to strategy memos, campaign plans, communications calendars, talking points, message testing, polling or focus groups, embargo coordination, and agreed divisions of subject matter or audience.

**13.** For each Identified Claim, Documents Pertaining to any involvement by a renewable energy company, developer, trade association, or other entity engaged in solar, wind, geothermal, hydroelectric, biomass, biofuel, biogas, or hydrogen energy in the development, funding, review, approval, timing, publication, or distribution of the Identified Claim, including:

a. communications about the content, timing, funding, or distribution of an Identified Claim;

b. total funding received that was earmarked for work producing an Identified Claim, and which organization provided it; and

c. contracts, retainers, sponsorships, consulting arrangements, grant agreements, statements of work, or other arrangements relating to the Identified Claim.

**14.** Documents Pertaining to 350.org's financial, contractual, organizational, or governance relationships during the Relevant Period with renewable energy companies, developers, trade associations, or other entities engaged in solar, wind, geothermal, hydroelectric, biomass, biofuel, biogas, or hydrogen energy, including:

a. contracts, retainers, sponsorships, consulting arrangements, grant agreements, or other financial arrangements;

b. funding received from or provided to such entities, including the amount, purpose, and source of such funding;

c. shared officers, directors, employees, contractors, consultants, or board members; and

d. agreements or arrangements concerning joint projects, research, advocacy, communications, public relations, or other coordinated activity.

**15.** For third-party studies, models, or datasets 350.org cited or Published but not previously produced under Demand Nos. 1 through 14, Documents Pertaining to what they are and who produced them; communications with the author, publisher, or sponsor about method, assumptions, scenario choice, or conclusions; and 350.org' own assessment of their reliability or limits.

**16.** Documents Pertaining to dealings with any coalition, advocacy group, or organization operating in or targeting West Virginia about a WV Energy Business, an Identified Claim, or advocacy on West Virginia energy facilities, permitting, or regulation, including coalition agreements, joint work plans, shared budgets, grants, and funding given or received.

**Given under my hand this 16th day of September, 2026.**

John B. McCuskey
*Attorney General*

BY: ______________________

Zachary A. Viglianco (WVSB No. 12579)
*Director of Strategic Litigation*
Office of the West Virginia Attorney General
State Capitol Complex
1900 Kanawha Blvd, East
Charleston, WV 25305
(304) 558-8986 | Fax: (304) 558-0184

SEP 19 2026

SEP 19 2026

# Ex. 6

State of West Virginia
Office of the Attorney General
*John B. McCuskey*
Attorney General

October 23, 2025

The Honorable Doug Burgum
Secretary
Department of the Interior
1849 C Street, NW
Washington, DC 20240

The Honorable Christopher A. Wright
Secretary
Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585

The Honorable Lee Zeldin
Administrator
Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dear Secretaries Burgum and Wright and Administrator Zeldin,

We write to urge you to put the safety, security, and economic interests of Americans first by declining to send a delegation to the upcoming United Nations' Conference of the Parties meeting in Brazil (COP-30). Now, more than ever, America needs to take a strong stance against the anti-coal, anti-gas and anti-oil policies that the COP promotes—policies driven by adverse actors and propped up by often contested climate theory.[1] If the United States participates in COP-30, it would serve only to legitimize such unsound science and policies.

[1] INT'L. ENERGY AGENCY, FROM TAKING STOCK TO TAKING ACTION 3, 14 (Sept. 2024).

Our nation is facing an unprecedented energy reliability and affordability crisis.[2] In the midst of this crisis, electric demand continues to outpace supply, with projections for 2025 and 2026 showing that demand levels will continue to reach record highs.[3] Innovation has fueled this demand. America is poised to lead the charge in developing artificial intelligence—but we need consistent and cost-effective electric generation to continue to rapidly expand data centers and other tech-focused facilities.[4]

Coal, natural gas, and oil can solve that crisis; they have long supported American prosperity and security by providing affordable, safe, and reliable energy generation.[5] President Trump has repeatedly recognized this reality. We applaud his efforts to enact common-sense policies to remove regulatory barriers and to support infrastructure development for traditional energy sources. Those policies will lower energy costs, increase reliability, power innovation, and foster American energy independence.[6]

But at a time when demand for energy is greater than ever, the prior administration embraced COP policies that dismantled—rather than supported—coal, oil, and gas production. The COP and other international actors favor less reliable and more expensive renewable energy sources, and that preference has proven harmful to American energy stability.[7]

The COP's policy initiatives disregard the realities of renewable energy generation. Solar and wind power have significant reliability issues, and they are more expensive than traditional energy sources.[8] Coal, gas, and oil can generate power as necessary to meet demand. Solar and wind cannot.[9] Even in ideal weather and geographic conditions, solar and wind power generation is unreliable—cloud coverage and wind speeds are consistently varied and impossible to predict.[10] America cannot afford to entrust the future of its electric grid on energy sources that operate only when the wind blows or the sun shines.

At the international level, the data speaks for itself. Countries that primarily rely on solar and wind energy have more expensive electricity.[11] And overreliance on renewable energy generation destabilizes the electric grid and heightens the risk of dangerous and costly blackouts. Just earlier

---

[2] *Declaring a National Energy Emergency*, Exec. Order No. 14156, 90 Fed. Reg. 8433, 8433-37 (Jan. 29, 2025).

[3] *See* Scott Disavino, *US power use to reach record highs in 2025 and 2026, EIA says*, REUTERS (October 7, 2025 5:22 p.m. EST), bit.ly/3VTvn1I.

[4] U.S. DEPT. OF ENERGY, EVALUATING THE RELIABILITY AND SECURITY OF THE UNITED STATES ELECTRIC GRID 1 (July 2025).

[5] The White House, *Fact Sheet: President Donald J. Trump Strengthens the Reliability and Security of the United States Electric Grid* (Apr. 8, 2025), bit.ly/3VTg4Gl; *see also* U.S. Dept. of Energy, *The Economic Benefits of Oil & Gas*, https://bit.ly/3VXmDri (last visited Oct. 14, 2025).

[6] *Unleashing American Energy*, Exec. Order No. 14154, 90 Fed. Reg. 8353, 8353-59 (Jan. 29, 2025); *Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241*, Exec. Order No. 14261, 90 Fed. Reg. 15517, 15517-20 (April 8, 2025).

[7] Diana Furchtgott-Roth, *Restoring America's Energy Renaissance*, THE HERITAGE FOUNDATION (May 30, 2023), https://bit.ly/47iotJK.

[8] *See* James Taylor, *Affordable, Reliable, And Clean: an Objective Scorecard to Assess Competing Energy Sources*, THE HEARTLAND INSTITUTE 7 (April 2025), bit.ly/3J03Sk9.

[9] *See* Kerry Jackson and Wayne Winegarden, *The Cost of Going Green*, PACIFIC RESEARCH INSTITUTE 6 (April 2025), https://bit.ly/4q7EgTi.

[10] *See* Taylor, *supra*, at 7.

[11] Bjørn Lomborg, *Solar and Wind Power are Expensive*, FRASER INSTITUTE (March 25, 2025), https://bit.ly/4ofq48Y.

this year, a large-scale blackout in Spain and Portugal left millions of people without power, all because traditional energy was not there to support the grid.[12]

COP-aligned policies have also already caused serious problems at the state level. Since California adopted a net-zero emissions target in 2018, for example, Californian consumers have paid more for less reliable energy. Estimates show each California household will pay up to $20,182 over the next twenty-five years to fund the state's transition to renewable energy.[13] And even while costs have risen, the reliability and stability of California's electric grid has suffered.[14]

But consumers in States that enact policies targeting traditional energy production are not alone in seeing increased costs from renewable generation. Driven by policies adopted in Minnesota, for instance, Xcel Energy has sought to decrease its use of coal and to supplant it by developing infrastructures to produce solar power.[15] Xcel's policy-driven transition from coal to solar has come at a cost to its 97,000 North Dakotan consumers, who have had rates increase by around 12% in the past year (and may face more rate increases in the coming months).[16]

Cost and reliability aside, increased reliance on renewable energy also endangers America's national security and energy independence. Renewable energy generation relies heavily on materials procured outside of the United States, with China supplying many of the materials needed for renewable generation.[17] So renewable energy requires the United States to become only further entangled with hostile interests. And wind and solar also face the very real threat of cyberattacks, opening the door for foreign attackers to undermine the security and stability of our grid.[18]

Renewable energy sources also present both known and (currently) unknown hazards for which the COP fails to account. For instance, damage to wind turbines can lead to the spread of toxic debris in nearby areas. Just last year, six beaches in Nantucket closed to swimmers after an offshore wind blade broke and fell into the water, causing fiberglass shards and other hazardous debris to wash up on the shores.[19] Photovoltaic solar panels are fire hazards—an especially concerning reality given that solar panels are most often viable in wildfire-prone areas.[20] Lithium battery energy storage of wind and solar generated power likewise carries serious fire risks and environmental hazards; the extreme difficulty of containing lithium-generated fires only

---

[12] Paige Lambermont, *Spanish blackout should serve as a warning*, COMPETITIVE ENTERPRISE INSTITUTE (May 27, 2025), https://bit.ly/3VZLR8v.

[13] *See* Jackson and Winegarden, *supra*, at 26.

[14] *Id*.

[15] Jeff Beach, *Xcel's coal exit an issue in North Dakota electric rate case*, NORTH DAKOTA MONITOR (Oct. 6, 2025 5:00 a.m. EST), https://bit.ly/48nTRYu.

[16] *Id*.

[17] Int'l Energy Agency, *Clean energy supply chains vulnerabilities* (2023), https://bit.ly/4n264Wn.

[18] Robert Walton, *Renewable energy, microgrids face growing cyber threats: FBI*, UTILITY DIVE (July 3, 2024), *available at* https://bit.ly/4q3jFPQ.

[19] *See* Jackson and Winegarden, *supra*, at 9, 20-21; *see also* Brian Bushard, *Blown Away*, NANTUCKET MAGAZINE (Aug. 30, 2024), https://bit.ly/43kevoL.

[20] *See generally* Nur Aliah Fatin Mohd Nizam Ong, et al., *Fault tree analysis of fires on rooftops with photovoltaic systems*, 46 J. BUILDING ENG'G 103752 (April 1, 2022), https://bit.ly/4h6gfaY; *see also* U.S. Dept. of Energy, *Solar Photovoltaic Hardening for Resilience – Wildfire* (last visited Oct. 14, 2025), https://bit.ly/3VZddvv.

exacerbates those risks.[21] Consider the fire that broke out at the Moss Landing battery storage plant in California early this year: around 1,500 people had to be evacuated, and noxious gases were emitted into the surrounding areas.[22]

Equally as alarming are the COP's climate-finance proposals, which seek to require the American people to pay billions of dollars to fund COP objectives globally.[23] The prior administration wasted taxpayer dollars that could have been put toward fostering American energy independence and reliability on the COP's global aims.[24] America should not now feel compelled to spend additional taxpayer dollars to appease adverse interests.

Sending a delegation to COP-30 would do little more than lend credibility to the COP's policies. Yet we should not permit international actors to dictate our energy and environmental choices; the federal government (alongside States) should be making those calls. And while we understand the hope that participating might allow for an "honest dialogue" about the realities of climate change,[25] we're less hopeful. These kinds of international meetings and the like have already been used as justification for more aggressive climate-related impositions at the international level.[26] On the other hand, by refusing to participate in COP-30, America will safeguard its national security, energy independence and economic interests.

We urge this administration to continue to putting America first by declining to participate in COP-30.

Sincerely,

John B. McCuskey
West Virginia Attorney General

---

[21] *See* EPA, *Battery Energy Storage Systems: Main Considerations for Safe Installation and Incident Response* (last visited Oct. 14, 2025), https://bit.ly/3KKf1Gc; *see also* U.S. Fire Admin, *Risks and Response Strategies for Lithium-ion Battery Fires* (last visited Oct. 14, 2025), https://bit.ly/46IJqgN.

[22] Olga R. Rodriguez & Isabella O'Malley, *Smoke from fire at California lithium battery plant raises concerns about air quality*, ASSOCIATED PRESS (Jan. 17, 2025 9:35 p.m. EST), https://bit.ly/4mWJEG0.

[23] United Nations, *Introduction to Climate Finance* (last visited Oct. 14, 2025), https://bit.ly/4hbykVe.

[24] U.S. Dept. of State, *COP 29 Update: U.S. International Public Climate Finance* (Nov. 18, 2024), https://bit.ly/4mYmGOH.

[25] John Ainger & Ewa Kurkowska, *US Weighs COP30 Climate Summit Attendance for 'Honest Dialogue'*, BLOOMBERG (Sept. 12, 2025 1:45 p.m. UTC), https://bit.ly/4qech4o

[26] *See, e.g.*, Obligations of States in Respect of Climate Change, Advisory Opinion ¶ 288 (July 23, 2025), https://bit.ly/3J7duJP (citing "COP decisions" and other COP-related matters as evidence of purported customary international law requiring nations to participate in aggressive anti-energy measures).

Steve Marshall
Alabama Attorney General

Tim Griffin
Arkansas Attorney General

James Uthmeier
Florida Attorney General

Christopher M. Carr
Georgia Attorney General

Raúl Labrador
Idaho Attorney General

Brenna Bird
Iowa Attorney General

Kris W. Kobach
Kansas Attorney General

Liz Murrill
Louisiana Attorney General

Catherine L. Hanaway
Missouri Attorney General

Austin Knudsen
Montana Attorney General

Mike Hilgers
Nebraska Attorney General

Gentner Drummond
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Marty J. Jackley
South Dakota Attorney General

Ken Paxton
Texas Attorney General

Keith Kautz
Wyoming Attorney General

# Ex. 7



**JB McCuskey**
@mccuskeyforwv

If you've followed be #Suncor case at all and can't see the insidious nature of the green cabal, wake up.

If you're not following it, and you care at all about rational energy policy, the constitution, or even fair results, check it out. You'll understand what @RepublicanAGs are fighting for.

11:31 PM · Oct 5, 2026 · **1,600** Views

4 3 9

Relevant

View quotes

# Ex. 8

WV.gov State Agency Directory | Online Services | Phone Directory

Office of the WV Attorney General
John B. McCus

Search this site Search

About Us | Consumer Protection | News | Transparency | Careers | FAQ | Contact Us

Home

# ATTORNEY GENERAL MCCUSKEY LEADS STATES IN URGING THE EPA TO CUT BUREAUCRATIC RED TAPE SLOWING INFRASTRUCTURE PROJECTS

*August 7, 2026*

Attorney General JB McCuskey is leading a coalition of 21 states supporting the U.S. Environmental Protection Agency's (EPA) proposal to rewrite how the agency handles the National Environmental Policy Act (NEPA) reviews.

Since it was signed into law in 1970, NEPA required that before the federal government can approve or fund a major infrastructure project—highways, water systems, power plants or pipelines—it must study and document the environmental impacts first. The coalition writes in its letter, "For too long, NEPA has entangled States, industry, and everyday citizens in years-long reviews, ballooning environmental reports, and endless litigation risk."

According to the States, Congress meant for NEPA to execute its objectives through modest procedural requirements. But that soon shifted. Shortly after its enactment, special interest groups weaponized NEPA to challenge projects they

opposed. The proposed update to EPA's procedures for implementing NEPA will result in the environmental review process being faster and more predictable without any accountability lost. EPA's proposed rule requires firm deadlines, page limits, and streamlined categorial exclusions so vital projects like roads, water systems and energy infrastructure can move forward without getting tied up in years of red tape and litigation.

"Liberal eco-activist special interest groups weaponized this Act so that it bogged down critical infrastructure projects, simply because they didn't like them. Over time, this legislation ballooned to take power Congress didn't authorize it to have. The EPA's proposed rule reins in how NEPA is used and streamlines the process, which means essential infrastructure projects that West Virginians need move forward faster. It's a win for everyone," Attorney General McCuskey said.

The States refer to several changes made in recent years, beginning with the passage of the Fiscal Responsibility Act which was signed into law in 2023. Additionally, President Trump, the Supreme Court and Congress have all forged ahead in correcting NEPA abuse. If EPA adopts the proposed rule, it will take another substantial step toward protecting critical infrastructure from being stalled, or even stopped, by procedural hurdles.

The coalition's letter concludes, "The result is a NEPA process that works better for everyone it touches: States get faster review for the projects their residents depend on; project sponsors get predictability and, where they want it, the option to pay for speed; the public gets a process still grounded in real accountability; and EPA gets a rule it can defend with confidence, on the merits and in court."

Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas and Wyoming joined West Virginia's letter in support of the EPA's proposed rule, which can be read in its entirety here.

###

**Contact Name**
Kallie Cart

**Contact Phone**
304-558-2021

**Contact Email**
kcart@wvago.gov

**WV Office of the Attorney General**

1900 Kanawha Blvd. E
WV State Capitol Building Room E-26
Charleston, WV 25305

**Ph** 304-558-2021
**Fx** 304-558-0140
**GET IN TOUCH**

Privacy, Security and Accessibility | WV.gov | USA.gov | © 2026 State of West Virginia

# Ex. 9

# WEST VIRGINIA AND ALABAMA LEAD STATES DEFENDING ENERGY WORKERS AS SUPREME COURT HEARS CLIMATE LAWSUIT

*October 5, 2026*

Today, the U.S. Supreme Court heard argument in *Suncor Energy v. Boulder County*, an important case that will affect energy production nationwide. That is why Attorney General JB McCuskey, alongside Alabama Attorney General Steve Marshall, led a 26-state coalition in filing an amicus brief in the case to stand up for West Virginia's energy workers and states' rights.

The amicus, or "friend of the court" brief, filed in this case argues that allowing a single Colorado locality to hold the entire energy industry liable for global climate change under state law would unconstitutionally allow one jurisdiction to dictate national energy policy — and deal a devastating blow to states like West Virginia that depend on traditional energy production.

"Today's argument confirmed what we've said all along: federal law closes the book on these eco-radical lawsuits. As Justice Kavanaugh suggested, we think it's 'crystal clear' that interstate issues like these must be governed by federal law, not by varying state law in dozens of state courts. State, county or municipal

governments cannot weaponize their radical environmental laws to enrich their treasuries to the detriment of the nation. We have fought this kind of climate warfare before, and we will keep fighting to protect West Virginia's energy workers. We are confident the Court will agree," Attorney General McCuskey said.

In August, Attorney General McCuskey led a lawsuit and won against New York's Climate Change Superfund Act, which aimed to impose $75 billion in retroactive fines for lawful energy production outside New York State. The U.S. District Court for the Northern District of New York held that the Climate Change Superfund Act was "simply beyond the limits of state law" and conflicted with federal interests in applying uniform air pollution regulations. The Court also ruled that the foreign affairs doctrine preempted the Superfund law's attempt to regulate international emissions.

Attorney General McCuskey has made protecting West Virginia's energy industry against attacks from other States a priority, from filing this amicus brief in *Suncor* to suing Vermont and New York over their state Superfund laws.

Today is the first day of the Supreme Court's new term. A decision in the *Suncor* case is expected by May 2027.

###

**Contact Name**
Kallie Cart

**Contact Phone**

304-558-2021

**Contact Email**
kcart@wvago.gov

**WV Office of the Attorney General**

1900 Kanawha Blvd. E
WV State Capitol Building Room E-26
Charleston, WV 25305

**Ph** 304-558-2021
**Fx** 304-558-0140
**GET IN TOUCH**

Privacy, Security and Accessibility | WV.gov | USA.gov | © 2026 State of West Virginia

# Ex. 10

AUSTIN KNUDSEN

STATE OF MONTANA

February 12, 2026

Hon. Pamela Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530

Hon. John Eisenberg
Assistant Attorney General for National Security
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530

Dear Attorney General Bondi and Assistant Attorney General Eisenberg:

We write to respectfully request that the Justice Department investigate over 150 U.S.-based organizations which over the past decade have collectively received nearly $2 billion in foreign dark money from five organizations that push extreme policies and fund left-wing green-energy and climate advocacy: (1) Oak Foundation ("Oak"); (2) Children's Investment Fund Foundation ("CIFF")[1]; (3) Quadrature Climate Foundation ("QCF"); (4) KR Foundation ("KR"); and (5) Laudes Foundation ("Laudes"). At least one of the five foreign organizations, CIFF, has documented ties to the Chinese Communist Party. And all five foreign entities use funding to direct climate activism and influence energy policy in the United States, including by funding U.S. policy fights, litigation, research, protests, and lobbying to advance an extreme, foreign, activist agenda.[2] An October 2025 report from Americans for Public Trust traces the foreign dark money from these five left-wing organizations to over 150 U.S.-based 501(c)(3) entities.

[1] A coalition of State Attorneys General recently sent a letter on December 16, 2025, highlighting CIFF's ties to China, as well as requesting that the Department of Justice investigate two U.S.-based groups, Energy Foundation China and Center for Climate Integrity for potential violations of FARA. This letter requests that the Department likewise investigate the other 37 organizations identified in the APT report into which CIFF has funneled millions of dollars of foreign money. Letter from 26 State Attorneys General to DOJ (Dec. 16, 2025), https://perma.cc/VKR3-783U.

[2] *Foreign Charities Fueling Extreme Policies in the U.S.*, AMS. FOR PUB. TR. (Oct. 2025), https://perma.cc/AT4Q-GTGS ("APT Report").

DEPARTMENT OF JUSTICE

215 North Sanders
PO Box 201401
Helena, MT 59620-1401

(406) 444-2026
Contactdoj@mt.gov
mtdoj.gov

The over 150 domestic entities that have received funding from the five foreign organizations engage in policy advocacy on local, state, and federal levels; media and messaging campaigns; climate litigation funding; research coordination and funding; policy consulting; climate grantmaking; coordinated lobbying; grassroots organizing; and planning and funding climate protests.[3] Among those organizations which have accepted the most money from these foreign funding groups are the following:

- ClimateWorks Foundation ($344 million)
- Energy Foundation China ($88 million)
- Grantham Foundation ($80 million)
- Growald Climate Fund ($80 million)
- New Venture Fund ($67 million)
- The Windward Fund ($49 million + $12 million)
- The Sunrise Project ($35 million + $9 million)
- Oceana ($30 million)
- NEO Philanthropy ($26 million)
- Carter Center ($25 million)
- Rockefeller Philanthropy Advisors ($22 million + $108 million)
- World Resources Institute ($17 million)
- Center for International Environmental Law ($5 million)

There is substantial evidence that many of the over 150 organizations identified in the APT Report have acted as unregistered agents of foreign principals. For these reasons, we respectfully request that the Justice Department investigate the over 150 U.S.-based organizations for potential violations of the Foreign Agents Registration Act ("FARA").

## I. Background

### A. Foreign Funding Sources

#### 1. Oak Foundation

The Oak Foundation is a Swiss-based group established in 1983 by British billionaire Alan M. Parker. Oak has supported extreme "net zero" initiatives, groups pushing to implement the Paris Climate Accords, and groups opposing the Keystone XL pipeline.[4] Oak has supported the approach of "using finance as a lever for change to challenge the fossil fuel sector," and Oak itself states that it supports "efforts that use innovative and disruptive finance strategies to end public money for coal, oil, and gas expansion or production."[5] Among the "disruptive financial strategies" Oak employs is funding U.S.-based groups that facilitate climate litigation against energy companies at local, municipal, and state levels.[6] In total,

[3] The names of the over 150 groups registered as U.S.-based 501(c)(3) charitable organizations and the amounts they received from each of the foreign funding organizations are listed in the APT Report. *Id.* at 21–31.
[4] *Id.* at 11.
[5] *Id.* (internal quotations omitted).
[6] *Id.*

Oak has given $750 million of foreign money to 152 U.S.-based groups.[7] Among the top U.S-based groups receiving Oak funding are ClimateWorks Foundation ($186 million), Rockefeller Philanthropy Advisors ($108 million), New Venture Fund ($67 million), Energy Foundation China ($13 million), the Natural Resources Defense Council ($6.5 million), and Center for International Environmental Law ($5 million).[8]

Oak's grant-making page describes that Oak makes grants only to organizations that align with their "programme areas."[9] Oak subjects grantees to a "rigorous due diligence and selection process, which includes extensive discussion, financial reviews, and site visits to ensure that organisations have robust internal processes and controls, a clear strategy, and the capacity to thrive."[10] Oak also states that "the majority of awards are multi-year in duration," demonstrating that grantees enter into an ongoing relationship with Oak.[11] These expectations are formalized in a letter to the grantee which "aligns expectations about the terms of the grant" and which both Oak and the grantee sign.[12] Oak also states "[w]e support our partners' capacity to assess and measure progress," suggesting an ongoing involvement and supervision of grantees' "progress."[13]

2. Quadrature Climate Foundation

The Quadrature Climate Foundation was established in 2019 as the philanthropic arm of the London-based hedge fund Quadrature Capital, which gave the "largest single donation ever" to the UK's Labour Party.[14] Members of the hedge fund, including its two secretive billionaire founders, Greg Skinner and Suneil Setiya, provide funding to QCF to issue grants. QCF uses its grants to fund research and campaign groups, aiming to "steer[] the direction of both research and *lobbying on the green transition*," including through almost $530 million in foreign money to 41 U.S.-based groups.[15] Among the top recipients of QCF funding and grants are ClimateWorks Foundation ($147 million), Growald Climate Fund ($80 million), the Grantham Foundation ($80 million), the Windward Fund ($49 million), and the Sunrise Project ($36 million).[16]

QCF describes itself as taking a "strategic approach" to "help[] us drive meaningful climate solutions that influence systems, policies, and practices globally."[17] It describes its three key objectives as "reducing greenhouse gas emissions, removing greenhouse gasses, and

---

[7] *Id.*
[8] *Id.* at 12.
[9] Grant-making
[10] Grant-making.
[11] Grant-making
[12] 2. Grant Application Review Stages Mia
[13] Grant-making
[14] APT Report at 4, *supra* n.2.
[15] *Id.* (emphasis in original)
[16] *Id.* at 5.
[17] *Impact Framework*, QUADRATE CLIMATE FOUND. at 2, https://perma.cc/58RY-R2LW ("QCF Impact Framework").

responding effectively to climate impacts." To accomplish these goals, QCF lists among the tools in its "toolkit" engaging in policy advocacy and "running movements and campaigns."[18]

Additionally, QCF monitors grantees and collects data from their programs "to assess QCF's contributions."[19] According to QCF's "Impact Framework," it closely "track[s] the contribution of our programmes to climate solutions that reduce and remove emissions."[20] QCF collects and monitors data from its partners through a "structured approach to data collection across our goals and our portfolio."[21] In part, QCF uses its data collection to "understand how programmes are progressing, so we can provide tailored support."[22] As one would expect when receiving grants for tens or even hundreds of millions of dollars, QCF grantees are subject to ongoing monitoring and reporting requirements to QCF so that QCF can provide "tailored support" and involvement.

3. Children's Investment Fund Foundation

The Children's Investment Fund Foundation,[23] run by billionaire and activist hedge-fund manager Christoper Hohn, has sent over $553 million to U.S.-based groups to push extreme climate and environmental policies.[24] In addition to its extreme climate agenda, CIFF maintains ties to China and the CCP.[25] From 2014 to 2023, CIFF has given money to 39 U.S.-based groups, including The Energy Foundation China ("EFC") ($70 million), The Sunrise Project ($36 million), the Institute for Governance and Sustainable Development ($25 million), and the Environmental Defense Fund ($17 million).[26]

CIFF is a registered charity in England and Wales committed to "accelerating solutions that will mitigate climate change."[27] In particular, Hohn has funded and supported efforts to "batter companies with litigation and threats" to pressure businesses to report and reduce their carbon emissions.[28] In addition, CIFF has documented ties to China, where it is registered as an NGO, and the Chinese Communist Party (CCP) whose former officials now serve on the NGO's board.

CIFF describes a rigorous process for selection and oversight of grantees, including "a full programme budget and mapped work plan [] developed by the grantee and the [Foundation]

---

[18] *Id.*
[19] *Id.* at 3.
[20] *Id.* at 2.
[21] *Id.* at 3.
[22] *Id.*
[23] A coalition of State Attorneys General recently sent a letter on December 16, 2025, highlighting CIFF's ties to China, as well as requesting that the Department of Justice investigate two U.S.-based groups, Energy Foundation China and Center for Climate Integrity for potential violations of FARA. This letter requests that the Department likewise investigate the other 37 organizations identified in the APT report into which CIFF has funneled millions of dollars of foreign money. Letter from 26 State Attorneys General to DOJ (Dec. 16, 2025), https://perma.cc/VKR3-783U.
[24] APT Report at 16, *supra* n.2.
[25] *See* Letter from 26 State Attorneys General to DOJ (Dec. 16, 2025), https://perma.cc/VKR3-783U.
[26] APT Report at 17, 30–31, *supra* n.2.
[27] *Id.*
[28] *Id.* at 16.

sector teams during the due diligence phase," and approvals obtained by the Board and/or Programme Investment Committees.[29] Additionally, all grantees must submit "performance reviews" and grant funding is conditioned "upon adherence to the work-plan, budget[s]," "milestones," and other criteria.[30] This express contracting, as well as ongoing supervision and monitoring of grantees for compliance with CIFF's goals is strong evidence of agency relationships between CIFF and its grantees.

4. KR Foundation

The KR Foundation, based in Copenhagen, Denmark, has spent over $36 million to influence U.S. climate policy, including "almost $500,000 to Sustainable Markets Foundation for ending fossil fuel advertising, over $300,000 to 350.org for fossil-fuel-divestment campaigns, and $250,000 to Center for International Environmental Law for accelerating the managed decline of oil and gas."[31] While the overall size of KR's grants is not as large as the other foreign charities listed above, KR "has had a significant hand in American energy policy by funding everything from climate litigation, to U.S. climate protests, to pushing back against pro-energy legislation passes on the state level."[32]

KR strategically seeks groups and movements that will have a sway on American opinion or policy on climate-related issues. KR has given nearly $400,000 to the Conservation Law Foundation, a group that has initiated multiple climate lawsuits against the Trump administration and energy companies and has engaged in aggressive lobbying campaigns, including for the passage of climate superfund laws in Vermont and New York.[33] Likewise, KR has given nearly $1.4 million to CIEL, a key proponent of legal and messaging campaigns for climate liability for carbon producers.[34]

KR has also given over $300,000 to Stop the Money Pipeline, a fiscally sponsored project of 350 Seattle.[35] That foreign money was expressly earmarked for "Advancing Climate Financial Regulation and Pushing Back on the Anti-ESG Movement in the USA," indicating a clear desire to influence public opinion in the U.S.[36]

KR's terms and conditions for administration of grants imposes "regular reporting requirements" which include a "Narrative Progress Report" and an "Interim Financial Statement."[37] KR also conditions the release of the final ten percent of the grant amount "upon approval of the grantee's final reporting."[38] Additionally, the grant terms provide that

---

[29] *Annual Report 2024*, CHILDREN'S INV. FUND FOUND. at 40 (May, 22 2025), https://perma.cc/DW5P-5PA8 ("CIFF 2024 Ann. Report").
[30] *Annual Report 2023*, CHILDREN'S INV. FUND FOUND. at 35 (June 13, 2024), https://perma.cc/6VWW-DVQS ("CIFF 2023 Ann. Report").
[31] APT Report at 7 (internal quotations omitted), *supra* n.2.
[32] *Id.*
[33] *Id.* at 9.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Terms and Conditions for Administration of Grants*, KR FOUND. at 2 (Nov. 12, 2019), https://perma.cc/75AY-PXXQ ("KR Found. Grant Terms").
[38] *Id.*

"[t]he Foundation reserves the right to demand supervision, research, monitoring and evaluation of the activities using own consultants, who should at any time have unlimited access to all information. The grantee accepts to bear own costs related to presenting information and participating in meetings and in activities relating to such monitoring, research and evaluation activities as may be required by the Foundation."[39] Such ongoing reporting and supervisory provisions set forth in a detailed grant agreement is strong evidence of an agency relationship.

5. Laudes Foundation

The Laudes Foundation was established in Switzerland in 2020 by the Brenninkmeijer family as a philanthropic venture with a mission to combat climate change, biodiversity loss, and social inequality.[40] Since then it has funneled nearly $20 million of foreign funding into U.S.-based groups.[41] Its goals include influencing policymakers, businesses, and the financial sector "to do the right thing," which it defines as implementing laws and policies requiring action on climate and equity and inclusion.[42] Among the top U.S.-based groups Laudes has funded are The Pulitzer Center for Crisis Reporting ($3.7 million), the World Resources Institute ($2.8 million), Ceres ($1.7 million), and Community Initiatives ($1 million).[43]

Laudes' grant information page states its requirement that each grantee's "project aligns with our mission and priorities."[44] Additionally, under the heading "Start of partnership" Laudes provides "[u]pon approval, we will sign a grant agreement outlining the grant activities, intended outcomes, general terms and conditions as well as the reporting and disbursement schedule."[45] Laudes also publishes a guide for reporting requirements for grantees described as "Measurement and Evaluation."[46] This guide describes annual reports and follow-up meetings with a Laudes point of contact for the duration of the grant.[47] These ongoing reporting requirements, express grant agreements and terms, and continued "partnership" with Laudes strongly suggest an agency relationship between Laudes and its U.S.-based grantees.

**B. U.S. Domestic Entities**

A recent report from Americans for Public Trust ("APT") provides a complete list of the U.S.-based 501(c)(3) charitable organizations that collectively receive hundreds of millions of dollars annually from the five organizations discussed above.[48] While this letter does not

---

[39] *Id.*
[40] APT Report at 14, *supra* n.2.
[41] *Id.*
[42] *Id.*
[43] *Id.* at 15.
[44] *Becoming a Partner*, LAUDES FOUND. at 1–2, https://perma.cc/CJR8-WFQJ ("Laudes Becoming a Partner").
[45] *Id.*
[46] *Measurement and Evaluation for Learning and Improvement*, LAUDES FOUND., https://perma.cc/WUM4-6R7Q ("Laudes Initiative Requirements").
[47] *Id.* at 2.
[48] APT Report at 21–31, *supra* n.2.

provide a complete investigation of each of the over 150 domestic entities listed in the APT report, it highlights those entities which have received the largest grants or which have engaged in particularly extreme climate-related activism.

1. ClimateWorks Foundation

ClimateWorks Foundation is the largest recipient of foreign money documented in the APT Report with a combined nearly $344 million over the past decade from the foreign entities discussed above.[49] ClimateWorks is a San Francisco-based 501(c)(3) and left-wing pass-through funding entity "that distributes funds from donors to environmentalist advocacy groups around the world."[50] ClimateWorks aims to combat global warming and cut emissions by "fund[ing] bold climate strategies."[51] ClimateWorks has received large grants to "support the acceleration of electric vehicles" and "financial regulation advocacy to address climate risk."[52] ClimateWorks in turn has issued over 2,800 grants totaling over $2 billion since 2008, including to "Center for American Progress (CAP), CERES, Environmental Defense Fund (EDF), League of Conservation Voters (LCV), New Venture Fund, and Windward Fund," operating as a "foreign dark money ATM to fuel other liberal climate advocacy groups."[53] Many of the groups it funds "lobby for climate-based policies including emissions taxes, restricting coal use, international climate treaties with strict enforcement mechanisms, and diminishing the use of cars."[54] In addition to its grantmaking, ClimateWorks "advances its left-of-center environmentalism through a wide array of projects, international partnerships, and campaigns, including its [] Project Catalyst and its 2021 'Drive Electric Campaign' which seeks to prohibit the new sale of combustion engine vehicles in phases by 2040."[55]

2. Grantham Foundation

The Grantham Foundation for the Protection of the Environment (private foundation) and the related Grantham Trust (public charity) have received over $80 million from QCF, $50 million of which is earmarked for a "partnership to unlock neglected climate opportunities."[56] Grantham's website landing page boldly claims "[c]limate change is the greatest challenge humanity has ever faced," and that "[h]umanity's impact on the planet is out of control."[57] Grantham reveals its ultimate goal of upending the economic order claiming we need "[n]ew kinds of breakthroughs [to] make the remaking of our economy easier."[58] To that end,

---

[49] *Id.*
[50] *ClimateWorks Foundation*, INFLUENCEWATCH, https://perma.cc/L4LJ-BGPL ("ClimateWorks Information").
[51] *How We Work*, CLIIMATEWORKS FOUND., https://perma.cc/U4XH-JTQT ("ClimateWorks Approach").
[52] APT Report at 5, *supra* n.2.
[53] *Id.*; ClimateWorks Approach, *supra* n.51.
[54] ClimateWorks Information, *supra* n.50.
[55] *Id.*; *Home*, DRIVE ELEC. CAMPAIGN, https://perma.cc/4A4L-GCNW ("Drive Electric Campaign Information"); Monica Araya & Anthony Eggert, *The Drive Electric Campaign: 100% Electric Road Transportation for the World,* CLIMATEWORKS FOUND. (Mar. 17, 2021), https://perma.cc/EB9N-KN39 ("Drive Electric Article").
[56] APT Report at 5, *supra* n.2.
[57] *Home*, GRANTHAM FOUND., https://perma.cc/69CS-NQQM.
[58] *Id.*

Grantham funds a range of climate initiatives from "grassroots efforts to stop the development of coal plants" to funding the "Global Trends in Climate Change Litigation" annual report, which tracks climate-related litigation.[59] The Grantham Foundation was founded in 1997 in Boston by British billionaire Jeremy Grantham.[60] Jeremy Grantham is a known "supporter of population control, having suggested the critical population limit of the earth at 10 billion."[61] The Grantham Foundation has used money it receives to provide grants to numerous climate and environmentalist organizations.[62]

3. Growald Climate Fund

Founded in 2007 by Eileen Rockefeller Growald, the Growald Climate Fund distributes grants to fund left-wing "environmentalist causes with a focus on environmentalist energy and the electricity sector."[63] The Growald Climate Fund has received over $80 million from QCF which it will presumably use for additional grantmaking for U.S. climate initiatives. Growald uses a "venture philanthropy" model, actively "invest[ing]" in early-stage or innovative climate organizations similar to a venture capital fund.[64] Growald's stated goal is to engage in high-impact "venture philanthropy" to "catalyz[e] the rapid transition to a clean energy future."[65] A "core practice of [Growald's] venture philanthropy approach is to provide grantees with resources and high-touch organizational development and programmatic guidance to help them grow into . . . effective . . . organizations."[66] Growald emphasizes that their "grantees inspire key financial actors, policymakers, the media and wider movements

---

[59] APT Report at 5, *supra* n.2.
[60] *Grantham Foundation for the Protection of the Environment*, INFLUENCEWATCH, https://perma.cc/7DGG-LR5A ("Grantham Found. Information").
[61] *Id.*; Carlo Rotella, *Can Jeremy Grantham Profit From Ecological Mayhem?*, THE NEW YORK TIMES, (Aug. 11, 2011), https://perma.cc/EW83-TFLX.
[62] Grantham grantees include "the Acadia Center, American Association for the Advancement of Science, Azuero Earth Project, the Carbon Tracker Initiative, Center for Public Integrity, Climate and Health Research, Climate Foundation, CO2 Sciences, Community Foundation of Southeastern Massachusetts, Conservation Law Foundation, Conservation X Labs, Divecha Centre for Climate Change, Earth Innovation Institute, Environmental Defense Fund, Environmental League of Massachusetts, Greenpeace Fund, Health in Harmony, Linden Trust for Conservation, Lost Light Projects, Metafoundation, New England Forestry Foundation, Oxfam America, Rainforest Action Network, Rethinking Economics, Rockefeller Family Fund, Rocky Mountain Institute, Sierra Club, South Carolina Coastal Conservation, Stichting European Climate Foundation, Sustainability Accounting Standards Board, the Energy Foundation, Union of Concerned Scientists, WGBH Education Foundation, WILD AID, Woods Hole Research Center, and the World Resources Institute." Grantham Foundation for the Protection of the Environment - InfluenceWatch; A 990-PF: Grantham Foundation for the Protection of the Environment, Return of Private Foundation Exempt From Income Tax (Form 990-PF), 2017, Form 990-PF, Part XV Line 3 – Grants and Contributions Paid During the Year or Approved for Future Payment.
[63] *Growald Climate Fund*, INFLUENCEWATCH, https://perma.cc/AXP3-ULAA ("Growald Climate Fund Information").
[64] *Our Approach*, GROWALD CLIMATE FUND, https://perma.cc/U53L-WGQC ("Growald Climate Fund Approach").
[65] *Id.*
[66] *Id.*

to take on the challenge of change at a critical moment for our collective future."[67] Among the fund's first grants was an award "to the 'Beyond Coal' campaign, a project of the left[-wing] Sierra Club that works to retire coal plants in favor of environmentalist energy."[68] The Growald Fund has also issued grants to organizations including the Anti-Defamation League, the Natural Resources Defense Council, the New Venture Fund, and the World Wildlife Fund.[69]

4. New Venture Fund

New Venture Fund was founded in 2006 by Eric Kessler, and it acts as a fiscal sponsor to 170 nonprofit projects, many of which engage in lobbying and civic engagement on behalf of left-wing causes.[70] New Venture Fund provides operational support to the projects that operate under its tax-exempt status, as well as serving as an incubator for early-stage or seed-funded initiatives to eventually become operational nonprofits.[71] NVF also administers grants and provides resources to the projects it houses, including climate and sustainability-related groups.[72] NVF "is the largest 501(c)(3) nonprofit in the network of five nonprofits created and managed by Arabella Advisors, a Washington, D.C.-based philanthropy consulting company that caters to major foundations and organizations on the political Left."[73] Critics of NVF, "including the *New York Times*, argue that New Venture Fund is a 'dark money' organization, serving as a way for left-leaning foundations and donors to anonymously funnel money toward various political advocacy issues, such as attacking vulnerable Republicans or pushing environmental restrictions."[74] NVF was implicated by the *New York Times*' criticism of "Arabella's 'system of political financing, which often obscures the identities of donors,' as 'dark money,' calling the network 'a leading vehicle for it on the Left.' "[75] According to public filings, "in 2018, NVF spent $90,387,850 on 'civil rights, social action, and advocacy,' of which $44,453,476 was spent in grants to other nonprofits," and "spent $87,959,941 on 'environmental programs,' of which $60,616,035 was spent in grants to other nonprofits."[76]

5. Windward Fund

Windward Fund is a nonprofit fiscal sponsor "managed by 'behemoth liberal dark money nonprofit network' Arabella Advisors."[77] It formerly operated under Stacey Abrams and

---

[67] *Id.*
[68] Growald Climate Fund Information, *supra* n.63.
[69] *Id.*
[70] APT Report at 13, *supra* n.2.
[71] *2024 Impact Report*, NEW VENTURE FUND at 3,6, https://perma.cc/HC25-4FTM ("NVF 2024 Impact Report").
[72] *Id.*
[73] *New Venture Fund*, INFLUENCEWATCH, https://perma.cc/U3EM-2U2A ("New Venture Fund Information").
[74] *Id.*; Kenneth P. Vogel & Katie Robertson, *Top Bidder for Tribune Newspapers Is an Influential Liberal Donor*, THE NEW YORK TIMES (Apr. 13, 2021), https://perma.cc/CQ2G-9A4X.
[75] New Venture Fund Information
[76] *Id.*; New Venture Fund Information; Form 990, Department of the Treasury, Internal Revenue Service, New Venture Fund, Return of Organization Exempt from Income Tax 2018, Part III — Statement of Program Service Accomplishments, https://perma.cc/9L5T-KW7Q.
[77] APT Report at 5, *supra* n.2.

worked to ban gas stoves and push extreme environmental regulations.[78] In 2024, "Windward Fund awarded over $154 million to 337 grantees across 48 states and territories," distributing the money it received from foreign organizations into the U.S.[79] The Windward Fund operates in conjunction with its "sister" nonprofits, the 501(c)(4) Sixteen Thirty Fund and 501(c)(3) New Venture Fund, which both provide similar funding and fiscal sponsorship services to radical left-wing advocacy organizations.[80] Windward acts as "a fiscal sponsor of 'various projects,'."[81] Windward's activities include "provid[ing] legal compliance, finance, and HR services to its projects, and additionally seek[ing] to help its projects create greater impact through facilitating connections, providing access to information, and capacity building."[82]

6. The Sunrise Project

The Sunrise Project is a left-wing nonprofit that uses aggressive tactics to bring about the transition from fossil fuels to renewables "as fast as possible."[83] Among its tactics is coordinating protests against the fossil fuel industry to influence public opinion about U.S. energy policy.[84] Sunrise Project "serves as an activist hub, receiving tens of millions of dollars in grants, that it then disburses in accordance with its strategic plan," which includes "end[ing] the use of traditional energy" and "campaign[ing] to de-bank the oil and gas industry by pressuring the financial sector and various industries to not do business with it."[85] Of the tens of millions the group receives in grants, it "regrants roughly two-thirds of the funds out" to "organizations that it believes fit into its global change strategy."[86] Beyond its grantmaking strategy, "the project also runs a specific initiative aimed at cajoling various aspects of international finance into cutting out traditional energy providers from finance markets and to facilitate weather-dependent energy projects instead. These efforts include targeting and pressuring insurers, asset managers, private banks, central banks, private equity, bond markets, and automakers to shut out the oil and gas industry."[87]

7. Rockefeller Philanthropy Advisors

Rockefeller Philanthropy Advisors (RPA) was among the top recipients of funding from Oak Foundation, from whom it received over $108 million since 2016.[88] RPA issues hundreds of

---

[78] *Id.*
[79] C. Lynn McNair, *Collaboration is Key to Solving Climate Change*, WINDWARD FUND (Nov. 15, 2024), https://perma.cc/BG6B-GQCU.
[80] *Windward Fund*, INFLUENCEWATCH, https://perma.cc/3BWZ-XFZ7 ("Windward Fund Information").
[81] *Id.*
[82] *Id.*
[83] APT Report at 5, *supra* n.2.
[84] *Id.*
[85] *The Sunrise Project*, INFLUENCEWATCH, https://perma.cc/LSD7-9U6U ("Sunrise Project Information"); *About*, THE SUNRISE PROJECT, (Apr. 23, 2018), https://perma.cc/3EY6-AXRK; *Grants*, THE SUNRISE PROJECT (June 26, 2018), https://perma.cc/K33V-MYRW.
[86] Sunrise Project Information, *supra* n.85.
[87] *Id.*; *Shifting Global Finance Beyond Fossil Fuels*, THE SUNRISE PROJECT (Apr. 14, 2025), https://perma.cc/4L38-YHGL.
[88] APT Report at 12, *supra* n.2.

millions of dollars in grants to progressive groups, including over $400 million in 2023 alone.[89] RPA dispenses contributions it receives from foreign organizations to U.S.-based left-wing groups. Among its largest grants in 2023 were "$10,247,809 to the Climate Leadership Initiative, $7,797,805 to Climate Breakthroughs, $6,633,000 to the Sustainable Markets Foundation, $5,082,261 to Climate Arc, $3,910,000 to Oil Change International, $3,069,696 to the Global Alliance for Incinerator Alternatives, and $2,853,658 to the World Wildlife Fund."[90] Aside from its grantmaking operations, RPA also "engages in research, writes papers, and creates coalitions for purposes of guiding donors and foundations," including "a series of donor guides, addressing issues like gender and climate change."[91]

8. Center for International Environmental Law

CIEL is a public interest, not-for-profit environmental law firm founded in 1989 in the United States.[92] CIEL accepts foreign grants and uses this money to fund whitepapers and policy research related to extreme climate policies.[93] Among the titles of publications by CIEL are "Accelerating the Managed Decline of Oil and Gas," "Climate Law, Liability, and Litigation: A New Era in Climate Advocacy," and "Leveraging legal and financial risk to end global reliance on fossil fuels."[94] More recently, in an attempt to aid litigation against traditional energy companies, CIEL published "Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis."[95] CIEL's policy advocacy include "oppos[ition] the use of carbon emitting fuels such as petroleum, coal, and low carbon natural gas."[96] In addition, "CIEL has also joined coalitions that oppose the use of carbon free nuclear power, produced reports opposing the development of carbon free hydro-electric dams, and opposed the deployment of technologies that would remove carbon emissions from the atmosphere."[97] In 2023, CIEL co-produced a "report that advocated for the World Bank Group to restrict its energy financing to only 'renewable' projects."[98] CIEL also opposes net-zero goals in favor of even more extreme "real zero" goals.[99] CIEL has criticized net zero goals as "hollow" attempts to "mask climate inaction and provide cover for business-as-usual fossil fuel production that spells planetary destruction."[100] CIEL engages directly in policy advocacy in the U.S. to influence public opinion regarding domestic energy policy.

---

89 *Id.*
90 *Rockefeller Philanthropy Advisors*, INFLUENCEWATCH, https://perma.cc/9SFX-9255 ("RPA Information"); *Rockefeller Philanthropy Advisors Inc.*, PROPUBLICA NONPROFIT EXPLORER (2024), https://perma.cc/D5NJ-WMVT ("RPA Data")
91 RPA Information, *supra* n.90,
92 *Center for International Environmenal Law*, INFLUENCEWATCH, https://perma.cc/CYW7-BAWQ ("CIEL Information").
93 APT Report at 9, *supra* n.2.
94 *Id.*
95 *Id.*
96 CIEL Information, *supra* n.92.
97 *Id.*
98 *Id.*
99 *Id.*
100 *Id.*

9. Environmental Law Institute

ELI is a left-wing environmentalist legal advocacy organization that runs judicial education programs to teach judges left-wing climate policy and legal theories.[101] The group is also known for teaching and advocating for the "far-left concept of environmental justice."[102] The group's Climate Judiciary Project was the subject of a House Judiciary Committee investigation to determine whether the group sought to influence judicial decision-making in climate-related litigation.[103] ELI "develops law and policy, advocates environmentalist policy outcomes to professionals and the public, provides data and analysis, and convenes various groups to address environmental issues."[104] Additionally, ELI "supports the creation of regulatory rules to address the critical race theory-influenced concept of racial justice, operates the Climate Equity for Local Governments initiative that supports the far-left concept of environmental justice, publishes *The Environmental Law Reporter*, operates an Emerging Leaders Initiative, runs a podcast, and seeks to influence global environmental law and governance practices."[105]

10. Ceres

Ceres Inc. is a Boston-based 501(c)(3) that coordinates institutional investors to influence corporate behavior and push the adoption of radical ESG policies in "every aspect of decision-making" and costly climate disclosures for public energy companies.[106] Ceres was a founding partner and driving force behind the Net Zero Asset Managers Initiative and Climate Action 100+, which brought together asset managers from around the world to engage in a coordinated effort to push for ESG policies and emissions disclosures from portfolio companies.[107] Ceres and its related initiatives "leverage[ed] a network of investors totaling more than $32 trillion in assets to pressure companies into adopting Ceres' preferred [climate and ESG] policies."[108] Ceres' own stated purpose is to "pressure stock exchanges and capital market regulators to improve climate and sustainability risk disclosure, and opportunities to advocate for stronger climate, clean energy and water policies at all levels of government."[109] Ceres also operates the Business for Innovative Climate and Energy Policy (BICEP) Network which "provides members with the tools and knowledge they need to effectively engage with state and federal policymakers on climate

---

[101] *Environmental Law Institute*, INFLUENCEWATCH, https://perma.cc/ZDQ5-5D7H ("ELI Information")
[102] *Id.*; *Welcome to the Environmental Justice Initiative at ELI*, ENV'T L. INST., https://perma.cc/C6J5-VVY5 ("Environmental Justice at ELI").
[103] Katelynn Richardson, *Exclusive: House Committee Opens Probe into Climate Activist Group Attempting to 'influence' Judges*, THE DAILY CALLER, (Sep. 1, 2025), https://perma.cc/LFP8-DTTN.
[104] ELI Information, *supra* n.101; *2021 Annual Report*, ENV'T L. INST. at 19, https://perma.cc/J6KR-UZ4S ("ELI 2021 Report").
[105] ELI Information, *supra* n.101.
[106] APT Report at 15, *supra* n.2.
[107] https://www.ceres.org/initiatives/climate-action-100.
[108] *Ceres*, INFLUENCEWATCH, https://perma.cc/5ZWX-BGWJ ("Ceres Information").
[109] *Ceres Investor Network*, CERES, https://perma.cc/J563-GAJH ("Ceres Investor Network").

and energy policies."[110] Additionally, "[b]etween 2020 through October 2023, Ceres increased the amount it spent on lobbying, from around $80,000 in 2020 to at least $270,000 in 2022, an amount which the organization claimed was on track to match or exceed as of the second quarter of 2023."[111]

11. Rocky Mountain Institute

RMI, founded by activist Amory Lovins in 1982, is a China-linked, U.S.-based nonprofit and think tank that engages in climate policy analysis and advocacy.[112] RMI's goal is to replace fossil fuel usage with renewable energy sources, though the group also opposes nuclear energy projects.[113] The group also has ties to China through an official partnership with the National Development and Reform Commission, a Chinese government agency.[114] In 2022, RMI published a study claiming that gas stoves are linked to childhood asthma and advocating for a ban on gas stoves.[115] RMI is also linked to billionaire activist donor Fred Stanback and his family, who has been noted as a "proponent of anti-humanist environmentalism . . . the belief that protecting the environment hinges on population control."[116] RMI's research is used by RMI and other left-wing climate organizations to push radical environmentalist views in their efforts to influence public opinion and legislation concerning energy policy in the United States.

12. Environmental Defense Fund

Founded in 1966, EDF is a nonprofit environmental activist group whose annual revenues have ballooned to nearly $250 million in 2023.[117] EDF uses "litigation programming" to advance its extreme left-wing climate agenda, which includes "a federally mandated 20 percent decrease in carbon emissions in less than a decade; a 40-50 percent reduction in methane emissions resulting from natural gas production; and mandated reductions in chemicals that the EDF argues impact human health."[118] EDF has deep ties to former President Barack Obama, and has pledged to oppose President Donald Trump's environmental policies.[119] The group has a related lobbying arm in the Environmental

---

[110] Ceres Information, *supra* n.108; *Client Profile: Ceres*, OPENSECRETS, https://perma.cc/T2HT-3MMT ("Ceres Client Profile").
[111] Ceres Information, *supra* n.108.
[112] *Rocky Mountain Institute*, INFLUENCEWATCH, https://perma.cc/6V2U-77ZJ ("RMI Information").
[113] *Id.*
[114] Colin Anderson & Joseph Simonsan, *Meet the Green Energy Group Behind the Study That's Driving Calls To Ban Gas Stoves*, THE WASHINGTON FREE BEACON (Jan. 16, 2023), https://perma.cc/XE9R-4YL2.
[115] *Id.*
[116] Ken Braun, *'Anti-Humanist Environmentalism' and the Foundation for the Carolinas*, CAP. RSCH. CTR. (June 18, 2019), https://perma.cc/JFR8-8LGA (internal citations omitted).
[117] *Environmental Defense Fund*, INFLUENCEWATCH, https://perma.cc/TK5S-EMTV ("EDF Information").
[118] *Id.*
[119] Don't Give Up: Stand Against Trump's Climate Attacks." Environmental Defense Fund. Undated. Accessed September 22,

Defense Action Fund, a 501(c)(4) organization.[120] EDF's activities include "lobbying, research, communications, litigation, and providing legal advisory to other organizations."[121] Among the initiatives EDF supports are expanding California's cap and trade program, a federally mandated 30% cut in power-plant emissions, and an approximately 40-50% reduction in methane emissions from natural gas production.[122]

13. Institute for Governance and Sustainable Development

IGSD is a radical left-wing climate advocacy organization that supports the Green New Deal and other extreme climate initiatives to "eliminate the use of conventional fuels."[123] In addition to its climate advocacy in the U.S., the group "works with international organizations to promote agreements to combat climate change."[124] Within the U.S., "IGSD targets professionals to push its environmentalist agenda, working with lawyers, political scientists, economists, and scientists," including through establishing "the Program on Governance for Sustainable Development at the University of California-Santa Barbara" to direct research to support environmentalist projects.[125] Additionally, "IGSD has received over $6.2 million in grants from the U.S. government since 2008."[126] Among its most radical initiatives, since 2017 IGSD has operated the Center for Climate Integrity (CCI). "CCI supports lawsuits against energy companies to push for environmental regulation. CCI works to encourage citizen groups and governments to sue energy companies, billing the lawsuits as necessary to force polluters to pay for the damage of climate change instead of shifting the costs to taxpayers."[127]

14. Tides Nexus (Tides Foundation and Tides Center)

The Tides Nexus, a system of related nonprofits founded in 1976 by left-wing activist Drummond Pike, includes the Tides Network, a 501(c)(3) nonprofit headquartered in San Francisco which operates as the controlling organization for the system; the Tides Center, the group's fiscal sponsorship organization; the Tides Foundation, the system's pass through funder and grantmaking organization; and Tides Advocacy, the group's 501(c)(4) entity.[128] In

---

2017. https://secure2.edf.org/site/Advocacy?cmd=display&id=2852&page=UserAction&utm_source=twitter&utm_campaign=edf_content-share_upd_mem&utm_medium=referral&utm_id=1478728172&utm_content=alert-short.

[120] EDF Information, *supra* n.117.

[121] *Id.*

[122] *Id.*

[123] *Institute for Governance and Sustainable Development*, INFLUENCEWATCH, https://perma.cc/EU4G-MKGW ("IGSD Information") .

[124] *Id.*

[125] *Id.*; *Research & Education*, IGSD (2020), http://www.igsd.org/about/research-and-education/.

[126] IGSD Information, *supra* n.123; Robert Stilson, *Green New Deal Supporters Use Taxpayer Dollars*, CAP. RSCH. CTR. (June 21, 2019) https://perma.cc/2388-YG66.

[127] IGSD Information, *supra* n.123.

[128] *Tides Nexus*, INFLUENCEWATCH, https://perma.cc/U2NA-ZFRQ ("Tides Nexus Information"); *Tides Network*, INFLUENCEWATCH, https://perma.cc/AM23-V9SE ("Tides Network Information"); *Tides*

2023 alone, the Tides Nexus—through its associated entities—issued over 4,000 grants and served as fiscal sponsor for over 120 different groups.[129] The Tides Foundation, in addition to receiving millions of dollars in foreign money from groups like CIFF, has been noted as "George Soros' Favorite Money Handler" when it was discovered that Soro's Open Society Foundation had given at least $17.2 million to the Tides Foundation between 2009 and 2022.[130] Additionally, "[t]he Tides Nexus has been described as an organization that 'washes' away the paper trail between its grants and the original donor."[131] Tides founder Drummond Pike reportedly stated, "Anonymity is very important to most of the people we work with."[132]

## II. FARA

Absent an exemption, an individual or entity must register under FARA if it acts as an "agent" of a "foreign principal" and engages in certain activities that trigger registration. See 22 U.S.C. § 612(a).

### A. Foreign Principal

FARA defines a foreign principal to include "a government of a foreign country and a foreign political party," as well as a "partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country." *Id.* § 611(b); *see also* 28 C.F.R. 5.100(a)(8). The foreign entities identified in the APT Report all appear to fall within this definition.

**OF.** As a charitable foundation incorporated in Switzerland and seemingly headquartered in Geneva,[133] OF (registered as Oak Philanthropy Ltd) appears to be an "organization" or "combination of persons organized under the laws of" a foreign country with a "principal place of business in a foreign country." 22 U.S.C. § 611(b)(3). As a result, it qualifies as a foreign principal.

**QCF.** As a U.K-registered charity with headquarters seemingly in London,[134] QCF appears to be an "organization" or "combination of persons organized under the laws of" a foreign country with a "principal place of business in a foreign country." 22 U.S.C. § 611(b)(3). As a result, it qualifies as a foreign principal.

**CIFF.** As a U.K-registered charity seemingly headquartered in London,[135] CIFF appears to be an "organization" or "combination of persons organized under the laws of" a foreign

---

*Foundation*, INFLUENCEWATCH, https://perma.cc/78XK-9CKB; *Tides Center*, INFLUENCEWATCH, https://perma.cc/LQ29-AK63.

[129] Tides Network Information, *supra* n.128.

[130] Carl Horowitz, *The Tides Center: George Soros' Favorite Money Handler?*, NAT'L LEGAL AND POL'Y CTR. (April 21, 2025) https://perma.cc/28AR-NNEC.

[131] Tides Nexus Information, *supra* n.128.

[132] *Charitable Money-Laundering*, CTR. FOR CONSUMER FREEDOM (Mar. 9, 2004), https://perma.cc/MH6U-N2SJ.

[133] *Our Values*, OAK FOUND., https://perma.cc/TA3P-A6CX.

[134] *About Us*, QUADRATURE CLIMATE FOUND., https://perma.cc/B3RE-MJZP.

[135] *About Us*, CHILD.'S INV. FOUND., https://perma.cc/5ZXB-A4DL. Contact

country with a "principal place of business in a foreign country." 22 U.S.C. § 611(b)(3). As a result, it qualifies as a foreign principal.

**KR.** As a charitable foundation incorporated in Denmark and seemingly headquartered in Copenhagen,[136] KR appears to be an "organization" or "combination of persons organized under the laws of" a foreign country with a "principal place of business in a foreign country." 22 U.S.C. § 611(b)(3). As a result, it qualifies as a foreign principal.

**Laudes.** As a charitable foundation incorporated in Switzerland and seemingly headquartered in Zug,[137] Laudes appears to be an "organization" or "combination of persons organized under the laws of" a foreign country with a "principal place of business in a foreign country." 22 U.S.C. § 611(b)(3). As a result, it qualifies as a foreign principal.

### B. Agency Relationships

"Agent of a foreign principal" is defined to include "[a] any person who acts as an agent, representative, employee, or servant, or [b] any person who acts in any other capacity at the order, request, or under the direction or control, [i] of a foreign principal or [ii] of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal" and engages in specified activities. *Id.* § 611(c)(1); *see* 28 C.F.R. § 5.100(b) (defining control "[a]s used in the Act"). Each domestic entity appears to have or have had an agency relationship with a foreign principal.

*1. Each Grantee of the Oak Foundation is an Agent of Oak within the United States.* As outlined above, each of Oak's grantees has received hundreds of thousands or millions of dollars of grants from Oak[138], which generally claims that grantees go through a "rigorous due diligence and selection process, which includes extensive discussions, financial reviews, and site visits to ensure the organisations have robust internal processes and controls, a clear strategy, and the capacity to thrive."[139] Oak also states that "the majority of awards are multi-year in duration," demonstrating an ongoing relationship between Oak and grantees.[140] Finally, Oak "creates a grant letter to align expectations about the terms of the grant. The letter is reviewed and signed by both Oak and the grantee partner."[141] Assuming Oak followed its procedures with each grantee identified in the APT report, its requirements and grant-making process are strong evidence of an agency relationship. For example, an October 15, 2021 FARA Advisory Opinion addressing a grant to a domestic nonprofit concluded an agency relationship existed where (1) there was a contract between the parties that "obligated" the requester "to perform specified and detailed obligations for the benefit of [the foreign principal] in order to receive funding," and (2) the requester, to continue to receive funding, had to provide "detailed narrative reports of its progress in achieving the

---

[136] *About Us*, KR FOUND., https://perma.cc/4Y9M-68GY.
[137] *Privacy Statement*, LAUDES FOUND., https://perma.cc/D4XT-L6MA.
[138] OF claims that the average award is $900,000 USD. OF Grant-Making Pol'y, *supra* n.9.
[139] *Id.*
[140] *Id.*
[141] OF Grant Application Process at 3, *supra* n.12.

objectives set out in the" parties' agreement along with "a final narrative report at the completion of the project."[142] Even if there were not an express agreement—Oak's policies suggest there is one—an agency relationship may still exist. According to a December 21, 2023 Advisory Opinion from the DOJ FARA Unit to a nonprofit, any mutual understanding as to how a domestic entity can best "support" a foreign principal's initiatives can potentially give rise to an agency relationship.[143]

*2. Each Grantee of QCF is an Agent of QCF within the United States.* As outlined above, each of QCF's grantees has received hundreds of thousands or millions of dollars of grants from QCF,[144] and as one would expect when receiving grants for tens or hundreds of millions of dollars, QCF grantees are subject to ongoing QCF monitoring and reporting requirements so that QCF can provide "tailored support" and involvement.[145] Additionally QCF monitors grantees and collects data from their programmes "to assess QCF's contributions."[146] According to QCF's "Impact Framework," it closely "track[s] the contribution of our programmes to climate solutions that reduce and remove emissions."[147] QCF collects and monitors data from its partners through a "structured approach to data collection across [its] goals and [its] portfolio."[148] In part, QCF uses its data collection to "understand how programmes are progressing, so we can provide tailored support."[149]

Assuming QCF followed its procedures with each grantee identified in the APT report, its requirements and grant-making process are strong evidence of an agency relationship. As stated above, DOJ FARA advisory opinions have found an agency relationship where (1) there was "a contract between the parties" that "obligated" the requester "to perform specified and detailed obligations for the benefit of [the foreign principal] in order to receive funding," and (2) the requester, to continue to receive funding, had to provide "detailed narrative reports of its progress in achieving the objectives set out in the" parties' agreement along with "a final narrative report at the completion of the project."[150] Even if there were not an express agreement—QCF's policies suggest there is—an agency relationship may still exist. As stated above, according to a December 21, 2023 Advisory Opinion from the DOJ FARA Unit to a nonprofit, any mutual understanding as to how a domestic entity can best "support" a foreign principal's initiatives can potentially give rise to an agency relationship.[151]

---

[142] Advisory Opinion Pursuant to 28 C.F.R. § 5.2 at 2–3 (U.S. Dep't of Justice Oct. 15, 2021), https://perma.cc/QU7H-SYCH ("DOJ Advisory Opinion").
[143] DOJ, FARA Unit, *Advisory Opinion*, at 6 (Dec. 21, 2023), https://www.justice.gov/nsdfara/media/1355096/dl?inline.
[144] APT Report at 21–31, *supra* n.2.
[145] *See* Section I.A.2., above.
[146] QCF Impact Framework at 3, *supra* n.2.
[147] *Id.* at 2.
[148] *Id.* at 3.
[149] *Id.*
[150] DOJ Advisory Opinion at 3, *supra* n.142.
[151] DOJ, FARA Unit, *Advisory Opinion*, at 6 (Dec. 21, 2023), https://www.justice.gov/nsdfara/media/1355096/dl?inline.

*3. Each Grantee of CIFF is an Agent of CIFF within the United States.* As described above and in the December 16, 2025 DOJ Letter, CIFF exercises considerable continuing control and oversight of its grantees, providing strong evidence of an agency relationship under FARA. CIFF describes a rigorous process for selection and oversight of grantees, including "a full programme budget and mapped work plan [] developed by the grantee and the [Foundation] sector teams during the due diligence phase," and approvals obtained by the Board and/or Programme Investment Committees.[152] Additionally, all grantees must submit "performance reviews" and grant funding is conditioned "upon adherence to the work-plan, budget[s]," "milestones," and other criteria.[153] This express contracting, as well as ongoing supervision and monitoring of grantees for compliance with CIFF's goals is strong evidence of agency relationships between CIFF and its grantees.

*4. Each Grantee of KR is an Agent of KR within the United States.* As described above, KR's terms and conditions for administration of grants imposes "regular reporting requirements" which include a "Narrative Progress Report" and an "Interim Financial Statement."[154] KR also conditions the release of the final ten percent of the grant amount "upon approval of the grantee's final reporting."[155] Additionally, the grant terms provide that "[t]he Foundation reserves the right to demand supervision, research, monitoring and evaluation of the activities using own consultants, who should at any time have unlimited access to all information. The grantee accepts to bear own costs related to presenting information and participating in meetings and in activities relating to such monitoring, research and evaluation activities as may be required by the Foundation."[156] Such ongoing reporting and supervisory provisions set forth in a detailed grant agreement is strong evidence of an agency relationship.

*5. Each Grantee of Laudes is an Agent of Laudes within the United States.* As described above, Laudes' grant information page states its requirement that each grantee's "project aligns with our mission and priorities."[157] Additionally, under the heading "Start of partnership" Laudes provides "[u]pon approval, we will sign a grant agreement outlining the grant activities, intended outcomes, general terms and conditions as well as the reporting and disbursement schedule."[158] Laudes also publishes a guide for reporting requirements for grantees described as "Measurement and Evaluation."[159] This guide describes annual reports and follow-up meetings with a Laudes point of contact for the duration of the grant.[160] These ongoing reporting requirements, express grant agreements and terms, and continued "partnership" with Laudes strongly suggest an agency relationship between Laudes and its U.S.-based grantees.

---

[152] CIFF 2024 Annual Report at 40, *supra* n.29.
[153] CIFF 2023 Annual Report at 35, *supra* n.30.
[154] KR Found. Grant Terms at 2, *supra* n.37.
[155] *Id.*
[156] *Id.* at 3.
[157] Laudes Becoming a Partner, *supra* n.44.
[158] *Id.*
[159] Laudes Initiative Requirements at 1, *supra* n.46.
[160] *Id.* at 2.

### C. Registrable Activities

While many activities give rise to the obligation to register under FARA, most relevant here are the activities of engaging in "political activities for or in the interests of [a] foreign principal." 22 U.S.C. § 611(c)(1)(i), and "solicit[ing], collect[ing], disburs[ing], or dispens[ing] contributions, loans, money, or other things of value for or in the interest of" a foreign principal. *Id.* § 611(c)(1)(iii). Political activities are defined to include "any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States *or any section of the public within the United States* with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." *Id.* § 611(o) (emphasis added).

#### *i.* ClimateWorks Foundation

***ClimateWorks engages in political activities intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States."*** 22 U.S.C. § 611(o). ClimateWorks has received large grants to support "the acceleration of electric vehicles" and "financial regulation advocacy to address climate risk."[161] In addition, ClimateWorks "advances its left-of-center environmentalism through a wide array of projects, international partnerships, and campaigns, including its [] Project Catalyst and its 2021 'Drive Electric Campaign' which seeks to prohibit the new sale of combustion engine vehicles in phases by 2040."[162] Such campaign and advocacy activities are apparently intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policy of the United States," and therefore constitute political activity triggering registration obligations under FARA.

***ClimateWorks "disburses, or dispenses contributions . . . money, or other things of value for or in the interest of [a] foreign principal" within the United States.*** 22 U.S.C. § 611(c)(iii). As stated above, ClimateWorks is left-wing pass-through funding entity "that distributes funds from donors to environmentalist advocacy groups around the world."[163] ClimateWorks aims to combat global warming and cut emissions by "fund[ing] bold climate strategies."[164] ClimateWorks has received large grants to "support the acceleration of electric vehicles" and "financial regulation advocacy to address climate risk"[165] including a combined over $344 million from the five foreign organizations identified by the APT Report.[166] ClimateWorks in turn has issued over 2,800 grants totaling over $2 billion since 2008, including to "Center for American Progress (CAP), CERES, Environmental Defense Fund (EDF), League of Conservation Voters (LCV), New Venture Fund, and

---

[161] APT Report at 5, *supra* n.2.
[162] ClimateWorks Information, *supra* n.50; Drive Electric Article, *supra* n.55.
[163] ClimateWorks Information, *supra* n.50.
[164] ClimateWorks Approach, *supra* n.51.
[165] APT Report at 5, *supra* n.2.
[166] *Id.* at 21, 23, 25, 29, 30.

Windward Fund," operating as a "foreign dark money ATM to fuel other liberal climate advocacy groups."[167] Many of the groups it funds "lobby for climate-based policies including emissions taxes, restricting coal use, international climate treaties with strict enforcement mechanisms, and diminishing the use of cars."[168] ClimateWorks's activities appear to come within the ambit of FARA because they constitute "disburs[ing]" or "dispens[ing] contributions . . . money, or other things of value for or in the interest of [a] foreign principle,"—registrable activity that triggers registration obligations under FARA.

#### *ii.* Grantham Foundation

***Grantham "disburses, or dispenses contributions . . . money, or other things of value for or in the interest of [a] foreign principal" within the United States.*** 22 U.S.C. § 611(c)(iii). As stated above, Grantham funds a range of climate initiatives from "grassroots efforts to stop the development of coal plants" to funding the "Global Trends in Climate Change" annual report, which tracks climate-related litigation.[169] Grantham provides grants to dozens of left-wing climate organizations that are either pass-through funding organizations themselves or else engage in direct climate and environmental activism and advocacy.[170] As the APT Report shows, Grantham received over $80 million from QCF to fund its grantmaking activities, money which Grantham "disburses, or dispenses" . . . "in the interest of a foreign principal" within the United States.

#### *iii.* Growald Climate Fund

***Growald "disburses, or dispenses contributions . . . money, or other things of value for or in the interest of [a] foreign principal" within the United States.*** 22 U.S.C. § 611(c)(iii). As stated above, the Growald Climate Fund distributes grants to fund left-wing "environmentalist causes with a focus on environmentalist energy and the electricity sector."[171] The Growald Climate Fund has received over $80 million from QCF which it will presumably use for additional grantmaking for U.S. climate initiatives. Growald uses a "venture philanthropy" model, actively "investing" in early-stage or innovative climate organizations similar to a venture capital fund.[172] Growald's stated goal is to engage in "high-impact venture philanthropy" to "catalyz[e] the rapid transition to a clean energy future."[173] Growald's grantmaking activities using funds it receives from foreign agents apparently constitute "disburs[ing], or dispens[ing] contributions" or "money, or other things of value for or in the interest of [a] foreign principal" within the United States. As such, Growald's activities likely trigger registration obligations under FARA.

---

[167] APT Report at 5, *supra* n.2; ClimateWorks Approach, *supra* n.51.
[168] ClimateWorks Information, *supra* n.50.
[169] APT Report at 5, *supra* n.2.
[170] *See* Section I.B.2., above.
[171] Growald Climate Fund Information, *supra* n.63.
[172] Growald Climate Fund Approach, *supra* n.64.
[173] *Id.*

### *iv.* New Venture Fund

***NVF "disburses, or dispenses contributions . . . money, or other things of value for or in the interest of [a] foreign principal" within the United States.*** 22 U.S.C. § 611(c)(iii). As stated above, NVF acts as a fiscal sponsor to 170 nonprofit projects, many of which engage in lobbying and civic engagement on behalf of left-wing causes.[174] New Venture Fund provides operational support to the projects that operate under its tax-exempt status, as well as serving as an incubator for early-stage or seed-funded initiatives to eventually become operational nonprofits.[175] NVF also administers grants and provides resources to the projects it houses, including climate and sustainability-related groups.[176] NVF's activities using funds it receives from foreign agents apparently constitute "disburs[ing], or dispens[ing] contributions" or "money, or other things of value for or in the interest of [a] foreign principal" within the United States. As such, NVF's activities likely trigger registration obligations under FARA.

### *v.* Windward Fund

***Windward "disburses, or dispenses contributions . . . money, or other things of value for or in the interest of [a] foreign principal" within the United States.*** 22 U.S.C. § 611(c)(iii). As stated above, Windward Fund is a nonprofit fiscal sponsor part of the Arabella Advisors-managed group of funds.[177] Windward received over $72 million from the foreign funding groups analyzed in the APT Report.[178] In 2024, "Windward Fund awarded over $154 million to 337 grantees across 48 states and territories," distributing the money it received from foreign organizations into the U.S.[179] The Windward Fund operates in conjunction with its "sister" nonprofits, the 501(c)(4) Sixteen Thirty Fund and 501(c)(3) New Venture Fund, which both provide similar funding and fiscal sponsorship services to radical left-wing advocacy organizations.[180] Windward's activities include "provid[ing] legal compliance, finance, and HR services to its projects, and additionally seek[ing] to help its projects create greater impact through facilitating connections, providing access to information, and capacity building."[181] Windward's activities using funds it receives from foreign agents apparently constitute "disburs[ing], or dispens[ing] contributions" or "money, or other things of value for or in the interest of [a] foreign principal" within the United States. As such, Windward's activities likely trigger registration obligations under FARA.

---

[174] APT Report at 13, *supra* n.2.
[175] NVF 2024 Impact Report at 2, 3, 6, *supra* n.71.
[176] *Id.*
[177] APT Report at 5, *supra* n.2.
[178] *Id.* at 24, 28, 31.
[179] McNair, *supra* n.79.
[180] Windward Fund Information, *supra* n.80.
[181] *Id.*

### *vi.* The Sunrise Project

***Sunrise Project engages in political activities intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States."*** 22 U.S.C. § 611(o). As stated above, the Sunrise Project uses aggressive tactics to bring about the transition from fossil fuels to renewables "as fast as possible."[182] Among its tactics is coordinating protests against the fossil fuel industry to influence public opinion about U.S. energy policy.[183] Additionally, "the project also runs a specific initiative aimed at cajoling various aspects of [] finance into cutting out traditional energy providers from finance markets and to facilitate weather-dependent energy projects instead. These efforts include targeting and pressuring insurers, asset managers, private banks, central banks, private equity, bond markets, and automakers to shut out the oil and gas industry."[184] Such campaign and advocacy activities are apparently intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policy of the United States," and therefore constitute political activity triggering registration obligations under FARA.

***Sunrise Project "disburses, or dispenses contributions . . . money, or other things of value for or in the interest of [a] foreign principal" within the United States.*** 22 U.S.C. § 611(c)(iii). As stated above, the Sunrise Project "serves as an activist hub, receiving tens of millions of dollars in grants, that it then disburses in accordance with its strategic plan," which includes "end[ing] the use of traditional energy" and "campaign[ing] to de-bank the oil and gas industry by pressuring the financial sector and various industries to not do business with it."[185] Of the tens of millions the group receives in grants, it "regrants roughly two-thirds of the funds out" to "organizations that it believes fit into its global change strategy."[186] Sunrise Project's activities using funds it receives from foreign agents apparently constitute "disburs[ing], or dispens[ing] contributions" or "money, or other things of value for or in the interest of [a] foreign principal" within the United States. As such, Sunrise Project's activities likely trigger registration obligations under FARA.

### *vii.* Rockefeller Philanthropy Advisors

***RPA engages in political activities intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States."*** 22 U.S.C. § 611(o). As stated above, in addition to considerable grantmaking activities, RPA "engages in research, writes papers, and creates coalitions for purposes of guiding donors and foundations," including "a series of donor guides, addressing issues like gender and climate change."[187] Such campaign and advocacy activities are apparently intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policy of

---

[182] APT Report at 5, *supra* n.2.
[183] *Id.* at 6.
[184] Sunrise Project Information, *supra* n.85; *Shifting Global Finance Beyond Fossil Fuels*, *supra* n.87.
[185] Sunrise Project Information, *supra* n.85; *About*, *supra* n.85; *Grants*, *supra* n.85.
[186] Sunrise Project Information, *supra* n.85.
[187] RPA Information, *supra* n.90.

the United States," and therefore constitute political activity triggering registration obligations under FARA.

***RPA "disburses, or dispenses contributions . . . money, or other things of value for or in the interest of [a] foreign principal" within the United States.*** 22 U.S.C. § 611(c)(iii). As stated above, RPA was among the top recipients of funding from Oak Foundation, from whom it received over $108 million since 2016.[188] RPA issues hundreds of millions of dollars in grants to progressive groups, including over $400 million in 2023 alone.[189] RPA dispenses contributions it receives from foreign organizations to U.S.-based left-wing groups. Among its largest grants in 2023 were "$10,247,809 to the Climate Leadership Initiative, $7,797,805 to Climate Breakthroughs, $6,633,000 to the Sustainable Markets Foundation, $5,082,261 to Climate Arc, $3,910,000 to Oil Change International, $3,069,696 to the Global Alliance for Incinerator Alternatives, and $2,853,658 to the World Wildlife Fund."[190] RPA's activities using funds it receives from foreign agents apparently constitute "disburs[ing], or dispens[ing] contributions" or "money, or other things of value for or in the interest of [a] foreign principal" within the United States. As such, RPA's activities likely trigger registration obligations under FARA.

### *viii.* Center for International Environmental Law

***CIEL engages in political activities intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States."*** 22 U.S.C. § 611(o). As stated above, CIEL accepts foreign grants and uses this money to fund whitepapers and policy research related to extreme climate policies.[191] Among the titles of publications by CIEL are "Accelerating the Managed Decline of Oil and Gas," "Climate Law, Liability, and Litigation: A New Era in Climate Advocacy," and "Leveraging Legal and Financial Risk to End Global Reliance on Fossil Fuels."[192] More recently, in an attempt to aid litigation against traditional energy companies, CIEL published "Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis."[193] CIEL's policy advocacy include "oppos[ition] the use of carbon emitting fuels such as petroleum, coal, and low carbon natural gas."[194] In addition, "CIEL has also joined coalitions that oppose the use of carbon free nuclear power, produced reports opposing the development of carbon free hydro-electric dams, and opposed the deployment of technologies that would remove carbon emissions from the atmosphere."[195] In 2023, CIEL co-produced a "report that advocated for the World Bank Group to restrict its energy financing to only 'renewable' projects."[196] CIEL also opposes net-

---

[188] APT Report at 12.
[189] *Id.*
[190] RPA Information, *supra* n.90; RPA Data, *supra* n.90.
[191] APT Report at 9.
[192] *Id.*
[193] *Id.*
[194] CIEL Information, *supra* n.92.
[195] *Id.*
[196] *Id.*

zero goals in favor of even more extreme "real zero" goals.[197] CIEL has criticized net zero goals as "hollow" attempts to "mask climate inaction and provide cover for business-as-usual fossil fuel production that spells planetary destruction."[198] CIEL engages directly in policy advocacy in the U.S. to influence public opinion regarding domestic energy policy. Such campaign and advocacy activities are apparently intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policy of the United States," and therefore constitute political activity triggering registration obligations under FARA.

### *ix.* Environmental Law Institute

***ELI engages in political activities intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States."*** 22 U.S.C. § 611(o). As stated above, ELI runs judicial education programs to teach judges left-wing climate policy and legal theories.[199] The group is also known for teaching and advocating for the "far-left concept of environmental justice."[200] The group's Climate Judiciary Project was the subject of a House Judiciary Committee investigation to determine whether the group sought to influence judicial decision-making in climate-related litigation.[201] ELI "develops law and policy, advocates environmentalist policy outcomes to professionals and the public, provides data and analysis, and convenes various groups to address environmental issues."[202] Additionally, ELI "supports the creation of regulatory rules to address the critical race theory-influenced concept of racial justice, operates the Climate Equity for Local Governments initiative that supports the far-left concept of environmental justice, publishes *The Environmental Law Reporter*, operates an Emerging Leaders Initiative, runs a podcast, and seeks to influence global environmental law and governance practices."[203] Such campaign and advocacy activities are apparently intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policy of the United States," and therefore constitute political activity triggering registration obligations under FARA.

---

[197] *Id.*
[198] *Id.*
[199] ELI Information, *supra* n.101.
[200] Environmental Justice at ELI, *supra* n.102; ELI Information, *supra* n.101.
[201] Richardson, *supra* n.103.
[202] ELI Information, *supra* n.101; ELI 2021 Report at 19, *supra* n.104.
[203] ELI Information, *supra* n.101.

### *x.* Ceres

***Ceres engages in political activities intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States."*** 22 U.S.C. § 611(o). As stated above, Ceres coordinates institutional investors to influence corporate behavior and push the adoption of radical ESG policies in "every aspect of decision-making" and costly climate disclosures for public energy companies.[204] Ceres was a founding partner and driving force behind the Net Zero Asset Managers Initiative and Climate Action 100+, which brought together asset managers from around the world to engage in a coordinated effort to push for ESG policies and emissions disclosures from portfolio companies.[205] Ceres and its related initiatives "leverage[ed] a network of investors totaling more than $32 trillion in assets to pressure companies into adopting Ceres' preferred [climate and ESG] policies."[206] Ceres' own stated purpose is to "pressure stock exchanges and capital market regulators to improve climate and sustainability risk disclosure, and opportunities to advocate for stronger climate, clean energy and water policies at all levels of government."[207] Ceres also operates the Business for Innovative Climate and Energy Policy (BICEP) Network which provides members with the tools and knowledge they need "to engage with state and federal policymakers on" climate and energy policies.[208] Additionally, "[b]etween 2020 through October 2023, Ceres increased the amount it spent on lobbying, from around $80,000 in 2020 to at least $270,000 in 2022, an amount which the organization claimed was on track to match or exceed as of the second quarter of 2023."[209] Such campaign and advocacy activities are apparently intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policy of the United States," and therefore constitute political activity triggering registration obligations under FARA.

### *xi.* Rocky Mountain Institute Environmental Defense Fund

***RMI engages in political activities intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States."*** 22 U.S.C. § 611(o). As stated above, RMI engages in climate policy research, analysis, and advocacy.[210] RMI's goal is to "replace fossil fuel usage" with renewable energy sources, though the group also opposes nuclear energy projects.[211] RMI also has ties to China through an official partnership with the National Development and Reform Commission, a Chinese government agency.[212] As an example of the kinds of policy research and analysis RMI provides, in 2022 RMI published a

---

[204] APT Report at 15, *supra* n.2.
[205] https://www.ceres.org/initiatives/climate-action-100.
[206] Ceres Information, *supra* n.108.
[207] Ceres Investor Network, *supra* n.109.
[208] *Id.*
[209] Ceres Information, *supra* n.108.
[210] RMI Information, *supra* n.112.
[211] *Id.*
[212] Anderson & Simonsan, *supra* n.114.

study claiming that gas stoves are linked to childhood asthma and advocating for a ban on gas stoves.[213] RMI's research is used by it and other left-wing climate organizations to push radical environmentalist views in their efforts to influence public opinion and legislation concerning energy policy in the United States. Such campaign and advocacy activities are apparently intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policy of the United States," and therefore constitute political activity triggering registration obligations under FARA.

### *xii.* Environmental Defense Fund

***EDF engages in political activities intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States."*** 22 U.S.C. § 611(o). As stated above, EDF's activities include "lobbying, research, communications, litigation, and providing legal advisory to other organizations."[214] Among the initiatives EDF supports are expanding California's cap and trade program, a federally mandated 30% cut in power-plant emissions, and an approximately 40-50% reduction in methane emissions from natural gas production.[215] EDF uses "litigation programming" to advance its extreme left-wing climate agenda, which includes "a federally mandated 20 percent decrease in carbon emissions in less than a decade; a 40-50 percent reduction in methane emissions resulting from natural gas production; and mandated reductions in chemicals that the EDF argues impact human health."[216] EDF also has ties to former President Barack Obama, and has pledged to oppose President Donald Trump's environmental policies.[217] Such campaign and advocacy activities are apparently intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policy of the United States," and therefore constitute political activity triggering registration obligations under FARA.

### *xiii.* Institute for Governance and Sustainable Development

***IGSD engages in political activities intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States."*** 22 U.S.C. § 611(o). As stated above, IGSD is a climate advocacy organization that supports the Green New Deal and other extreme climate initiatives to "eliminate the use of conventional fuels."[218] In addition to its climate advocacy in the U.S., the group "works with international organizations to promote

---

[213] *Id.*
[214] EDF Information, *supra* n.117.
[215] *Id.*
[216] *Id.*
[217] Don't Give Up: Stand Against Trump's Climate Attacks." Environmental Defense Fund. Undated. Accessed September 22, 2017. https://secure2.edf.org/site/Advocacy?cmd=display&id=2852&page=UserAction&utm_source=twitter&utm_campaign=edf_content-share_upd_mem&utm_medium=referral&utm_id=1478728172&utm_content=alert-short.
[218] IGSD Information, *supra* n.123.

agreements to combat climate change."[219] Within the U.S., "IGSD targets professionals to push its environmentalist agenda, working with lawyers, political scientists, economists, and scientists," including through establishing "the Program on Governance for Sustainable Development at the University of California-Santa Barbara" to direct research to support environmentalist projects.[220] Additionally, "IGSD has received over $6.2 million in grants from the U.S. government since 2008."[221] Among its most radical initiatives, since 2017 IGSD has operated the Center for Climate Integrity (CCI). "CCI supports lawsuits against energy companies to push for environmental regulation. CCI works to encourage citizen groups and governments to sue energy companies, billing the lawsuits as necessary to force polluters to pay for the damage of climate change instead of shifting the costs to taxpayers."[222] Such campaign and advocacy activities are apparently intended to "influence . . . the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policy of the United States," and therefore constitute political activity triggering registration obligations under FARA.

***xiv.* Tides Network (and Related Entities)**

***Tides Foundation and Tides Center "disburse[], or dispense[] contributions . . . money, or other things of value for or in the interest of [a] foreign principal" within the United States.*** 22 U.S.C. § 611(c)(iii). As stated above, the Tides Foundation and the Tides Center provide thousands of grants each year and fiscal sponsorship of over 100 different groups. In 2023 alone, the Tides Network—through its associated entities—issued over 4,000 grants and served as fiscal sponsor for over 120 different groups.[223] As the APT Report notes, the two Tides entities, Tides Foundation and Tides Center, received a combined $10 million from two of the foreign funding organizations analyzed in that report.[224] The Tides Foundation, in addition to receiving millions of dollars in foreign money from groups like CIFF, has been noted as "George Soros' Favorite Money Handler" when it was discovered that Soros' Open Society Foundation had given at least $17.2 million to the Tides Foundation between 2009 and 2022.[225] The Tides Center, which provides fiscal sponsorship in the form of "incubation services" to emerging left-wing groups, allows these groups to accept tax-deductible donations before the groups become independent organizations.[226] This fiscal sponsorship arrangement "has the added effect of obscuring the donors to these individual projects, as grants to incubated organizations are paid to the Tides Center."[227] Tides' grantmaking and fiscal sponsorship activities using funds it receives from foreign agents apparently constitute "disburs[ing], or dispens[ing] contributions" or "money, or other things

[219] *Id.*
[220] *Id.*; "Research & Education". 2020. *IGSD*. http://www.igsd.org/about/research-and-education/.
[221] IGSD Information, *supra* n.123; Stilson, *supra* n.126.
[222] IGSD Information, *supra* n.123.
[223] Tides Network Information, *supra* n.128.
[224] APT Report at 28, 31, *supra* n.2.
[225] Horowitz, *supra* n.130.
[226] Tides Nexus Information, *supra* n.128.
[227] *Id.*

of value for or in the interest of [a] foreign principal" within the United States. As such, Tides' activities likely trigger registration obligations under FARA.

## III. Conclusion

For the foregoing reasons, we respectfully submit there is substantial evidence that many of the over 150 U.S.-based organizations that collectively have received nearly $2 billion from five foreign-registered charities are acting as unregistered agents of foreign principals by engaging in coordinated funding and advocacy efforts to influence U.S. energy policy and undermine American energy independence. Nor does it appear that the nonprofit organizations' activities would be covered by any of FARA's exemptions.[228]

Sincerely,

Austin Knudsen
ATTORNEY GENERAL OF MONTANA

Steve Marshall
ATTORNEY GENERAL OF ALABAMA

Stephen J. Cox
ATTORNEY GENERAL OF ALASKA

Tim Griffin
ATTORNEY GENERAL OF ARKANSAS

James Uthmeier
ATTORNEY GENERAL OF FLORIDA

Christopher M. Carr
ATTORNEY GENERAL OF GEORGIA

Raúl Labrador
ATTORNEY GENERAL OF IDAHO

---

[228] "The burden of establishing the availability of an exemption from registration under the Act shall rest upon the person for whose benefit the exemption is claimed." 28 C.F.R.§ 5.300

Todd Rokita
ATTORNEY GENERAL OF INDIANA

Brenna Bird
ATTORNEY GENERAL OF IOWA

Kris W. Kobach
ATTORNEY GENERAL OF KANSAS

Russell M. Coleman
ATTORNEY GENERAL OF KENTUCKY

Liz Murrill
ATTORNEY GENERAL OF LOUISIANA

Lynn Fitch
ATTORNEY GENERAL OF MISSISSIPPI

Mike Hilgers
ATTORNEY GENERAL OF NEBRASKA

Gentner F. Drummond
ATTORNEY GENERAL OF OKLAHOMA

Alan Wilson
ATTORNEY GENERAL OF SOUTH CAROLINA

Marty J. Jackley
ATTORNEY GENERAL OF SOUTH DAKOTA

Ken Paxton
ATTORNEY GENERAL OF TEXAS

John B. McCuskey
ATTORNEY GENERAL OF WEST VIRGINIA