**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**WEST VIRGINIA RIVERS COALITION, INC.,**
**and 350.org,**

**Plaintiffs,**

2:26-cv-679

**v.** **Civil Action No. 2:26-cv-______**

**JOHN B. MCCUSKEY, in his official capacity as**
**Attorney General of the State of West Virginia,**

**Defendant.**

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**DEREK TEANEY**
**AMANDA DEMMERLE**
**APPALACHIAN MOUNTAIN ADVOCATES, INC.**
**P.O. Box 507**
**Lewisburg, WV 24901**
**(304) 646-1182**
**dteaney@appalmad.org**
**ademmerle@appalmad.org**

**Counsel for Plaintiffs**

On September 16, 2026, the Attorney General of West Virginia, John B. McCuskey (Defendant), opened deceptive trade practices investigations into the two Plaintiff charities and served each with a subpoena. The subpoenas to Plaintiffs invoked only one source of authority: W. Va. Code § 46A-7-104(1), which permits an investigative subpoena only on probable cause that a person violated the Consumer Credit and Protection Act (the Act). The Act regulates deception in the "sale or distribution of any goods or services." Id. § 46A-6-102(6). The subpoenas identify no consumer, no transaction, no complaint, no sale of goods or services, and no act of deception, but they demand nearly ten years of records relating to Plaintiffs' funders and their communications, internal documents, drafts of documents, and testimony to governmental agencies.

Plaintiffs West Virginia Rivers Coalition, Inc. ("WV Rivers") and 350.org are non-profit organizations that raise money from charitable contributions, not by selling goods or services. They engage in no deceptive practices, and the subpoenas identify none. Simply put, the investigations and the subpoenas are illegitimate.

The subpoenas come due November 2. Plaintiffs ask the Court to enjoin the investigations before that date to protect their constitutional rights. The true goal of the subpoenas and investigations is to stifle speech and activities that Defendant does not like. The subpoenas make clear Defendant's refusal to accept the science of climate change and his willingness to abuse the power of his Office to retaliate against and harass groups to which he is politically opposed. Defendant's animus toward environmental groups is no secret—sixteen days after serving the subpoenas, he described climate activists as "insane leftist greeno's" and himself as "proud to stand with my friends" in the coal and gas industry. Ex. 1. And Defendant knows exactly what effect his subpoenas will have: in August 2025, he signed a brief telling the Supreme Court of the United States that an attorney general's subpoena to a nonprofit opposed to abortion is a "state-backed inquisition" conducted through "burdensome and harassing subpoenas for swaths of sensitive information," and that the subpoena power can be

"weaponize[d]" against disfavored groups. Br. of Florida et al. as Amici Curiae at 5–6, First Choice Women's Res. Ctrs., Inc. v. Platkin, No. 24-781 (U.S. Aug. 28, 2025).

In First Choice Women's Resource Centers, Inc. v. Davenport, 608 U.S. 174, 189 (2026), a unanimous Supreme Court held that a state attorney general's demand for a nonprofit's donor information injures the right of association from the moment the demand is made. So too here: Plaintiffs' speech and associations have been chilled since they received the subpoenas. WV Rivers has paused its mini-grant funding as a result of the subpoena; its staff is reconsidering what type of work it should do; its Executive Director cannot promise the funders of its work that their support will remain confidential; and its staff can no longer communicate freely even among themselves. Ex. 2 ("Smith Decl.") ¶¶ 14–20, 24, 28. Similarly, 350.org's Executive Director now reviews every public-facing document and communication from its United States team before release, and 350.org will not do any new work in the State while the sham investigation is outstanding. Ex. 3 ("Odendahl Decl.") ¶¶ 16–18.

WV Rivers and 350.org therefore ask the Court to enjoin Defendant from taking any further steps in these investigations, including enforcing the subpoenas at issue, applying for an order under W. Va. Code § 46A-7-104(3), issuing any further demand, initiating any proceeding under the Act or any other law predicated on the subjects of the investigations, and from using the power of his office to investigate, retaliate against, or harass Plaintiffs because of their efforts to explain climate science.

## FACTS

Plaintiff WV Rivers advocates for clean water and healthy waters for all in the Mountain State through research, public education, policy advocacy, citizen water-quality monitoring, and engagement with state and federal agencies. Smith Decl. ¶ 5. Plaintiff 350.org advocates for a transition from fossil fuels to renewable energy. Odendahl Decl. ¶ 3. To further their missions, Plaintiffs publish statements or otherwise speak about the impacts of climate change on the environment and on communities, and

about the environmental effects of fossil-fuel extraction, transportation, and combustion. Compl. ¶¶ 22, 32. WV Rivers regularly submits comments to state and federal agencies, testifies before legislative and administrative bodies, and participates as a party in litigation challenging permits and approvals for energy infrastructure and industrial projects in West Virginia. Id. ¶¶ 23–24. Those activities constitute political speech protected by the First Amendment. See § II.A.1, infra.

To fund their activities, Plaintiffs rely on grants from various organizations; they solicit charitable contributions from the public through their websites, mailings, emails, and events. Compl. ¶¶ 28, 33. Some of their funders, including charitable foundations, give on the understanding that the fact or amount of their support will not be disclosed. Smith Decl. ¶ 28; Odendahl Decl. ¶ 21. Plaintiffs also provide grants to other nonprofit organizations with similar missions to support their work. Smith Decl. ¶ 24; Odendahl Decl. ¶ 4.

On September 16, 2026, Defendant served investigatory subpoenas on WV Rivers (Ex. 4), 350.org (Ex. 5), and at least four other nonprofit organizations. Smith Decl. ¶¶ 6, 10; Odendahl Decl. ¶¶ 9, 12; Exs. 4 & 5. Defendant commanded Plaintiffs to turn over documents and communications dating back to January 1, 2017, including those related to their public statements on climate and energy, their internal deliberations about those statements, their requests for donations, the organizations that have funded their work (and the amounts those organization gave), the organizations they have paid, their dealings with coalitions and other advocacy organizations on energy permitting and regulation in West Virginia, and their submissions to regulatory agencies. Exs. 4 & 5. The subpoenas focus on Plaintiffs' "Climate Claims," defined as "statement[s] asserting, on a purportedly scientific or statistical basis, a demonstrable or otherwise traceable connection" between fossil-fuel greenhouse gas emissions and changes in climate or weather, including resulting harm to health or the economy, attributed to energy companies or projects or linked to a specific West Virginia energy business. Ex. 4 at 5–6; Ex. 5 at 5. The subpoenas contain 16 demands, many of which have subparts and not all of

which apply solely to "Climate Claims." See generally Exs. 4 & 5. No demand is limited to statements made to consumers. Exs. 4 & 5. The subpoenas set a return date of November 2, 2026. Ex. 4 at 1; Ex. 5 at 1. If Plaintiffs do not comply, Defendant can hale them into State circuit court to compel compliance. W. Va. Code § 46A-7-104(3).

The sole claimed basis for issuing these subpoenas was W. Va. Code § 46A-7-104(1), a provision of the West Virginia Consumer Credit and Protection Act. That provision permits Defendant to investigate only if he "has probable cause to believe that a person has engaged in an act which is subject to action by the Attorney General." The Act prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Id. § 46A-6-104. But "'trade' or 'commerce'" is defined as "the advertising, offering for sale, sale or distribution of any goods or services and shall include any trade or commerce, directly or indirectly, affecting the people of this state." Id. § 46A-6-102(6). The subpoenas describe the investigations as ones into "unfair or deceptive acts or practices." Thus, to commit the violation the subpoenas describe, one must deceive in the sale of goods or services.[1] Despite this, the subpoenas do not identify any consumer, any consumer transaction, any complaint, or any act by Plaintiffs that Defendant contends violates the Act. Indeed, the Act does not apply to Plaintiffs at all, but for their de minimis sales of merchandise (T-shirts, etc.) bearing their names or logos—sales the subpoenas do not mention. Smith Decl. ¶ 8; Odendahl Decl. ¶ 11. Plaintiffs otherwise do not engage in trade or sell any goods or services. Smith Decl. ¶ 8; Odendahl Decl. ¶ 11.

The subpoenas also presuppose that Plaintiffs' statements about climate change are deceptive. Remarkably, the subpoenas do not identify any such deception. Defendant should be aware that there

[1] The Act's remaining articles—consumer credit sales, loans, leases, and debt collection—have no conceivable application to a charity's advocacy, still require a sale of goods and services, and were not mentioned in the subpoena.

is a greater than 99% consensus in the peer reviewed literature that climate change is occurring and that it is human-caused[2] and that its impacts on West Virginia are devastating.[3] The U.S. Environmental Protection Agency observes that "the earth is warming" because "[p]eople have increased the amount of carbon dioxide in the air" by burning fossil fuels.[4] Far from engaging in deceptive practices, Plaintiffs' statements are performing a public service by informing citizens about climate change and its impacts.

## ARGUMENT

### I. Plaintiffs Have Standing to Protect Their Constitutional Rights.

Plaintiffs bring this action under 42 U.S.C. § 1983, which "authorizes suits against any person who, under color of state law, deprives another of his federal constitutional rights." First Choice, 608 U.S. at 181. Plaintiffs allege violations of their First and Fourth Amendment rights (as incorporated through the Fourteenth Amendment) and bring this action against Defendant in his official capacity. Ex parte Young, 209 U.S. 123, 155–56 (1908).

---

[2] See Mark Lynas et al., Greater than 99% consensus on human caused climate change in the peer-reviewed scientific literature (Oct. 2021), available at https://iopscience.iop.org/article/10.1088/1748-9326/ac2966.

[3] See, e.g., Jessica Riley, Rising waters, rising risks: How climate change and aging infrastructure are affecting flood risk in West Virginia (Dec. 2025), available at https://journalism.wvu.edu/wv-today/wvtoday-story/2025/12/05/rising-waters-rising-risks-how-climate-change-and-aging-infrastructure-are-affecting-flood-risks-in-west-virginia). Even if the scientific consensus were mistaken (it is not), a nonprofit does not deceive anyone by accurately reporting it. A conclusion drawn from non-fraudulent data and accurately described is not actionable as false advertising or as a deceptive practice because "the conclusions of empirical research are tentative and subject to revision" and "the trial of ideas plays out in the pages of peer-reviewed journals." ONY, Inc. v. Cornerstone Therapeutics, Inc., 729 F.3d 490, 496–99 (2d Cir. 2013) (dismissing Lanham Act and N.Y. Gen. Bus. Law § 349 claims). "Scientific controversies must be settled by the methods of science rather than by the methods of litigation." Underwager v. Salter, 22 F.3d 730, 736 (7th Cir. 1994).

[4] EPA, What Climate Means for West Virginia (Aug. 2016), available at https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-wv.pdf.

Article III of the Constitution requires standing, "consisting of three elements: injury in fact, causation, and redressability." First Choice, 608 U.S. at 183 (cleaned up). Plaintiffs satisfy all three.

First, as to injury-in-fact, the injury alleged must involve "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Just last term, the Supreme Court clarified in First Choice that parties suffer cognizable injury-in-fact when they receive subpoenas like the ones Plaintiffs have received here. A unanimous Supreme Court held that the issuance of a state attorney general's subpoena for a nonprofit's donor information "established a present injury to [First Choice's] First Amendment associational rights." First Choice, 608 U.S. at 188. The Court made this finding against the backdrop of decades of its prior First Amendment decisions that have applied exacting scrutiny to government demands for donor and member information. Id. at 187.

The Supreme Court has "long recognized that demands for a charity's private member or donor information … discourage people from associating with groups engaged in protected First Amendment advocacy" and also "encourage groups and individuals to cease or modify protected First Amendment advocacy the government disfavors." First Choice, 608 U.S. at 189 (cleaned up). "All this occurs not just when a demand is enforced, but when it is made and for as long as it remains outstanding." Id. at 189. In other words, "demands for private donor information inevitably carry with them a deterrent effect on the exercise of First Amendment rights." Id. at 186 (cleaned up).

The Fourth Circuit has similarly held that "the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" Edgar v. Haines, 2 F.4th 298, 310 (4th Cir. 2021) (quoting Cooksey v. Futrell, 721 F.3d 226, 235 (4th Cir. 2013)). Plaintiffs need only show that the "chilling effect" is "objectively reasonable," not that "the government action led them to stop speaking altogether." Id. (cleaned up).

The Fourth Circuit applied First Choice in TitleMax of S.C., Inc. v. Spicher, 185 F.4th 141, (4th Cir. 2026), a title lender's challenge to a non-self-executing subpoena. The court held that challenge unripe because the lender did "not allege that the issuance of the subpoena itself changed its business practices or otherwise inflicted a present injury." Id. at 165–66. Plaintiffs here are on the other side of that line: Defendant's demands for their funders, partners, and internal deliberations are themselves the injury First Choice recognized, and they have already changed how Plaintiffs operate.

Defendant's subpoena and investigation have caused WV Rivers to self-censor its speech and be more careful about its associations. For example, WV Rivers recently completed a project but is not promoting this project, like it planned to and normally does through social media and other press, because of the subpoena and fear that the citizens whose stories it tells will be targeted. Smith Decl. ¶ 19. WV Rivers's staff also regularly uses internal digital platforms to message amongst themselves about their work, but they are limiting this communication now that they know Defendant may one day read it and gain insights into their deliberative process. Id. ¶ 17. WV Rivers also, with great reluctance, decided to pause its mini-grant funding to protect smaller groups from being revealed to and targeted by Defendant. Id. ¶ 24.

350.org is also experiencing present injuries as a direct result of Defendant's subpoena and investigation. After two House committee chairmen sent 350.org a letter on September 10, 2026, 350.org began requiring its U.S. team to submit all public-facing documents and communications to its executive director for approval before release. Odendahl Decl. ¶¶ 8, 16. 350.org expected that measure to be short-lived. Id. ¶ 16. Since receiving Defendant's subpoena, however, it has extended the review process indefinitely. Id. The executive director now screens content with the subpoena and investigation in mind and has vetoed or toned down messages that could cause 350.org to be targeted based on the content of its speech. Id. ¶ 17. 350.org has also decided not to undertake any new work in West Virginia while the subpoena and investigation are pending. Id. ¶ 18.

The injuries Plaintiffs currently suffer are directly traceable to the issuance of the subpoenas. Both WV Rivers and 350.org were required to inform at least some donors of the investigation and understand, and indeed expect, that this could impact their funding. Plaintiffs reasonably fear that continuing to work with groups or engaging with new groups may put others on Defendant's investigation list, and they are changing their behavior because of it. They are also self-censoring their speech as a direct result of the subpoena. These chilling effects will be redressed if the Court enjoins enforcement of the subpoenas and their related investigations.

## II. The Court Should Issue a Temporary Restraining Order and Preliminary Injunction to Protect Plaintiffs' Constitutional Rights.

Plaintiffs seek a temporary restraining order ("TRO") and preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) and (b) prohibiting any furtherance of Defendant's investigations (including enforcement of the subpoenas) before November 2, 2026—the return date in the subpoenas. Plaintiffs file this Motion on October 22, 2026, eleven days before that compliance date, and have alerted Defendant of this filing. A TRO "preserv[es] the status quo only until a preliminary injunction hearing can be held." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 422 (4th Cir. 1999). Plaintiffs ask this Court to hold a preliminary injunction hearing as soon as practicable and to enter a TRO, a preliminary injunction, or both before November 2.

Plaintiffs' request is not unusual. In recent years, state attorneys general of both parties have opened investigations and used their subpoena powers against entities to which they are politically opposed, requiring the targets to seek injunctive relief. That was the posture in First Choice. 608 U.S. at 183. The D.C. District Court recently prohibited the enforcement of the Texas Attorney General's subpoenas against Media Matters, finding they were issued as retaliation for unfavorable news coverage. Media Matters for Am. v. Paxton, 732 F.Supp.3d 1, 8, 27–30 (D.D.C. 2024), aff'd, 138 F.4th 563 (D.C. Cir. 2025). Even more recently, an Indiana district court enjoined enforcement of a subpoena from the Indiana Attorney General to a nonprofit that serves immigrants and engages in

protected speech against U.S. Immigration and Customs Enforcement ("ICE"). Exodus Refugee Immigr., Inc. v. Rokita, No. 1:25-CV-01885, 2026 WL 2249397 (S.D. Ind. Aug. 5, 2026), appeal docketed, No. 26-2811 (7th Cir. Sept. 2, 2026).

Plaintiffs ask for similar injunctive relief. The standard for a temporary restraining order is the same standard for granting a preliminary injunction. See, e.g., Williams v. Rigg, 458 F.Supp.3d 468, 474 (S.D. W. Va. 2020). A plaintiff seeking a preliminary injunction must make a clear showing that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. Winter v. NRDC, 555 U.S. 7, 20 (2008); Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009). Plaintiffs satisfy all four Winter factors.

### A. Plaintiffs Are Likely to Succeed on Their First and Fourth Amendment Claims.

"Although … plaintiffs seeking injunctions [must] make a 'clear showing' that they are likely to succeed at trial, plaintiffs need not show a certainty of success." Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013) (citations omitted). Plaintiffs are likely to succeed on all of their claims, but likelihood of success on any one of them suffices. See, e.g., League of Women Voters of N.C. v. N.C., 769 F.3d 224, 248 n.7 (4th Cir. 2014) (reversing district court denial of preliminary injunction on Voting Rights Act claim and therefore not addressing constitutional claims).

#### 1. The First Amendment protects against retaliatory investigations like these.

Defendant's subpoenas are part of retaliatory investigations that violate Plaintiffs' First Amendment rights to free speech, association, and to petition. The Supreme Court unanimously held that "the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." Hous. Cmty. Coll. Sys. v. Wilson, 595 U.S. 468, 474 (2022). To establish a likelihood of success on the merits of a retaliation claim, Plaintiffs must demonstrate that "(1) [they] engaged in protected First Amendment activity, (2) the defendant[]

took some action that adversely affected [their] First Amendment rights, and (3) there was a causal relationship between [their] protected activity and the defendant['s] conduct." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005). Plaintiffs can establish all three.

First, Plaintiffs engage in protected First Amendment activity. "The First Amendment guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely. Each of these rights, this Court has long understood, necessarily carries with it a corresponding right to associate with others." First Choice, 608 U.S. at 184 (cleaned up). Plaintiffs' public statements on climate and energy, their comments and testimony to agencies and legislative bodies, their litigation challenging permitting decisions, their coalition work with other groups, and their solicitation of support for those activities fall within the scope of the First Amendment. See, e.g., Nat'l Rev., Inc. v. Mann, 589 U.S. 1088, 1093 (2019) (Alito, J., dissenting from denial of certiorari) (debate over climate change is core political expression protected by the First Amendment); Snyder v. Phelps, 562 U.S. 443, 452 (2011) (speech on public issues occupies "the highest rung of First Amendment values"); Americans for Prosperity Found. v. Bonta, 594 U.S. 595, 606–07 (2021) ("[Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association" and there is a "vital relationship between freedom to associate and privacy in one's associations." (cleaned up)).

Second, Plaintiffs suffer an adverse impact to their First Amendment activities. To make this showing, Plaintiffs need only show that the governmental action "would deter a person of ordinary firmness from continuing to exercise First Amendment rights," and not that it "actually … deprived [them of] First Amendment rights" or "to cease First Amendment activity altogether." Constantine, 411 F.3d at 499–500. In other words, the chilling effect must be objectively reasonable, and it is not dependent on Plaintiffs' "will to fight." Id. at 500. As explained in Section I, Plaintiffs' speech has already been chilled—individuals in the organizations are questioning whether to talk about climate

change and considering modifying their language because of the subpoenas and investigation. WV Rivers is reducing its internal communications because of the investigation, worried that Defendant may get an intimate view of their internal private deliberations. 350.org is screening all of its U.S. content through its executive director and its content is being vetoed or toned down. Plaintiffs' associations are also chilled. WV Rivers has paused its mini-grant funding so as to protect small organizations from associating with them and subjecting themselves to Defendant's harassing probe. Plaintiffs also reasonably understand that individuals and organizations may be less likely to donate or otherwise associate with them as the result of the subpoena and investigation. First Choice, 608 U.S. at 189–90.

The chill Plaintiffs are experiencing from Defendant's investigation is objectively reasonable. In Media Matters, because there was a "threat of invoking legal sanctions," a threat of intrusion into their process, and other "punitive consequences," the Court found "Plaintiffs' claim of chilled expression objectively reasonable." 732 F. Supp.3d at 28. Plaintiffs in the instant action are subjected to similar threats. See W. Va. Code § 46A-7-104(3).

Third, Defendant's subpoenas and related investigations are retaliatory and would not exist but for Plaintiffs' exercise of their Constitutional rights. In other words, Plaintiffs' protected activity caused the investigations. Causation requires, at a minimum, that the defendant knew of the protected activity and acted with some temporal proximity to it. Constantine, 411 F.3d at 501; Shaw v. Foreman, 59 F.4th 121, 130–31 (4th Cir. 2023). Causation may be shown through circumstantial evidence. See Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir. 2001) (recognizing that timing can "raise[] an inference of retaliatory motive"). And "[o]nce a plaintiff establishes his protected conduct was a substantial or motivating factor in the defendant's decision to take adverse action, the defendant is appropriately tasked with explaining why her decision was not animated by retaliatory motives." Martin v. Duffy, 977 F.3d 294, 301 (4th Cir. 2020).

Defendant's own words show his retaliatory motive. Before he issued the subpoenas, he described opposition to fossil fuels as "policies driven by adverse actors and propped up by often contested climate theory." Ex. 6. Sixteen days after he issued the subpoenas, he called climate advocates "[i]nsane leftist greeno's" and declared himself "proud to stand with my friends" at the Gas and Oil Association of West Virginia and the West Virginia Coal Association. Ex. 1. These are not isolated remarks. On his personal account and in his office's official statements, he has described climate activists and their activities using false and inflammatory language: a "green cabal," Ex. 7; "[l]iberal eco-activist special interest groups," Ex. 8; "[e]co-radical lawsuits"; and "[c]limate warfare," Ex. 9. He has made such heated statements on his personal X account, on official press releases, and through accounts from the office of the West Virginia Attorney General.

He has also made similar accusations in official public letters and court filings. See Compl. ¶¶ 35–64. In February 2026, Defendant signed the letter asking the Department of Justice to investigate 350.org by name. Ex. 10. In May 2026, his office told the Fourth Circuit that WV Rivers and its co-petitioners were relying on "deceiving" data and should not be allowed "to meddle" with a State carbon sequestration program. Brief of Intervenors at 1–2, 39, W. Va. Surface Owners' Rights Org. v. Zeldin, No. 25-1384 (4th Cir. May 18, 2026). Four months after the brief and seven months after that letter, he served the subpoenas at issue here. Indeed, a total of six nonprofits each received an identical subpoena except for the recipient's name. That reflects no particularized determination about anyone. And the demands track the subjects of his own letters and filings: attribution science and judicial education (Demand 7), the funders of climate advocacy (Demands 13(b), 14(b), 16), coordination among advocacy organizations (Demand 12), advocacy on energy permitting (Demand 16), and the selection and qualification of data (Demands 4, 7, 10, 11)—the very accusation his office leveled at WV Rivers in the Zeldin case.

Defendant knew what the subpoenas would do. A year before he issued them, he told the Supreme Court that an attorney general's subpoena to a nonprofit is a "state-backed inquisition" conducted through "burdensome and harassing subpoenas for swaths of sensitive information," and that the subpoena power can be "weaponize[d]." Fla. Amicus Br. at 5–6; see also Media Matters, 138 F.4th at 578, 580 (Texas Attorney General's acknowledgement in other litigation that investigative demands chill speech supported a finding of retaliatory motive).

The fact that Defendant's investigation had no lawful basis also shows the retaliatory motive. The Act permits investigations and attendant subpoenas only on probable cause that a person has violated the Act. W. Va. Code § 46A-7-104(1); Cavalry SPV I, LLC v. Morrisey, 232 W. Va. 325, 334–35 & n.13 (2013). The Act only regulates deception in the sale of goods or services. W. Va. Code §§ 46A-6-102(6), 46A-6-104. The subpoenas identify no consumer, no transaction, no complaint, no sale, and no deceptive practice. Defendant articulated no probable cause and none exists. The demands for Plaintiffs' funders are further evidence of their true purpose: such demands "give [their] targets a very good reason to clam up [and] give the target organization's members and supporters a very good reason to abandon the cause," and officials "sometimes issue[] subpoenas and other investigatory demands in order to secure just these results." First Choice, 608 U.S. at 190 (cleaned up).

**2. The Fourth Amendment bars baseless investigations and subpoenas like these.**

The Fourth Amendment also forbids these investigations. An official may compel a citizen's papers only in an investigation the law authorizes and only for a purpose the law permits. Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 209 (1946); United States v. Morton Salt Co., 338 U.S. 632, 652 (1950).

The Fourth Amendment prohibits investigations premised on lawful conduct. In Major League Baseball v. Crist, 331 F.3d 1177, 1180, 1186 (11th Cir. 2003), the Florida Attorney General issued antitrust investigative demands to Major League Baseball—but baseball is exempt from the

antitrust laws, and thus the League could not violate them. The Court held, in a pre-enforcement § 1983 suit like this one, that an investigation "premised solely upon legal activity" is a "baseless 'fishing expedition'" prohibited by the Fourth Amendment. Id. at 1182, 1187–89. The court rejected the argument that the inquiry might turn up information: an investigator must have "something" before demanding a citizen's papers. Id. at 1187 n.23. The court affirmed a judgment declaring that the Attorney General "cannot proceed with the investigation." Id. at 1179.

Additionally, an official's power to investigate ends where his power to enforce ends. Capital One Bank (USA), N.A. v. McGraw, 563 F.Supp.2d 613, 618 (S.D. W. Va. 2008). There, the West Virginia Attorney General subpoenaed Capital One under the Consumer Credit and Protection Act and petitioned a circuit court to enforce the subpoena. Id. at 614–15. Once Capital One became a national bank, however, federal law vested exclusive "visitorial" authority over it in the federal Comptroller of the Currency, which barred state officials from enforcing the Act against it. Id. The Court held that the bar on enforcement was a bar on investigation: "If the defendant is prohibited from enforcing the Act against Capital One, it follows that the defendant cannot use a subpoena to investigate whether Capital One violated the Act." Id. at 618. The Court permanently enjoined the Attorney General from issuing any subpoena in the investigation and from enforcing the one he had issued. Id. at 622.

Defendant's investigations here are baseless under both Crist and Capital One, and Plaintiffs are likely to succeed for two independent reasons. First, the investigations lack a statutory predicate. The Legislature permits Defendant to investigate, and to subpoena, only "[i]f the Attorney General has probable cause to believe that a person" has violated the Act. W. Va. Code § 46A-7-104(1); Cavalry SPV I, 232 W. Va. at 334–35 & n.13. Defendant has identified none, and cannot. A subpoena issued without the predicate is unauthorized, and an unauthorized demand for a citizen's papers is the "fishing expedition" the Fourth Amendment forbids. Crist, 331 F.3d at 1187 & n.23.

Second, Defendant has no power to enforce the Act against Plaintiffs because their conduct that he is investigating is not covered by the Act. Advocacy, litigation, agency comments, coalition work, and charitable solicitation are not "trade or commerce." See W. Va. Code § 46A-6-102(6). Yet those are the sole activities that Defendant seeks to investigate through the subpoenas. Charitable appeals are "inextricably intertwined with otherwise fully protected speech" and are not treated as commercial. Riley v. Nat'l Federation of the Blind of N.C., Inc., 487 U.S. 781, 796 (1988). Litigation is "a form of political expression." NAACP v. Button, 371 U.S. 415, 429 (1963). And a campaign to influence government is immune from liability under state law for its content. Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 138–40, 145 (1961); IGEN International, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 310 (4th Cir. 2003) (immunity extends to state-law claims).

Nor may the Act reach such conduct based on a theory of deception by Plaintiffs.[5] Deception is ground for regulating only commercial speech because that speech proposes a transaction and its claims are "more easily verifiable" by the one who makes them. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771–72 & n.24 (1976). Plaintiffs' speech, however, is not commercial—it proposes no transaction, promotes no product, and earns no profit. Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 66–67 (1983); Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor of Baltimore, 879 F.3d 101, 108–110 (4th Cir. 2018). It is speech on a public issue, at "the highest rung of the hierarchy of First Amendment values." Snyder, 562 U.S. at 452.

[5] Even if deception by Plaintiffs (nonprofit advocacy organizations) were something that Defendant could investigate under the Act (it is not), there is no plausible deception that Defendant could show. Plaintiffs stand behind every statement the subpoenas describe and, indeed, the connection between fossil-fuel emissions and a changing climate is one the Supreme Court has called "well-documented." Massachusetts v. EPA, 549 U.S. 497, 504–05 (2007). In fact, in a brief Defendant signed just four months before he issued these subpoenas, the State of West Virginia admitted that capturing carbon dioxide in carbon sequestration wells will "help mitigate climate change." Brief of Intervenors at 4, W. Va. Surface Owners' Rights Org. v. Zeldin, No. 25-1384 (4th Cir. May 18, 2026). If there is deception related to climate change in this case, it does not come from Plaintiffs.

Accordingly, even if Defendant's investigation did turn up "something," he could not act on anything the subpoenas produced because Plaintiffs' activity is not regulated by the Act. Under Capital One, that ends the inquiry: an official who cannot enforce cannot investigate. And under Crist, the investigation violates the Fourth Amendment because it is "premised solely upon legal activity."

The subpoenas fall with the investigation because they are not reasonable. Hale v. Henkel, 201 U.S. 43, 76 (1906). The Fourth Circuit stated that "an investigative subpoena, to be reasonable under the Fourth Amendment, must be (1) authorized for a legitimate governmental purpose; (2) limited in scope to reasonably relate to and further its purpose; (3) sufficiently specific …; and (4) not overly broad." In re Subpoena Duces Tecum, 228 F.3d 341, 349 (4th Cir. 2000). A subpoena issued in an unauthorized investigation fails the first requirement. It serves no legitimate governmental purpose because it serves no authorized inquiry. And where, as here, the papers demanded are themselves protected by the First Amendment, the court must apply those requirements with "scrupulous exactitude." Zurcher v. Stanford Daily, 436 U.S. 547, 564 (1978).

To afford necessary relief, therefore, an injunction issued by this Court must enjoin the investigation. Enjoining the subpoenas alone would invite the Attorney General to reissue them, narrower or not, in an inquiry that has no lawful subject, or attempt to obtain them in an enforcement action in state court. Capital One enjoined the Attorney General from issuing any subpoena in the investigation and declared that he could neither investigate nor sue the recipient on its subject. 563 F.Supp.2d at 622. Crist affirmed that the Attorney General could not proceed with the investigation. 331 F.3d at 1179. Capital One also declared that the Attorney General could neither investigate nor sue the subpoena recipient on the subject of the investigation. 563 F.Supp.2d at 622. Plaintiffs respectfully request the same: an order restraining enforcement of the subpoenas, any application under § 46A-7-104(3), any further demand, and any action under the Act or other law predicated on the subjects of the investigations.

### 3. **The subpoenas compel disclosure of association and burden charitable solicitation without any justifying interest.**

Independently, Plaintiffs are likely to succeed on their compelled-disclosure and charitable-solicitation claims. The subpoenas demand the Plaintiffs turn over information regarding organizations that fund each Plaintiff, the amounts they gave, the organizations each Plaintiff pays, board members' affiliations with renewable-energy entities, and each Plaintiff's dealings with every coalition partner. Demands 9(b), 12, 13(b), 14(b)–(d), 16. Compelled disclosure of affiliation with groups engaged in advocacy "may constitute as effective a restraint on freedom of association" as direct suppression. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462 (1958); First Choice, 608 U.S. at 185. Such demands require exacting scrutiny: "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and a demand "narrowly tailored to the government's asserted interest." Bonta, 594 U.S at 607–08. Defendant bears the burden of justifying these demands, and he has identified no interest at all: no consumer, no transaction, no complaint, and no deception. Accordingly, there is no governmental interest at play that would warrant this violation of Plaintiffs' rights to free association, let alone a "sufficiently important governmental interest" that would withstand exacting scrutiny. First Choice, 608 U.S. at 198–99.

The subpoenas likewise burden Plaintiffs' right to solicit charitable contributions, which "limits a government's ability to make demands of charities that would have the 'predictable result' of rendering their 'solicitations ... unsuccessful.'" First Choice, 608 U.S. at 190 n.2 (quoting Riley, 487 U.S. at 799–800). Plaintiffs' funders give on the understanding that their support will not be disclosed to the government, and Plaintiffs reasonably expect that disclosure—and the risk that a named funder will draw a demand of its own—will cause funders to reduce or withdraw support. Smith Decl. ¶¶ 26–30; Odendahl Decl. ¶¶ 6–8, 21, 23–25. Courts may draw that "commonsense inference[]" about third-party behavior, First Choice, 608 U.S. at 189–90, and Plaintiffs' experience confirms it, Smith Decl. ¶¶ 27; Odendahl Decl. ¶¶ 6–8.

Because the investigations' only-identified subjects are Plaintiffs' protected speech and association, no demand issued in them—however narrowed—could satisfy exacting scrutiny, and the injury First Choice recognized continues "for as long as [the demand] remains outstanding." 608 U.S. at 189. Relief on these claims must therefore enjoin the investigations, not just the subpoenas.

**B. Plaintiffs Are Suffering Irreparable Harm from the Subpoenas and Investigations.**

Plaintiffs will suffer irreparable harm without a TRO and preliminary injunction. Plaintiffs have already curtailed their speech and associations because of the issuance of the subpoenas. For example, employees at WV Rivers are now forced to consider whether to move forward with events or programs it had planned before the subpoena was issued despite the fact that its activities comply with all laws and are a benefit to the community. Smith Decl. ¶¶ 18–20, 23. WV Rivers is actively self-censoring its internal communications and has also paused its mini-grant funding as a direct result of the subpoena. Id. ¶¶ 17, 24. 350.org will undertake no new work in West Virginia while the subpoena and investigation are pending. Odendahl Decl. ¶ 18. And WV Rivers and 350.org have both also expressed reasonable concerns that groups and donors may not want to continue associating with the organization out of fear of becoming Defendant's newest investigative target. Smith Decl. ¶ 26–30; Odendahl Decl. ¶¶ 21–25.

This chilled speech and association are irreparable harms. It is a well-recognized principle that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373–74 (1976) (plurality opinion) (citing N.Y. Times Co. v. United States, 403 U.S. 713 (1971)). One district court recently found that the same types of First Amendment injuries that Plaintiffs have shown here—a more cautious staff hesitating to collect or disseminate information and the deterrence of partners or donors from associating with the organization—constituted irreparable harm. Exodus Refugee, 2026 WL 2249397, at *24–25. And

a "campaign of retaliation against [Plaintiffs] in response to their exercise of their First Amendment rights … is also an irreparable injury." Media Matters, 138 F.4th at 585.

Plaintiffs' Fourth Amendment injuries are irreparable as well. The Fourth Circuit, analyzing the Baltimore Police Department's surveillance program, determined that the program likely violated the Fourth Amendment and found that, "[b]ecause there is a likely constitutional violation, the irreparable harm factor is satisfied." Leaders of a Beautiful Struggle v. Baltimore Police Dep't, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). Defendant's unlawful subpoenas and investigations are themselves Fourth Amendment injuries. See Hale, 201 U.S. at 76 (order to produce papers "may constitute an unreasonable search and seizure"); Crist, 331 F.3d at 1187–88 (affirming judgment for recipients of attorney general's investigative demands in pre-enforcement § 1983 suit because a baseless investigation "violates the Fourth Amendment"). Further injury to Plaintiffs is imminent: the subpoena return date is November 2. By then, to preserve attorney-client privilege or other relevant privileges, Instruction 9 of the subpoena requires Plaintiffs to produce by the return date a log identifying "the Document or category of Documents withheld," the privilege asserted, "the factual basis for the assertion," and the specific request to which the withheld document responds. But to state the factual basis for withholding a document on associational grounds, Plaintiffs would have to disclose facts about the association the privilege is meant to protect.

These constitutional injuries are not the only irreparable harm Plaintiffs are suffering. Plaintiffs are diverting significant staff and leadership time towards dealing with the fallout from the subpoenas and investigation—time they should be spending on their important advocacy work. This, too, is irreparable harm that will continue until the subpoenas and investigations are enjoined. Every hour spent answering Defendant's demands is an hour not spent on the speech or associations he targets.

### C. The Balance of Equities and Public Interest Tip in Plaintiffs' Favor.

The final two Winter factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). Plaintiffs satisfy both factors. Neither Defendant nor the public has an interest in pursuing unconstitutional sham investigations. Newsom ex rel. Newsom v. Albemarle County Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003). In fact, the Fourth Circuit has held on numerous occasions that "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002); see also Newsom, 354 F.3d at 261 (same); Leaders of a Beautiful Struggle, 2 F.4th at 346 (same). An injunction here is also in the public interest—courts have held time and again that injunctions preserving constitutionally protected rights or freedoms are almost always in the public interest. See, e.g., Newsom, 354 F.3d at 261 ("Surely, upholding constitutional rights serves the public interest.").

Plaintiffs have therefore satisfied all four Winter factors, and an injunction is appropriate. A bond is unnecessary because an injunction would impose no economic hardship on Defendant.

## CONCLUSION

"There can be no greater judicial function of the court than to stand between the government and the citizen, and, thus, to protect the latter from harassment and unfounded intrusion." State ex rel. Hoover v. Berger, 199 W. Va. 12, 19 (1996). Plaintiffs need that protection here. The West Virginia Attorney General is entitled to hold an uninformed opinion of climate change. But he may not legally harass groups because they hold opposing (and in this case scientifically valid) views. By investigating Plaintiffs, Defendant has violated their constitutional rights, and he will continue to do so until the subpoenas and the concomitant investigations are enjoined. Plaintiffs therefore respectfully request that the Court grant their motion for a TRO and preliminary injunction.

DATE: October 22, 2026 Respectfully submitted,

***s/ Derek Teaney***
DEREK TEANEY (WVBN 10223)
AMANDA DEMMERLE (WVBN 13930)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org
ademmerle@appalmad.org

Counsel for Plaintiffs