**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

**WEST VIRGINIA RIVERS COALITION, INC., and 350.org,**

**Plaintiffs,**

**v.**

**Case No. 2:26-cv-00679**
**Hon. Joseph R. Goodwin**

**JOHN B. MCCUSKEY, in his official capacity as Attorney General of the State of West Virginia,**

**Defendant.**

**ATTORNEY GENERAL MCCUSKEY'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

The Attorney General respectfully submits this response in opposition to Plaintiffs' motion for a temporary restraining order and preliminary injunction.

## INTRODUCTION

"False statements of fact … interfere with the truth-seeking function of the marketplace of ideas." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 52 (1988).

This case concerns investigatory subpoenas issued by Attorney General McCuskey authorized by the West Virginia Consumer Credit and Protection Act (WVCCPA), W. Va. Code § 46A-1-101 *et seq*. The WVCCPA empowers the Attorney General to investigate—and when circumstances warrant, enforce—the WVCCPA's prohibition against "unfair or deceptive acts or practices" that impact trade or commerce in West Virginia. W. Va. Code § 46A-6-104. False, materially misleading, or otherwise deceptive speech can qualify as an unfair or deceptive act or practice. Because the Attorney General has probable cause to believe that a violation has occurred,

his issuance of investigatory subpoenas was an ordinary and proper exercise of his consumer protection authority.

Plaintiffs have rushed to this Court seeking emergency relief without ever engaging with the Attorney General about the concerns they have regarding the subpoenas' scope, the timeframe to comply, and any alleged interplay with the First and Fourth Amendments. At the threshold, Plaintiffs' request for relief is premature; Plaintiffs face no *legal obligation* (and thus have suffered no harm) flowing from the subpoena unless and until the Attorney General moves to enforce them. But beyond that, Plaintiffs repeatedly cast the issuance of these subpoenas as politically motivated retaliation aimed at "stifl[ing]" political speech the Attorney General does not like and harassment of groups "to which he is politically opposed." (ECF 3) at 1. In short, the Plaintiffs contend that these subpoenas—and any related investigatory efforts—are "illegitimate."

That simply isn't so. At the outset, Plaintiffs have fallen far short of producing the sort of evidence necessary to overcome the strong presumption of regularity that attaches to a government official's exercise of statutory authority. They need "well-nigh irrefragable" evidence; what they have is a handful of social media posts and other public statements. And, in any event, the Attorney General's issuance of the subpoenas was predicated on probable cause, which substantially undermines their claim that the investigation was impermissibly retaliatory.

Moreover, the WVCCPA authorizes the Attorney General to investigate acts or practices—including false or materially misleading speech—that impact West Virginia's economy or West Virginia consumers. And the production of energy—including the mining of coal, extraction of natural gas, and the use of those fuels to generate electricity—is both a critical part of West Virginia's economy and a market sector that impacts the affordability of daily life of every West

Virginian. Exercising authority granted by a statute expressly designed to protect West Virginia's marketplace and the economic interests of its citizens is obviously legitimate.

Plaintiffs—unabashed opponents of fossil fuels—are well within their rights to advocate for less (or even the complete abolition of) fossil fuel extraction. Their political advocacy and other expressive or associational activity is certainly protected by the First Amendment. But the First Amendment is not a license to lie or knowingly deceive or mislead, especially not when that deceptive commercial speech directly implicates trade or commerce within the ambit of a consumer protection statute like the WVCCPA. The First Amendment is designed to foster a marketplace of ideas, but "[n]either the intentional lie nor the careless error materially advances society's interest in uninhibited, robust, and wide-open debate on public issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).

It is premature to say definitively whether Plaintiffs have violated the WVCCPA. After all, the "purpose of an investigative subpoena is precisely as its name implies: to investigate." *Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 335 (2013). But, as outlined below, the Attorney General has the requisite probable cause necessary to undertake an investigation. And the Constitution does not immunize Plaintiffs from the Attorney General's lawful exercise of investigatory authority. Accordingly, Plaintiffs' request for emergency injunctive relief should be denied.

## BACKGROUND

The Attorney General is authorized to "pursue any investigation, prosecute any suit and take any other proper action relating to the enforcement" of every consumer protection provision set forth in the WVCCPA. W. Va. Code § 46A-7-103(1). Plaintiffs West Virginia Rivers Coalition (WV Rivers) and 350.org are non-profit organizations. (ECF 1) at 4. WV Rivers describes its mission as "promot[ing] clean and healthy West Virginia waters for all." *Id.* 350.org takes its

name from "the concentration of carbon dioxide in the atmosphere that its founders identified as the upper limit consistent with a stable climate." *Id*. 350.org's self-described mission is "to build a grassroots movement to end the use of fossil fuels and to accelerate the transition to renewable energy." *Id*.

Both Plaintiffs actively engage in "the conduct of trade or commerce" by expressly encouraging consumers to stop buying—and attempting to prevent producers from selling—fossil fuels. *See* W. Va. Code § 46A-6-104. 350.org has stated, for example, that "managed decline of fossil fuel production is the only way" to achieve its climate goals.[1] And WV Rivers has described "reducing the demand for fossil fuel products" as a "vital component" of its strategy to "address climate change on the scale required."[2]

These substantial commercial activities support the Attorney General's investigation into whether particular representations constitute deceptive practices within the WVCCPA's reach.

The potential violations under investigation here involve a narrow category of deceptive statements that rely on a model, assumption, or projection system that objectively overstates the potential harm of fossil fuels, telling consumers that ordinary levels of consumption will have catastrophic results. Use of the "RCP8.5" emission scenario is a clear example. The RCP8.5 model was developed in 2011 to project an extreme case: it forecast heatwaves that render entire regions of the globe uninhabitable, unprecedented droughts, and uncontrollable wildfires. *See* Hausfather & Peters, *Emissions – The 'business as usual story' is misleading*, Nature (Jan. 2020), https://perma.cc/EC4C-4K4S. But the assumptions underlying RCP8.5 were extreme to the point

---

[1] 350.org, *With launch of 'Beyond Oil & Gas Alliance', countries and regions forge first diplomatic initiative to phase out fossil fuel extraction* (November 11, 2021), https://perma.cc/CY3T-7U4X.

[2] *A Citizen's Guide to Climate Change: The Causes, Impacts, and Potential Solutions*, West Virginia Climate Alliance at 12 (Sept. 2020), https://perma.cc/TTP6-F37T.

of impracticality; the scenario relies on, for instance, a roughly sixfold increase in the per capita use of coal by 2100. *See* Ritchie & Dowlatabadi, *Why do climate change scenarios return to coal?*, Institute for Resources, Environment and Sustainability, University of British Columbia (2017), https://perma.cc/JY5A-TSQT. In short, the world RCP8.5 described—and the role fossil fuels like coal were supposed to play in causing that world to come into existence—is "deeply implausible." A. Revkin, *Burgess, Hausfather, Pielke and Tol on the overdue end to the worst-case RCP8.5 climate scenario*, Sustain What? (May 19, 2026), https://perma.cc/H8NX-TQW7. Yet RCP8.5 was "widely but erroneously labeled as [the] 'business as usual'" scenario. *Id*.

As the publication in *Nature* referenced above illustrates, the implausibility of RCP8.5 was well-known by 2020. Yet, for years thereafter, organizations seeking to diminish the sale of fossil fuels have continued to market it as a "business as usual scenario." *Id*.

Continuing to rely on RCP8.5—and, in particular, describing the RCP8.5 scenario as "business as usual"—after 2020 was (at best) materially misleading and (at worst) an outright falsehood. RCP8.5 is perhaps the best known model whose underlying structure or methodology is "deeply implausible"—but it is not the only one that may potentially deceive consumers. For example, some entities in this space make "event attribution claims"—i.e., claims that individual weather events are the direct result of carbon emissions from a particular industry—while ignoring (and certainly not disclosing) that the very scientists who created this field warn that they have "little or no confidence" in the ability to link severe weather events to particular human influences.[3]

It is the willful or knowing use of or reliance upon such a model, theory, or assumption, with the aim of "directly or indirectly" affecting trade or commerce in West Virginia, that the Attorney General's subpoenas seek to investigate. These industries generate hundreds of millions

[3] *See* Nat'l Acads. of Scis., Eng'g & Med., *Attribution of Extreme Weather Events in the Context of Climate Change* 10 (2016).

of dollars in severance tax revenue and support tens of thousands of good-paying jobs. As has long been the case with fraud and deceptive acts and practices of all sorts, behavior that takes aim at an industry that supports so many West Virginians falls squarely within the Attorney General's legitimate investigation and enforcement authority.

## ARGUMENT

Requests for a temporary restraining order and preliminary injunction are governed by Federal Rule 65 and the four-part standard articulated in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). To obtain such relief a plaintiff must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) preliminary relief is in the public interest.

Preliminary relief is an "extraordinary remedy" that requires a "clear showing" of an entitlement to relief. *Winter*, 555 U.S. at 22. The first factor—likelihood of success on the merits—is generally regarded as the "most important," especially when the First Amendment has been invoked. *See*, *e.g.*, *Sheehan v. W. Virginia Jud. Investigation Comm'n*, 837 F.Supp.3d 794, 798 (S.D.W. Va. 2026). "All four [*Winter*] requirements must be satisfied." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009). The "burden is on the party seeking [preliminary emergency] relief to show they are entitled to the relief, not the burden of the other party to show the movant is unentitled." *Disability Rts. S.C. v. McMaster*, 564 F. Supp. 3d 413, 419 (D.S.C. 2021).

### I. Plaintiffs Are Not Likely to Succeed on Their Claims.

#### A. At this preliminary stage, plaintiffs lack standing.

Before a plaintiff can obtain relief from a federal court, he must establish that he has standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Establishing standing requires

him to establish that he has suffered a "concrete" and "particularized" injury-in-fact that is attributable to the defendant. *Id*. Plaintiffs have not made the requisite showing.

**1. These subpoenas are not self-executing.**

It is important to remember where we are in the process. The Attorney General has issued investigatory subpoenas. That's it. No documents have been seized and no enforcement action has been filed. Indeed, the Attorney General has made clear his willingness to engage with the Plaintiffs regarding the scope of the subpoena and any other issues related to them. *See* Defendant's Motion for Abeyance (ECF 9).

To be sure, the WVCCPA authorizes the Attorney General to initiate an enforcement proceeding against the target of a subpoena who "fail[s] … to obey" without "lawful excuse." W. Va. Code § 46A-7-104(3). But such enforcement action is not automatic; these subpoenas are not self-executing. A subpoena is *not* like a warrant, which authorizes government agents to act without judicial oversight and pre-approval. Instead, a subpoena "commences an adversary process during which the person served with the subpoena *may challenge it in court before complying with its demands*." *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000) (emphasis added).

Thus, the mechanics of subpoena enforcement preclude Plaintiffs from establishing that they have, at this point in time, suffered a concrete injury attributable to the Attorney General. Plaintiffs face no judicially enforceable obligation to produce documents, and their asserted injuries must be evaluated in light of that procedural reality. And if the Attorney General initiates an enforcement proceeding, Plaintiffs are "guaranteed an opportunity to contest the subpoena's validity through any appropriate defense" *before they are obliged to comply*. *N.L.R.B. v. Interbake Foods, LLC*, 637 F.3d 492, 499 (4th Cir. 2011).

**2. Plaintiffs' operational changes are not traceable to the Attorney General.**

Both Plaintiffs claim to have initiated or extended operational changes in the wake of receiving an investigatory subpoena. These operational changes, they contend, are a concrete harm that establishes their standing. *See* (ECF 3) at 7.

These alleged harms do not suffice. Plaintiff WV Rivers states that receipt of the Attorney General's subpoena has caused it to "self-censor" and "be more careful about its associations." *Id.* (citing Smith Declaration, (ECF 2-1) at 4). But self-imposed precautions of this sort do not establish standing unless they are reacting to government action that is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on [a] fear[] of hypothetical future harm." *Id.*

An enforcement action seeking to compel WV Rivers to comply with the subpoena is not certainly impending. As discussed above, the Attorney General has clearly expressed a willingness to engage with entities to whom it has directed subpoenas. *See generally* (ECF 9). And, as Plaintiffs themselves have noted, the Attorney General has chosen not to pursue enforcement of similar subpoenas directed to other entities. *See* (ECF 10) at 2-3. It necessarily follows that enforcement of the subpoenas directed to Plaintiff is not "certainly impending." Which means WV Rivers' self-imposed injuries cannot provide the injury-in-fact necessary to establish standing.

The same argument applies to Plaintiff 350.org. Their self-imposed internal content review process, *see* (ECF 7) (citing Odendahl Declaration, (ECF 2-1) at 20) is exactly like WV Rivers' self-censorship, and therefore does not suffice to establish standing for the same reason. 350.org's content review is also not traceable to the Attorney General for an additional reason: That internal process began on September 10, 2026 in response to a letter received from the United States. *See* (ECF 2-1) at 18, 20. September 10 is before the investigatory subpoena directed to 350.org was even issued. (ECF 1-2) at 12. Because that process began in response to "the independent action

of some third party not before the court" it is not properly traceable to the Attorney General and cannot establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted).

**3. *First Choice* does not automatically confer standing here.**

Plaintiffs rely heavily on *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174 (2026), claiming that the Supreme Court held that "the issuance of a state attorney general subpoena" necessarily establishes an injury in fact. (ECF 3) at 6. Their reliance on *First Choice*, however, is misplaced.

Plaintiffs suggest that *First Choice* established a categorical rule that the receipt of a subpoena conveys standing to the subpoena recipient. But that contention fails to appreciate the procedural background at play in *First Choice*. There, after receiving a subpoena, the recipient "filed suit in federal district court" seeking to preclude enforcement. 608 U.S. at 181. But that is not all that happened. Critically, the attorney general who issued the subpoena "responded" to the federal lawsuit "with his own suit in state court" accusing the recipient of "violating state law by failing to comply." *Id*. In other words, there was no question about whether the attorney general there sought to enforce the subpoena. The argument that the harm the recipient alleged was conjectural was squarely foreclosed.

Another contextual aspect of *First Choice* cuts against the notion that it automatically confers standing, in advance of an enforcement action that may never come, to the recipient of a subpoena. Underpinning the outcome in *First Choice* were the First Amendment implications of the subpoena in question's unabashed request for the identity of the recipient's donors. *See First Choice*, 608 U.S. at 188 (describing the subpoena in question). A subpoena demanding a "charity's private member or donor information" causes an injury-in-fact because it "burdens" the subpoena

recipient's First Amendment rights. *Id*. at 189. The burden, the Court explained, "occurs not just when a demand is enforced, but when it is made and for as long as it remains outstanding." *Id*.

A subpoena demanding the identity of individual donors, then, does automatically convey standing. But the subpoenas at issue here *expressly disclaim* any demand for the sort of information found to establish standing in *First Choice*. *See* (ECF 1-1) at 3. Indeed, on their face the subpoenas declare that: "Nothing here requires the production of attorney-client, work-product, or *First Amendment associational privilege material*." *Id*. (emphasis added). They then reiterate that the "production of (i) membership lists, (ii) donor lists, or (iii) records identifying individual supporters, members, subscribers, or volunteers" is not required. *Id*. Furthermore, to the extent any language in these subpoenas leaves open *any requirement* that requires (or could be construed as requiring) the disclosure of donor identities (including the identities of organizational donors), the Attorney General affirmatively disclaims such language and warrants that, should enforcement efforts be initiated in the future, he hereby withdraws and will not attempt to enforce any request for donor identifying information of any kind.

These disclaimers alleviate the chilling effect that was the lynchpin of the *First Choice* decision. There is no reason for a subpoena recipient to "clam up" or for its supporters to "abandon the cause," *First Choice*, 608 U.S. at 190, in circumstances like this one, where the subpoena expressly carves out donor identity from its reach. It follows that Plaintiffs' invocation of *First Choice* does not automatically establish that they have standing.

**B. The subpoenas are a legitimate exercise of the Attorney General's consumer protection authority, not retaliation.**

**1. Plaintiffs have not put forth sufficient evidence to overcome the presumption of regularity.**

Lying at the heart of Plaintiffs' request for emergency relief is their contention that the subpoenas issued by the Attorney General "are illegitimate." (ECF 3) at 1. They claim that the

subpoenas are part of a "retaliatory investigation[]" aimed at them because they have "engaged in protected speech." (ECF 3) at 9. In support of this assertion they highlight a smattering of social media statements, a pair of letters to federal officials, and two press releases describing litigation engaged in by the Attorney General's Office on behalf of the State. *See* (ECF 2-1).

That is not nearly enough, however, to establish that the Attorney General acted with a retaliatory motive. After all, public officials enjoy a strong "presumption of regularity" when exercising their official duties. *United States v. Chem. Found.*, 272 U.S. 1, 14 (1926). Overcoming that presumption requires "clear evidence to the contrary." *Nardea v. Sessions*, 876 F.3d 675, 680 (4th Cir. 2017). And that standard sets a high bar: It requires "[w]ell-nigh irrefragable" evidence, that is, evidence which is effectively "incontestable, indisputable, irrefutable, [and] undeniable." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002).[4]

Proving the sort of bad faith necessary to sustain a claim of retaliation usually requires evidence that the public official has been "motivated alone by malice." *Gadsden v. United States*, 78 F. Supp. 126, 127 (Ct. Cl. 1948). Indeed, that is why "the presence of probable cause will generally defeat a [Section] 1983 First Amendment retaliation claim based on a civil lawsuit as a matter of law." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1304 (11th Cir. 2019). Or, to use the recent formulation of that principle articulated by the Fourth Circuit, "probable cause makes it nearly impossible to show that animus caused [the] adverse action" of a government official. *Stanley v. Bocock*, 160 F.4th 573, 577 (4th Cir. 2025).

Whatever the Attorney General's views on Plaintiffs' policy positions, the existence of independently sufficient grounds for investigating suspected statutory violations substantially

[4] Public statements allegedly reflecting a government official's "personal animus" toward the defendant are almost never good enough. *See*, *e.g.*, *VDARE Foundation, Inc. v. James*, No. 1:25-CV-810 (MAD/ML), 2026 WL 2664435, at *11 (N.D.N.Y. Sept. 10, 2026).

undermines any inference that protected advocacy caused the challenged subpoenas. *See Stanley v. Bocock*, 160 F.4th 573, 577–79 (4th Cir. 2025). As discussed below, *see* pp. 16–18, *infra*, the Attorney General had probable cause sufficient to issue the subpoenas in question here.

**2. The Attorney General's investigation has a lawful basis.**

In addition to the purported evidence of animus (the social media posts, press releases, etc.) noted above, Plaintiffs also contend that "the fact that the [Attorney General's] investigation ha[s] no lawful basis" establishes his "retaliatory motive." (ECF 3) at 13. In support of that contention they note they are non-profit organizations that do not routinely engage in the sale of goods or services and highlight the fact that the subpoenas "identify no consumer," "sale of goods or services," and do not state with specificity any "act of deception." *Id.* This, Plaintiffs claim, shows that the Attorney General's issuance of the subpoenas was "baseless." *Id.*

**a.**

That contention cannot survive even minimal contact with relevant West Virginia authority. The WVCCPA is a sweeping remedial statute that has the dual focus of "protecting consumers and promoting sound and fair business practices." *White v. Wyeth*, 227 W. Va. 131, 139 (2010). It is, as the Fourth Circuit recently remarked, a "comprehensive consumer protection law" that is "filled … with broad language" designed to effectuate its "very broad" and "powerful" remedial purpose. *Tederick v. LoanCare*, LLC, 168 F.4th 154, 169 (4th Cir. 2026). It expressly grants the Attorney General broad investigatory and enforcement powers to effectuate its purposes. *See* W. Va. Code § 46A-7-101 *et seq*. The Attorney General's issuance of these subpoenas was a permissible exercise of that authority.

Plaintiffs' suggestion to the contrary relies on an overly cramped understanding of the WVCCPA's broad sweep. That understanding is belied by the statutory text. The issuance of these subpoenas was ultimately predicated on Section 104, which declares "unfair or deceptive acts or

practices in the conduct of any trade or commerce" to be "unlawful." W. Va. Code § 46A-6-104. That section is "among the most broadly drawn provisions" in the entire act. *McFoy v. Amerigas, Inc.*, 170 W. Va. 526, 529, 295 S.E.2d 16, 19 (1982). Its breadth reflects the West Virginia Legislature's recognition that deceptive acts and practices can manifest in many forms. *Tederick*, 168 F.4th at 170. Thus, the Legislature employed remedial language broad enough to ensure that West Virginians would "not have to go back to the Legislature" every time a new form of deception or method of fraud was employed to cause harm. *Id.*

**b.**

The WVCCPA reaches materially deceptive practices within its statutory commercial scope, including certain misrepresentations about goods, services, and businesses—and is not limited to sellers. The relevant definitions section provides examples that help give shape to the phrase "unfair or deceptive acts or practices." Pertinent here, that phrase is defined to include (but is not limited to):

- Disparaging the goods, services or business of another by false or misleading representation of fact;
- Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;
- Engaging in any other conduct which … creates a likelihood of confusion or of misunderstanding;
- The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby.

W. Va. Code §§ 46A-6-102(7)(H), (E), (L), (M).

This statutory language has long been understood to authorize the Attorney General to investigate and, if circumstances warrant, undertake enforcement action aimed at the "willful"

dissemination of "deceptive and misleading information" that impacts trade or commerce in West Virginia. *See State ex rel. McGraw v. Johnson & Johnson*, 226 W. Va. 677, 684 (2010).

*Johnson & Johnson* is instructive. There, the Attorney General sought to enforce the WVCCPA against a pharmaceutical company (Janssen) for allegedly deceptive and misleading representations made about two of its drugs. 226 W. Va. at 681. One, an "atypical antipsychotic," was originally believed to have fewer side effects compared to "earlier generation[s]" of antipsychotic drugs. *Id.*[5] But new information came to light suggesting otherwise, and the FDA directed "all manufacturers of atypical antipsychotics" to append a warning label discussing their side effects, most notably a serious condition called "hyperglycemia." *Id.*

Janssen disseminated the required warning label accompanied by a "Dear Healthcare Provider" cover letter. The letter indicated that "[h]yperglycemia-related adverse events" associated with Janssen's drug were "infrequent" and that the "risk of diabetes" (which, combined with hyperglycemia is potentially fatal) was "lower" with Janssen's drug than it was with "other … atypical antipsychotics." *Id.* The letter made no mention of the "need to monitor patients receiving atypical antipsychotics for symptoms of hyperglycemia," which was the impetus for FDA's demand for the dissemination of the warning label. *Id.*

The Attorney General brought an enforcement action in state circuit court based on the "statements and omissions" in Janssen's "Dear Provider" letter. *Id.* at 683. He alleged that Janssen had "repeatedly and willfully issued deceptive and misleading communications" and sought an

---

[5] *Johnson & Johnson* also discusses Janssen's allegedly misleading statements regarding a pain medication that delivered a "continuous dose of fentanyl … through a patch applied to a patient's skin." *Id.* at 682–83. For brevity's sake—and because Janssen undertook corrective action to remedy its alleged misrepresentation regarding its fentanyl patch, *id.* at 683—the discussion below focuses on Janssen's misrepresentations regarding its antipsychotic drug. That said, the then-impending opioid epidemic—which would go on to cause catastrophic levels of harm to West Virginia and West Virginians—illustrates the importance of preserving the Attorney General's ability to use the WVCCPA to challenge false or misleading speech, such as Janssen's claim that its fentanyl patch had "a lower potential for abuse compared to other narcotics." *Id.*

injunction that would "prevent[] [Janssen] from disseminating deceptive and misleading information in West Virginia in the future," as well as monetary penalties for the prior violations. *Id*. at 684. Although the Supreme Court of Appeals ultimately reversed the trial court's determination that the "statements and omissions" in Janssen's letter were "false and misleading *as a matter of law*," West Virginia's highest court had no qualms with a remand to permit the Attorney General to "present evidence that Janssen's specific statements and omissions" violated the WVCCPA. *Id*. at 690 (emphasis added).

The notion that material misrepresentations that relate to or implicate (but do not necessarily directly involve) economic activity are actionable is reinforced by federal precedent the Legislature expressly deemed instructive. *See* W. Va. Code § 46A-6-101(1) (indicating that courts interpreting the WVCCPA should be "guided by" the "policies of the Federal Trade Commission" and federal court interpretations of the Federal Trade Commission Act). In *Nat'l Comm'n on Egg Nutrition v. F.T.C.*, the FTC brought an enforcement action against a nonprofit trade association (NCEN) for false statements made in response to "anti-cholesterol attacks on eggs." 570 F.2d 157, 159 (7th Cir. 1977). NCEN had made public statements indicating that "there is no scientific evidence that eating eggs increases the risk of . . . heart (and circulatory) disease." *Id*. But there was *at least some* scientific evidence suggesting that risk existed. *Id*. at 161. As the FTC explained, while it might be "impossible … to determine whether consuming eggs in fact increases the risk of heart and circulatory disease, *it is possible* to determine the existence and amount of evidence on that issue." *Id*. (emphasis added). Accordingly, the Seventh Circuit upheld the FTC's determination that NCEN's "no scientific evidence" claim was "patently false and misleading" and therefore violated the Federal Trade Commission Act. *Id*. at 161.

One of the arguments NCEN employed—and which the Seventh Circuit rejected—was that it was not engaged in commercial speech. *Id*. at 162. After all, NCEN's statements were not traditional advertisements that "d[id] [little] more than propose a commercial transaction." *Id*. Instead, NCEN claimed, its statements were "expressions of opinion on an important and controversial public issue." *Id*. In rejecting that argument, the Seventh Circuit emphasized the connection the speech had to market activity: The statements were made "for the purpose of persuading members of the reading public to buy [a] product." *Id*. at 163. "False claims … of harmlessness," the Court explained, violated federal law even if they were not traditional advertisements connected to a particular sale of goods or services. The same reasoning supports investigating whether materially misleading representations intended to influence purchasing decisions can constitute deceptive practices under the WVCCPA.

**c.**

Similar principles refute Plaintiffs' claim that the subpoenas directed to them are unlawful because they "identify no consumer, no transaction" and "no sale of goods or services," (ECF 3) at 1; *see also id*. at 13, 17, and their related claim that they cannot be the lawful target of a subpoena because they do not "sell any goods or services," *id*. at 4.

Simply put, the WVCCPA's sweep is not restrained in the manner Plaintiffs suggest. The "unfair or deceptive acts or practices" prohibited by W. Va. Code § 46A-6-104 are not limited to acts or practices that directly involve a sale of goods or services. Instead, "any trade or commerce" that "directly or indirectly" affects the people of West Virginia falls within the statute's sweep. W. Va. Code § 46A-6-102(6). That means, as Judge Copenhaver once explained, that the Attorney General's exercise of his consumer protection authority—including the issuance of investigatory subpoenas—does not "require the presence of either a consumer or a consumer transaction." *West*

*Virginia ex rel. McGraw v. Minnesota Mining & Mfg. Co.*, 354 F. Supp. 2d 660, 667 (S.D.W. Va. 2005).

*Johnson & Johnson* is again illustrative. There, the "Dear Provider" letter at issue was not a traditional advertisement (that is, speech directed to consumers intended to induce them to purchase some product). *See* 226 W. Va. at 681. Janssen's speech was aimed at healthcare providers—the entities that might choose to prescribe Janssen's atypical antipsychotics to their patients (or, conversely, choose to prescribe a competing product). *Id.* The misleading statements in its letter, therefore, despite being unrelated to any particular sale or particular transaction, were nevertheless clearly intended to influence market participants as they contemplated future commercial activity, and thus fell within the ambit of the WVCCPA.

**3. Probable cause sufficient to issue these subpoenas exists.**

The WVCCPA makes probable cause a "prerequisite" to the issuance of an investigatory subpoena. *Cavalry*, 232 W. Va. at 334 (citing W. Va. Code § 46A-7-104(1)). Probable cause, in this context, exists when there are "facts and circumstances" that would "warrant an honest belief in the mind of a reasonable and prudent person that an offense has been, or is being, committed" and a concomitant belief that "information relative to the commission of that offense is in the possession of the person or institution to whom the subpoena is directed." *Id.* (citation omitted); *cf. United States v. Morton Salt Co.,* 338 U.S. 632, 642 (1950) (investigatory subpoenas can be used when issuing entity has "merely [a] suspicion that the law is being violated"). Probable cause does not require "concrete proof" of any "alleged wrongdoing." *Cavalry*, 232 W. Va. at 335. Indeed, it is not even necessary to possess information sufficient to sustain the "successful prosecution of an enforcement proceeding" against the subpoena recipient. *Id.* at 336.

That low bar is satisfied here. It is worth noting, at the outset, that because the Attorney General is under no obligation to "describe in detail the nature of the potentially nefarious misconduct" when he issues an investigatory subpoena, *Cavalry*, 232 W. Va. at 335, the type of production sufficient to show that probable cause exists need not be elaborate. Indeed, in *Cavalry* itself, the mere receipt of "several complaints" was enough to afford the Attorney General the requisite honest belief. *Id*.

Here, the Attorney General's probable-cause determination rested not on Plaintiffs' opposition to fossil fuels, but on specific, objectively identifiable representations that raised legitimate questions concerning deception affecting West Virginia's energy marketplace. For instance, the Attorney General is aware that WV Rivers collaborated on and published a "Citizen's Guide to Climate Change"[6] that includes dire warnings about the likelihood of heavy precipitation events in West Virginia—based on projections drawn directly from RCP8.5. And in July 2023—three years after the implausibility of RCP8.5 became well-known—WV Rivers endorsed comments submitted to FEMA that specifically described RCP8.5 as the "business-as-usual pathway."[7] As for 350.org, just a few months ago (in April 2026) it issued a report making a claim about climate change's impact on global GDP that relies upon and reproduces a claim made in a study that was formally retracted on December 3, 2025.[8] 350.org also frequently markets deceptive "event attribution" claims, including specific claims about weather events in West Virginia.[9]

[6] *See* Note 2, *supra*.

[7] Geos Institute, Comment on Community Disaster Resilience Zones and National Resilience Index RFI: FEMA–2023–0009 at 5 (July 25, 2023), https://perma.cc/A5ZP-PDGK.

[8] 350.org, *Out of Pocket: How Fossil Fuels Are Draining Households and Economies* at 27 (April 21, 2026), https://perma.cc/ZY4D-TXLR (declaring, based on a study, that "the world is already committed to an income (GDP) reduction of about 19% by 2050 due to past and current emissions"). The study that was the original source of that claim was retracted in December 2025. *See* Kotz et al., *The economic commitment of climate change*, Nature (April 17, 2024), https://perma.cc/T3LP-HHVE *retracted* Dec. 3, 2025.

[9] *See*, *e.g.*, Deon J. Hampton, *West Virginia Utility Companies have spent Millions to Mitigate Power Outages. Why do they keep Happening?*, NBC News (May 6, 2021), https://perma.cc/CQ2S-39WZ (quoting a 350.org

To be clear, these examples may not themselves violate the WVCCPA. But they don't need to in order to provide the honest belief necessary to establish probable cause. It is enough that WV Rivers has on several occasions (including at least once years after it had been discredited) relied upon RCP8.5. The same can be said of 350.org's repetition of a claim drawn from a fully retracted study. These examples justify the use of investigatory subpoenas calibrated to help the Attorney General "ascertain whether a violation … has, in fact, occurred." *Cavalry*, 232 W. Va. at 335.

**C. The Subpoenas do not violate the Fourth Amendment.**

Plaintiffs' Fourth Amendment arguments also fail. Although couched as a trio of independent arguments, each ultimately boils down to the same assertion: that the Fourth Amendment bars the subpoenas because the "conduct that [the Attorney General] is investigating is not covered by the Act." (ECF 3) at 15; *see also id*. at 14 (arguing that "an official's power to investigate ends where his power to enforce ends"); *id*. at 16 (arguing the subpoenas are unreasonable because "a subpoena issued in an unauthorized investigation lacks a 'legitimate governmental purpose'"). That argument fails for the reasons already discussed above—the WVCCPA covers this sort of behavior. *See* pp. 11–16, *supra*.

## II. Plaintiffs Have Not Established a Likelihood of Irreparable Harm

Plaintiffs contend that they are experiencing a chilling effect on their speech and right of association and that those impacts constitute irreparable harm. (ECF 3) at 18. Plaintiffs are correct that an infringement on their First Amendment rights, "even for [a] minimal period[] of time," qualifies as an irreparable injury. *Id*. But the chilling effect Plaintiffs describe is not warranted given that these subpoenas expressly disclaim disclosure of any donor identities. *See* p. 9, *supra*.

spokeswoman who "estimated" there would be "more extreme weather in West Virginia" if "changes in global climate aren't reversed in the next decade").

### III. The Final Two *Winter* Factors Favor the Attorney General

When the government is the party opposing a request for emergency relief, the third and fourth *Winter* factors (the balance of the equities and the public interest) merge. *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024); *cf. Nken v. Holder,* 556 U.S. 418, 435 (2009). The merger reflects the basic truth that, in such circumstances, "the government's interest *is* the public interest." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020) (citation omitted) (emphasis in original).

Here, the public interest and the equities favor the Attorney General. The production and export of fossil fuels are a cornerstone of West Virginia's economy. Thousands of West Virginians depend upon those industries for their livelihood. And all West Virginians enjoy benefits, such as the hundreds of millions of dollars of severance tax revenue the industry generates, which helps the State pay for many essential government services. The Attorney General's investigatory effort to determine whether such an important part of West Virginia's economy has been (or is being) harmed by unfair or deceptive acts or practices is thus clearly in the public interest.

### IV. The Requested Emergency Relief Exceeds the Federal Courts' Equitable Authority.

Plaintiffs seek an extraordinary injunction placing the Attorney General's investigation under federal judicial supervision. They ask this Court to prohibit him "from taking any steps to further his sham investigations into Plaintiffs," including "initiating any other judicial proceedings under the West Virginia Consumer Credit and Protection Act or any other law predicated on the subjects of the investigations." (ECF 2) at 1–2. Their request reaches far beyond two subpoenas: it would empower this Court to police how West Virginia's elected Attorney General investigates, gathers evidence, and exercises enforcement discretion in the future. That is federal judicial superintendence of a state investigation—not merely relief from an allegedly unlawful demand.

Federalism sharply limits that kind of continuing judicial oversight. In *Rizzo v. Goode*, 423 U.S. 362 (1976), the Supreme Court reversed an injunction involving supervision of local executive officials, emphasizing the "special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Id.* at 378 (citation omitted). The Court held that federalism informs the "availability and scope of equitable relief" against state executive officials, not only state courts. *Id.* at 379–80. Likewise, the Court has rejected relief that would create an "ongoing federal audit" of state proceedings through "unwarranted anticipatory interference." *O'Shea v. Littleton*, 414 U.S. 488, 500–02 (1974). These constraints remain applicable to § 1983 suits. *Mitchum v. Foster*, 407 U.S. 225, 243 (1972).

Plaintiffs' requested injunction would create the very oversight these decisions warn against. Any subsequent investigative step, request for documents, or proposed enforcement proceeding could produce another dispute over compliance with the federal decree—even if undertaken on new facts or under a different law. Rather than resolve the constitutionality of identified conduct, the order would make this Court a continuing arbiter of the Attorney General's investigative judgment.

Equitable relief must instead track the specific injury demonstrated. "[T]he scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see Lewis v. Casey*, 518 U.S. 343, 357–60 (1996). The Supreme Court recently reiterated that equitable authority "is not freewheeling," *Trump v. CASA, Inc.*, 606 U.S. 831, 145 S. Ct. 2540, 2551 (2025), and that an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *id.* at 2557–58 (cleaned up). Although *CASA* involved relief for nonparties, its remedial-limits principle applies here.

Courts have specifically rejected overbroad restraints on future state enforcement. In *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382–83 (1992), the Court condemned a "blunderbuss injunction" reaching beyond the particular threatened enforcement activity before it. And in *Google, Inc. v. Hood*, 822 F.3d 212, 226–28 (5th Cir. 2016), which involved a state attorney general's consumer-protection subpoena, the Fifth Circuit vacated an injunction reaching a "fuzzily defined range of enforcement actions that do not appear imminent." *Id*. at 227. *Google*'s treatment of subpoena standing must be read in light of *First Choice Women's v. Davenport*, 608 U.S. 174 (2026), as its concern with speculative future enforcement remains instructive.

The state-law enforcement process does not justify such federal supervision. An investigative subpoena is not self-enforcing: state law requires the Attorney General to seek circuit-court enforcement if compliance is refused. W. Va. Code § 46A-7-104(3); *see also* p. 6, *supra*. The Attorney General does not contend that Plaintiffs must exhaust that process before bringing a § 1983 action. *First Choice*, 608 U.S. at 195–96. But the existence of a federal constitutional claim does not entitle Plaintiffs to an open-ended injunction against otherwise lawful future investigative activity.

The withdrawal of any organizational-donor demand, *see* p. 9, *supra*, further narrows any need for an injunction. The Attorney General has withdrawn those demands from the subpoenas and will not enforce them. Plaintiffs therefore need not disclose organizational donor identities under those demands. An injunction serves to prevent threatened future harm: "[T]he moving party must satisfy the court that relief is needed." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). The withdrawal does not itself moot Plaintiffs' broader claims, *First Choice*, 608 U.S. at 197–98, but it does weigh against an injunction forbidding enforcement of demands no longer pursued.

The Court should reject Plaintiffs' invitation to superintend the Attorney General's investigation. Even if specific subpoenas or investigative acts warrant relief, the remedy should address the constitutional injury shown—not bar investigative steps not yet taken, proceedings not yet commenced, and statutes not yet invoked. The Attorney General must remain free to undertake independently justified, lawful investigations and enforcement proceedings without continuing federal supervision.

## CONCLUSION

Plaintiffs' request for emergency relief should be denied.

DATED: October 26, 2026

Respectfully submitted,

**JOHN B. McCUSKEY,**
**in his official capacity**
**as Attorney General**
**of West Virginia**

**By counsel,**

/s/ Zachary A. Viglianco

Zachary A. Viglianco (WVSB No. 12579)
*Director of Strategic Litigation*

State Capitol Complex
1900 Kanawha Blvd, East
Office of the Attorney General
Charleston, WV 25314
Telephone: (304) 558-2021
zviglianco@wvago.gov

Ryan McCune Donovan (WVSB No. 11660)
*Special Assistant Attorney General*

Hissam Forman Donovan Ritchie PLLC
700 Virginia St. East, Suite 210
Charleston, WV 25301
Telephone: (681) 265-3802
rdonovan@hfdrlaw.com