**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**WEST VIRGINIA RIVERS COALITION, INC.,**
**and 350.org,**

**Plaintiffs,**

**v.** **Civil Action No. 2:26-cv-00679**

**JOHN B. MCCUSKEY, in his official capacity as**
**Attorney General of the State of West Virginia,**

**Defendant.**

# PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER

**DEREK TEANEY**
**AMANDA DEMMERLE**
**APPALACHIAN MOUNTAIN ADVOCATES, INC.**
**P.O. Box 507**
**Lewisburg, WV 24901**
**(304) 646-1182**
**dteaney@appalmad.org**
**ademmerle@appalmad.org**

**Counsel for Plaintiffs**

Attorney General McCuskey's investigation of environmental organizations is a thorough repudiation of the First and Fourth Amendments. If his investigative power were as sweeping as he claims, Defendant could investigate anyone at any time without limitation. But our Constitution limits the authority of government officials who would abuse their power to harass and punish citizens with whom they disagree. The investigation at issue here is precisely the kind of unbridled governmental action that the Bill of Rights was adopted to prevent. It should therefore be enjoined.

## ARGUMENT

### I. Plaintiffs' Claims Are Justiciable Now.

Defendant's justiciability argument is a set of contentions the Supreme Court unanimously rejected six months ago, in the same posture as this case: a state attorney general's consumer-protection subpoena to an advocacy organization, a § 1983 suit filed before any enforcement, and a standing defense built on the subpoena's "non-self-executing" character. First Choice Women's Res. Ctrs., Inc. v. Davenport, 608 U.S. 174 (2026). Plaintiffs have present injuries, like those in First Choice, that the Court can redress by issuing an injunction.

#### A. The subpoenas and the investigations they serve inflict a present injury, despite Defendant's eleventh-hour attempt to cure.

An injury in fact arises "when a defendant burdens a plaintiff's constitutional rights." First Choice, 608 U.S. at 189 (citing TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021)). An official demand for an advocacy organization's private records does so in two ways: it "discourag[es]" others from associating with the group" and "encourage[s] groups and individuals to cease or modify protected First Amendment advocacy the government disfavors." Id. at 189. Both injuries occur "not just when a demand is enforced, but when it is made and for as long as it remains outstanding." Id.

Defendant withdrew his demand for donor identity. Ex. A. He concedes (at 21) the withdrawal does not moot the case, but neither does it cure Plaintiffs' injuries. The letter leaves in place every demand that does not name a donor: board affiliations (Demand 9(b)), coalition partners (12), grantees

(14, modified only as to the source of the funds), agency submissions (16), communications with attribution organizations (9, 15), internal deliberations and drafts (7), and solicitation totals and targeting (5), all reaching back to January 2017. It leaves Instruction 9, which requires Plaintiffs to log any document withheld on First Amendment grounds, and its undertaking to "respect withholding or redaction" extends only to donor identity. Ex. A at 1. Thus, Defendant still seeks information on who Plaintiffs associate with and their internal deliberative process. Those demands, which are still outstanding, caused WV Rivers to limit its internal communications and to pause its mini-grants (groups it funds). Smith Decl. ¶¶ 17, 24. Those same demands caused 350.org to continue indefinitely its screening process for all U.S. content and to decide not to do any new work in the State. Odendahl Decl. ¶¶ 16–18. Defendant presents no evidence contradicting Plaintiffs' chilled speech and associations. The test is objective, First Choice, 608 U.S. at 189–90, and the Court has already observed an objectively reasonable recipient of a subpoena will be "induced … to trim its protected advocacy knowing it now stands in the government's crosshairs." Id. at 193. Self-censorship from a "well-founded fear that the law will be enforced" is an injury in fact "that can be realized even without an actual prosecution." Id. (quoting Va. v. Am. Booksellers Ass'n, 484 U.S. 383, 393 (1988)).

The same is true of the investigation. The D.C. Circuit held in Media Matters for America v. Paxton, 138 F.4th 563, 582–83 (D.C. Cir. 2025), that the recipient of a state attorney general's investigative demand suffers a present injury from the investigation and the demand without awaiting enforcement. The Supreme Court cited that decision in First Choice, holding that the rule of Reisman v. Caplin, which defers review until enforcement, does not apply "where a plaintiff suffers ongoing injuries from the subpoena itself." First Choice, 608 U.S. at 195; see also Exodus Refugee Immigr., Inc. v. Rokita, No. 1:25-CV-01885, 2026 WL 2249397, at *8 (S.D. Ind. Aug. 5, 2026), appeal docketed, No. 26-2811 (7th Cir. Sept. 2, 2026). This Court reached the same conclusion in Capital One Bank (USA), N.A. v. McGraw, 563 F.Supp.2d 613 (S.D. W. Va. 2008), enjoining the Attorney General from

issuing any subpoena in an investigation he lacked authority to conduct, as the Eleventh Circuit did in Major League Baseball v. Crist, 331 F.3d 1177 (11th Cir. 2003), affirming an injunction against an attorney general's investigation of conduct the law he invoked did not reach.

Plaintiffs similarly face a credible threat of enforcement, which independently suffices to show injury. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 161, 164–67 (2014); see also First Choice, 608 U.S. at 183. Defendant has not withdrawn the subpoenas; he asked this Court to hold the return date in abeyance, ECF No. 9, and his October 26 letter contemplates "enforcement efforts related to these (or any similar, subsequently-issued) subpoenas." Ex. A at 1–2. The Attorney General's proposal injects even more uncertainty into his investigatory process and actually prolongs Plaintiff's injuries.

**B. Plaintiffs' injuries are traceable to Defendant.**

Defendant does not contest that WV Rivers' injuries are traceable to his investigation and subpoena. However, Defendant argues (at 7) that 350.org's pre-publication review is not traceable to Defendant because it began with a September 10 congressional letter. Traceability does not require that the defendant's conduct be the sole cause of the injury. Bennett v. Spear, 520 U.S. 154, 168–69 (1997). The unrebutted declaration states that the review was extended indefinitely because of the subpoena, Odendahl Decl. ¶ 16, and that 350.org will undertake no new West Virginia work while the investigation is pending, id. ¶ 18. That shows traceability.

**C. First Choice rejected each of Defendant's remaining justiciability arguments.**

First, Defendant says (at 21) the subpoenas impose no obligation until he applies to a circuit court under W. Va. Code § 46A-7-104(3). That contention was flatly rejected by First Choice: whether a subpoena's command "and those penalties were immediately enforceable or depended on subsequent court action," the recipient faces "a distinct possibility of disclosure" that reasonable people "would 'not lightly disregard.'" 608 U.S. at 192. Section 46A-7-104(3) of the Act is the

mechanism First Choice described: a command "backed by a threat of court-ordered compliance followed by the possibility of sanctions." Id. at 193.

Further, First Choice held Laird v. Tatum, 408 U.S. 1 (1972), inapposite where "the Attorney General targeted First Choice for investigation" and "commanded production." 608 U.S. at 193. Clapper v. Amnesty International USA, does not save Defendant—it concerned a "speculative chain of possibilities" and fears of harm "not certainly impending." 568 U.S. 398, 414, 416 (2013). Nothing here is speculative: the subpoenas were issued, the investigations are open, and Defendant tells this Court (at 4-5) he intends to pursue both. The district court in Exodus rejected the same Clapper argument for the same reason. Exodus, 2026 WL 2249397, at *11.

Next, Defendant contends (at 8) First Choice turned on a pending state enforcement action. The chronology refutes that. First Choice sued in federal court "[t]wo days before the deadline to produce documents," and the state suit came "[s]hortly after that." 608 U.S. at 181. The Court's holding rested on the subpoena "itself," which inflicts injury "when it is made," and the Court noted that the state court "had not yet compelled" production. Id. at 182, 189. The absence of any state proceeding here makes this case simpler, not harder, as shown by Defendant's concession (at 21) that no exhaustion is required. First Choice, 608 U.S. at 195–96; Knick v. Township of Scott, 588 U.S. 180, 185 (2019).

Finally, Defendant reads (at 8-9) First Choice as a case about individual donors. The Court's injury analysis, however, rested on "compelled disclosure of affiliation with groups engaged in advocacy," NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462 (1958), and on the recipient's self-censorship. 608 U.S. at 175, 193. Defendant still seeks exactly that affiliation information: coalition partners (Demand 12), grantees (Demand 14), and board affiliations (Demand 9(b)). Those demands have caused Plaintiffs to self-censor and reduce their associational activities.

## II. Plaintiffs Are Likely to Succeed on Their First and Fourth Amendment Claims.

Defendant does not dispute that he made the politically charged and scurrilous statements against environmental organizations compiled in Plaintiffs' opening brief. Rather, his sole defense to Plaintiffs' First Amendment retaliation argument and Fourth Amendment unreasonable search and seizure argument is that he had a lawful basis to issue the subpoenas under the Consumer Credit and Protection Act ("CCPA"). He does not, and it is not a close question.

Defendant also has the burden to show that his governmental interests outweigh Plaintiffs' First and Fourth Amendment rights and that he would have investigated Plaintiffs regardless of their speech. He has not even attempted to do so. For these reasons, Plaintiffs are likely to succeed on their First and Fourth Amendment claims.

### A. The Subpoenas and Investigations Have No Lawful Basis.

Defendant is investigating Plaintiffs solely based on his authority under the CCPA. If the Act does not apply to Plaintiffs' conduct, Defendant cannot investigate.

#### 1. The CCPA is not as broad as Defendant claims.

The West Virginia Consumer Credit and Protection Act protects consumers by, among other things, prohibiting "unfair methods of competition and unfair or deceptive acts or practices <u>in the conduct of any trade or commerce</u>." W. Va. Code § 46A-6-104 (emphasis added). "Trade or commerce" is defined as "the advertising, offering for sale, sale or distribution of any goods or services and shall include any trade or commerce, directly or indirectly, affecting the people of this state." <u>Id.</u> § 46A-6-102(6). The Act gives examples of "unfair methods of competitive and unfair or deceptive acts or practices," <u>id.</u> 46A-6-102(7), but, as the plain language of the Act states, they must be done "in the conduct of any trade or commerce" to be regulated by the Act, <u>id.</u> § 46A-6-104.

Two features of these key provisions of the Act control the instant action. First, the phrase "directly or indirectly, affecting the people of this state" modifies "trade or commerce." It extends the

Act to commerce conducted elsewhere that affects West Virginians, but it does not reach conduct that is not trade or commerce itself. Second, every example in § 46A-6-102(7) describes something a market participant does with its own or a competitor's goods. The one Defendant leans on hardest (at 12-15)—subsection (M)—is expressly confined to deception "in connection with the sale or advertisement of any goods or services." Plaintiffs advertise, sell, and distribute nothing, apart from the de minimis merchandise neither the subpoenas nor the response mention. Political statements, agency comments, litigation, coalition work, and charitable solicitation are not the advertising, sale, or distribution of goods or service by anyone. Defendant's assertion (at 13) that the Act regulates whatever "impacts" trade or commerce has no textual support.

None of the cases Defendant cites holds otherwise; every one of them involves a seller speaking about its own goods or credit or its competitors. State ex rel. McGraw v. Johnson and Johnson, 704 S.E.2d 677 (W. Va. 2010), cited (at 13) for the proposition that the Act reaches conduct that merely "impacts" trade or commerce, involved a drug maker's misleading statements about drugs it sold, id. at 681, made for the purpose, as Defendant admits (at 16), to get providers to prescribe them. That providers stood between the actual seller and the consumer did not take the seller out of commerce. The rest of his cases are the same: McFoy v. Amerigas, Inc., 170 W. Va. 526 (1982), involved a propane seller; White v. Wyeth, 227 W. Va. 13 (2010), a drug maker; and Tederick v. LoanCare, LLC, 168 F.4th 154, 169 (4th Cir. 2026), a mortgage servicer.

Neither does National Commission on Egg Nutrition v. FTC, 570 F.2d 157 (7th Cir. 1977), support Defendant's argument. The Seventh Circuit examined that nonprofit's statements only because they were made "for the purpose of persuading members of the public to buy [a] product" on behalf of the egg producers who formed the association. Id. at 163. The Act's own instruction to follow Federal Trade Commission Act interpretations, W. Va. Code § 46A-6-101(1), cuts the same

way because the FTC's jurisdiction over nonprofits extends only to those that operate for the profits of their members. Cal. Dental Ass'n v. FTC, 526 U.S. 756, 765–69 (1999).

W. Va. ex rel. McGraw v. Minnesota Mining, cited by Defendant at 15–16, decided whether the Attorney General had been fraudulently joined to keep the case in state court, a standard under which a claim survives if it has even a "glimmer of hope." 354 F.Supp.2d 660, 666 (S.D. W. Va. 2005). Judge Copenhaver merely observed that the Supreme Court of Appeals "could possibly conclude" that an action under W. Va. Code § 46A-6-104 might proceed "in the absence of a consumer transaction." Id. at 667. But that does not help Defendant here—the mining company in that case was clearly engaged in commerce by selling respirators. That it may not have been a "consumer transaction" (a sale to a natural person) does not mean it is not trade or commerce (a sale).

The authority claimed by Defendant reaches beyond that which was, or could have been, granted to him by the Legislature. If the Act reaches whatever "impacts" commerce, as he claims, § 46A-7-104 becomes a standing authority to open any file cabinet in West Virginia whose owner has said something about a product or a business that the Attorney General believes is wrong. That is a prohibited general warrant. The writs the Fourth Amendment was written against gave officers "blanket authority to search where they pleased." Stanford v. Texas, 379 U.S. 476, 481 (1965). They "specified only an offense ... and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." Steagald v. United States, 451 U.S. 204, 220 (1981).

On his reading, Defendant's own statements that solar and wind power "have significant reliability issues," are "more expensive," and risk "dangerous and costly blackouts," ECF No. 2-1 at Ex. 6 at 2, disparage "the goods ... of another by ... representation of fact," § 46A-6-102(7)(H), and a successor to his office who favors renewables could demand ten years of his correspondence to investigate. Courts do not read statutes to confer that power. The Supreme Court refused to attribute

to a legislature an intent to authorize an agency "to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime," or "even to come so near to doing so as to raise a serious question of constitutional law." FTC v. Am. Tobacco Co., 264 U.S. 298, 306–07 (1924). The West Virginia Supreme Court reads the CCPA by its text and declines to extend it to relationships the Legislature regulates elsewhere. State ex rel. Morrisey v. Copper Beech Townhome Communities Twenty-Six, LLC, 239 W. Va. 741, 748 (2017). The text reaches "the advertising, offering for sale, sale or distribution of any goods or services." W. Va. Code § 46A-6-102(6). The Legislature did not write the statute Defendant describes.

**2. This is protected First amendment speech not regulable by CCPA.**

In one breath, Defendant admits (at 2) that Plaintiffs' "political advocacy and other expressive or associational activity is certainly protected by the First Amendment." In the next, he alleges, without explanation, that Plaintiffs are also engaging in "deceptive commercial speech." Id. Remarkably, the only speech by Plaintiffs he cites (at 16-18) as deceptive are a "Citizen's Guide to Climate Change," public comments to FEMA, and a public report on climate change's impact. These are clearly all protected, not commercial, speech. Even if state law intended to restrict such speech, it could not do so without violating bedrock First Amendment principles.

Speech on public issues occupies "the highest rung of First Amendment values." Snyder v. Phelps, 562 U.S. 443, 452 (2011). Speech urging people to boycott products or establishments is also political speech, protected by the First Amendment even if it is intended to cause and does cause economic loss to the businesses it targets. NAACP v. Claiborne Hardware Co., 458 U.S. 886, 807–15 (1982). The right to petition the government is a core component of the First Amendment right to free speech and includes the advocacy for an organization's cause and point of view. Cal. Transport v. Trucking Unlimited, 404 U.S. 508, 510–11 (1972). Plaintiffs' opening memorandum (ECF No. 3 at 15 & n.5) explains why the activities the investigations and subpoenas target, such as advocacy, agency

comments, litigation, coalition work, and charitable solicitation, are protected speech. Defendant's Response brief completely fails to address these claims.

Instead, Defendant attempts (at 1–4, 15–16) to evade these heightened First Amendment protections on speech by suggesting that Plaintiffs' speech is commercial in nature. By his own definition, any speech criticizing the fossil fuel industry is "commercial." He is wrong. Commercial speech is speech that does "no more than propose a commercial transaction." Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976). Such speech enjoys lesser First Amendment protections and can be regulated because that speech proposes a transaction and such claims are "more easily verifiable" by the one who makes them. Id. at 771–72 & n.24. The test to identify commercial speech asks whether the speech is an advertisement, refers to a specific product, and is economically motivated. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66–67 (1983). Defendant makes a conclusory statement (at 2) that Plaintiffs engage in commercial speech. He claims (at 4) that Plaintiffs engage in trade or commerce "by expressly encouraging consumers to stop buying—and attempting to prevent producers from selling—fossil fuels." That describes boycotting and petitioning, not commercial speech. The First Amendment protects boycotts (see Claiborne Hardware (discussed above)), and petitions are immune from state-law liability for their content. Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 138–40 (1961); IGEN Int'l, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 310 (4th Cir. 2003). A speaker does not become a merchant just because its message affects someone else's sales. Plaintiffs' speech is not commercial because it proposes no transaction, promotes no product, and earns no profit. Bolger, 463 U.S. at 66–67; Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 879 F.3d 101, 108–110 (4th Cir. 2018) (nonprofit's advocacy and offer of free services are not commercial speech; strict scrutiny applies).

Thus, what Defendant is really arguing is that his power under the CCPA extends even into Plaintiffs' core political speech protected by the First Amendment. But he makes no argument that such an expansive reach of his power could survive strict scrutiny, which waives the argument.

The First Amendment recognizes no "exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker." New York Times Co. v. Sullivan, 376 U.S. 254, 271 (1964). An attorney general's investigation into whether climate advocacy "objectively overstates" the harm of a product (at 4) is that test, administered by the Attorney General. Defendant's own opening quotation (at 1) concedes the point when it is read in full without Defendant's convenient omissions: Hustler Magazine, Inc. v. Falwell says that false statements of fact interfere with the marketplace of ideas, but it explains in the very next sentence (not included his brief) that such statements "are nevertheless inevitable in free debate" and that punishing them would chill speech "that does have constitutional value." 485 U.S. 46, 52 (1988); see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 341 (1974) ("The First Amendment requires that we protect some falsehood in order to protect speech that matters."). Plaintiffs stand behind every statement the investigations and subpoenas target (ECF No. 3 at 15, n.5), and the following section shows that the statements Defendant now names are accurate. But the constitutional point does not depend on that showing. A State officer may not assign himself the role of adjudicating the truth of one side of a public debate and demand a decade of that side's papers to prove it.

The Court, however, need not reach this issue—as explained above, the CCPA does not reach Plaintiffs' speech, and courts are "obligated to construe the statute to avoid constitutional problems if it is fairly possible to do so." Boumediene v. Bush, 553 U.S. 723, 787 (2008).

**3. Even if Plaintiffs' protected speech were regulable by CCPA, Defendant has shown no probable cause of deception.**

Even if the Act could apply to Plaintiffs' speech, Defendant would still have to show probable cause, as required by W. Va. Code § 46A-6-104, that they engaged in deception. Defendant has not

met this burden. He concedes (at 1, 18) it would be "premature to definitely say whether Plaintiffs have violated" the Act. But the case Defendant cites as the standard for investigatory subpoenas still requires an "honest belief" of a violation. Cavalry SPV I, LLC v. Morrisey, 752 S.E.2d 356, 365 (W. Va. 2013). He does not even allege that.

Instead, he solely focuses on criticism of the "RCP8.5 scenario" and of "event attribution science." His argument is a red herring. He first casts (at 3–4 and 16–18) certain viewpoints in a scientific debate as proof that reliance on the criticized tools is "misleading" or "deceptive." Second, he points to "objectively identifiable representations" that, he argues, place Plaintiffs on the wrong side of the debate. Both premises fail. Defendant concedes (at 18) that his "examples may not themselves violate the WVCCPA," and describes (at 5) the conduct he investigates as "willful or knowing use of or reliance upon such a model." But he alleges knowledge nowhere.

RCP8.5 was one of four emissions scenarios in the Intergovernmental Panel on Climate Change's (IPCC) Fifth Assessment Report (2013-14).[1] On April 7, 2026, a highly technical article by climate modelers announced that the RCP8.5 scenario would be retired because the emissions on which it was based "have become implausible, based on trends in the costs of renewables, the emergence of climate policy and recent emission trends."[2] Retiring that scenario does not mean that the harmful effects of climate change are not real and severe. Indeed, the paper's lead author describes focus on the retirement as a "red herring" and that "we are simply in a situation that is bad news."[3] And the scenario Defendant calls (at 18) discredited in 2020 was used in the IPCC's Sixth Assessment Report (2021) and in the federal government's own Fifth National Climate Assessment (2023).[4]

More importantly, despite RCP8.5's retirement, the consensus that climate change leads to

---

[1] https://www.ipcc.ch/site/assets/uploads/2018/02/SYR_AR5_FINAL_full.pdf
[2] https://gmd.copernicus.org/articles/19/2627/2026/
[3] https://www.eenews.net/articles/the-worst-case-climate-scenario-is-gone-the-catch-the-best-case-is-too/
[4] https://toolkit.climate.gov/sites/default/files/2025-07/NCA5_2023_FullReport.pdf at xxvi Table 3

more severe weather and can lead to catastrophic impacts remains unchanged. For example, the National Oceanic and Atmospheric Administration (NOAA) notes that "[e]xtremes in 1-day precipitation have been steadily rising in the contiguous United States" and that "as oceans warm and sea levels rise, hurricanes and typhoons are not becoming more frequent, but they are becoming stronger and more destructive—driven by underlying climate change."[5] A study examining this past summer's heat waves in Europe attributed 32,600 deaths to industrial greenhouse gas emissions.[6] A recent article in Nature (the journal Defendant relies on for the 2020 criticism of the RCP8.5) concluded that even "moderate global warming does not rule out extreme global climate outcomes,"[7] including "precipitation extremes." Id. Another article in Nature found that climate change increases the risk of extreme forest fires across the globe.[8] NASA recognizes that climate change will "result in more frequent and intense storms" and that "storm-affected areas are likely to experience increases in precipitation and increased risk of flooding." The USDA informs the public that "[e]xtreme events are occurrences of unusually severe weather or climate conditions that can cause devastating impacts on communities and agricultural and natural ecosystems." Irrespective of RCP8.5, the IPCC found in its 2021 report that "relatively small incremental increases in global warming (+0.5°C) cause statistically significant changes in extremes on the global scale and for large regions (high confidence). In particular, this is the case for temperature extremes (very likely) and the intensification of heavy precipitation (high confidence)."[9] The established science thus continues to support statements linking climate change to severe weather, including changes in temperature and precipitation.

---

[5] https://www.ncei.noaa.gov/news/warming-earth-also-wetter-earth

[6] https://www.science.org/content/article/europe-s-summer-heat-wave-killed-more-50-000-people-urban-areas

[7] https://www.nature.com/articles/s41586-026-10237-9

[8] https://www.nature.com/articles/s41467-025-61608-1

[9] https://www.ipcc.ch/report/ar6/wg1/chapter/chapter-11/

The statements Defendant attributes to WV Rivers are consistent with accepted science. The so-called "dire warnings" about the heavy precipitation in the Citizens Guide to Climate Change described water cycle intensification (citing the Bulletin of the American Meteorological Society and the Journal of Hydrology), noted that the 2016 floods in West Virginia "may have been made worse by climate change" (citing NOAA), and relayed the Third National Climate Assessment's projection of future heavy precipitation events in West Virginia.[10] The claims were not misleading; they cited readily available, credible sources. The Geos Institute comment, which WV Rivers joined, made no prediction about any weather event. Rather, such comment, protected by the First Amendment's right to petition, asked the Federal Emergency Management Agency (FEMA) to consider climate scenarios in its National Risk Index.[11]

Defendant likewise mischaracterizes 350.org's statements. He points (at 17 & n.8) to a statement about the economic impacts of climate change, arguing that it "relie[d] upon and reproduce[d] a claim made in a study that was formally retracted on December 3, 2025." The report, however, does not cite the retracted study. Its footnote cites a Guardian news article and a National Bureau of Economic Research working paper revised in January 2026 and since published in the Proceedings of the National Academy of Sciences.[12, 13] To the extent that the statement can be linked to the retracted Kolz et al. paper, revisions to that paper change the economic figure only slightly and leave the main conclusions undisturbed.[14] The Statement attributed to a 350.org spokeswoman simply recited the truth that "extreme weather in West Virginia and elsewhere is more likely" if climate change

---

10 Geos Institute, Comment on Community Disaster Resilience Zones and National Resilience Index RFI: FEMA–2023–0009 at 3 & nn.10-13 (July 25, 2023), https://perma.cc/A5ZP-PDGK.

11 https://geosinstitute.org/wp-content/uploads/2023/07/Geos-Institute-Comments-to-FEMA-on-CDRZ-and-the-National-Risk-Index-230725.pdf

12 https://s3.amazonaws.com/350wagtail-live-afef3c896ec14ef3a8d09e9-f6e2285.divio-media.com/media/documents/Out-of-Pocket-Full-Report-EN.pdf at 27 nn.32, 34 (350.org Report).

13 https://www.nber.org/system/files/working_papers/w32450/w32450.pdf (NBER report).

14 https://climateinstitute.edhec.edu/news/climate-economics-isnt-broken-debating-true-damage-figure-does-not-negate-threat.

continues, with examples of stronger hurricanes and extreme temperatures that the science supports.[15] Defendant's criticism of "event attribution" science misstates his own source. The 2016 National Academies report he cites (at 5 n.3) states in the passage he quotes from: "Confidence in attribution analysis of specific extreme events is highest for extreme heat and cold events, followed by hydrological drought and heavy precipitation. There is little or no confidence in attribution of severe convective storms and extratropical cyclones." Defendant quoted the second sentence (at 4) as if it described the entire conclusion. The Academies' later report finds that the science has advanced "considerably" since 2016, with the highest confidence for temperature extremes and large-scale heavy rainfall.[16]

That is all to say that Plaintiffs did not make any deceptive statements; all their statements are scientifically supported. That they may have indirectly relied on the RCP8.5 scenario, before it was retired, does not prove deception or anything close to it. This is why "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." Underwager v. Salter, 22 F.3d 730, 736 (7th Cir. 1994); see also ONY, Inc. v. Cornerstone Therapeutics, Inc., 729 F.3d 490, 496–99 (2d Cir. 2013) (recognizing "the conclusions of empirical research are tentative and subject to revision" and "the trial of ideas plays out in the pages of peer-reviewed journals").

**B. Defendant Bears the Burden of Proof on the Remaining Issues and Has Failed to Carry It.**

The Supreme Court has made clear that "the burdens at the preliminary injunction stage track the burdens at trial," Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006). Accordingly, when the government must justify its action at trial, the plaintiff "must be deemed likely to prevail unless the Government has shown" that its justification holds, Ashcroft v. ACLU,

---

[15] https://www.nbcnews.com/news/us-news/west-virginia-utility-companies-have-spent-millions-mitigate-power-outages-n1264996.

[16] https://www.nytimes.com/2026/07/16/climate/national-academies-extreme-weather-attribution.html.

542 U.S. 656, 666 (2004). Defendant has three specific burdens in this case: (1) to prove he would have issued these subpoenas had Plaintiffs never engaged in political speech he disfavored; (2) to show that the inquiry is one the law authorizes; and (3) to show a substantial relation between the demands and a sufficiently important interest. Argument, however, is not evidence. The government's burden to justify a burden on speech "is not satisfied by mere speculation or conjecture," Edenfield v. Fane, 507 U.S. 761, 770–71 (1993); see Sorrell v. IMS Health Inc., 564 U.S. 552, 571–72 (2011) ("[I]t is the State's burden to justify its content-based law as consistent with the First Amendment."). And the burden does not lighten because the questions arise on a preliminary-injunction motions: Where the party with the burden fails to carry it at that stage, it loses the question there as it would at trial. O Centro, 546 U.S. at 428–29 (rejecting the argument that evidentiary "equipoise" at the preliminary-injunction stage should favor the government because the plaintiff is the movant). On this record, Defendant cannot.

**1. Defendant must prove he would have issued the subpoenas absent Plaintiffs' speech to defeat Plaintiffs' First Amendment retaliation claim, and he has not tried.**

In retaliation cases, once a plaintiff shows that protected conduct was a "motivating factor" in the defendant's decision, the burden shifts to the defendant to prove "by a preponderance of the evidence that it would have reached the same decision" without the protected conduct. Mt. Healthy, 429 U.S. at 287. Plaintiffs made that showing (at 11-13), and Defendant disputes neither the statements (at 1) nor the views behind them (at 10-11). The "presumption of regularity" Defendant invokes (at 10–11) does not displace that rule. The Supreme Court has repeatedly weighed an official's own statements as evidence of motive in First Amendment cases, including in First Choice, where the Attorney General's description of pro-life groups as "extremists" and his suggestion that "charges" might follow counted toward the injury. 608 U.S. at 188; see Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 191–94 (2024). VDARE Foundation, Inc. v. James, which Defendant cites (at 10 n.4), does

not hold otherwise; it did not apply Mt. Healthy and held only that animus "by itself" is not retaliation. 2026 WL 2664435, at *2, *10–11 (N.D.N.Y. Sept. 10, 2026).

Defendant has not tried to carry his burden to show he would have opened these investigations anyways. He filed no declaration. The four public documents his counsel describes (at 17–18) are not identified in the subpoenas, and no one with knowledge says the office considered them before opening the investigations. Rationale supplied by counsel post hoc does not show what Defendant would have done, and the timing of the subpoenas, the "tenuous rationale" now offered for them, and their "disproportionately broad scope" are the marks of pretext. Exodus, 2026 WL 2249397, at *24. Stanley v. Bocock, on which Defendant relies (at 10-11), does not help him because, as explained in Section II.A supra, Defendant has never shown probable cause that Plaintiffs have violated the Act: there is no "offense" under the Act for speech outside trade or commerce, and Defendant concedes (at 18) his examples "may not themselves violate the [Act]."

In fact, Defendant's brief only confirms his motive. The violation he describes (at 4) is "telling consumers that ordinary levels of consumption will have catastrophic results"; the conduct (at 5) is "behavior that takes aim at an industry"; the interest (at 19) is protecting "[t]he production and export of fossil fuels." That is a point of view, selected for investigation because of what it says.

**2. The Fourth Amendment places the burden on Defendant to show the inquiry is authorized, and he has not carried it.**

Compelled production of papers is reasonable only if "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." United States v. Morton Salt Co., 338 U.S. 632, 652 (1950); Oklahoma Press Publ'g Co. v. Walling, 327 U.S. 186, 208–09 (1946). The burden to make that showing belongs to the government.

A subpoena must be "(1) authorized for a legitimate governmental purpose; (2) limited in scope to reasonably relate to and further its purpose; (3) sufficiently specific ...; and (4) not overly broad." In re Subpoena Duces Tecum, 228 F.3d 341, 349 (4th Cir. 2000); see also United States v.

Powell, 379 U.S. 48, 57–58 (1964). West Virginia allocates the burden identically for Defendant's own subpoenas: the agency must prove, inter alia, "(1) that the subpoena was issued for a legislatively authorized purpose, (2) that the information sought is relevant to the authorized purpose," and only if those requirements are satisfied does the burden shift to those opposing the subpoena. State ex rel. McGraw v. King, 229 W. Va. 365, 369 (2012). Where, as here, the papers demanded are themselves protected by the First Amendment, those requirements apply with "scrupulous exactitude." Zurcher v. Stanford Daily, 436 U.S. 547, 564 (1978).

That allocation does not move because Plaintiffs sued first. A burden of proof is substantive, and a procedural vehicle that lets one party obtain a ruling before the other side sues leaves that burden where it was. Medtronic, Inc. v. Mirowski Family Ventures, LLC, 571 U.S. 191, 194, 199 (2014). Defendant would bear this burden in the Circuit Court of Kanawha County if he applied to enforce the subpoenas; he does not escape it just because he is in the federal forum § 1983 guarantees. First Choice, 608 U.S. at 195–96.

Defendant concedes (at 19) that the Fourth Amendment question turns on whether the Act reaches Plaintiffs' conduct. For the reasons in Section II.A supra, it does not. An official who cannot enforce the Act against a person "cannot use a subpoena to investigate whether [that person] violated the Act," Capital One, 563 F.Supp.2d at 618, and an investigation "premised solely upon legal activity" is the "baseless 'fishing expedition'" the Fourth Amendment forbids, Crist, 331 F.3d at 1187–89. Defendant has shown nothing else: not relevance, not specificity, not why a demand for ten years of records is tailored to an investigation whose stated theory concerns statements made after 2020.

**3. The surviving demands fail exacting scrutiny because Defendant has shown no substantial relation to any important interest.**

Demands for a charity's funders and affiliations are subject to exacting scrutiny, which requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" and a demand "narrowly tailored to the government's asserted interest." Americans for

Prosperity Found. v. Bonta, 594 U.S. 595, 607–08 (2021). The showing is the government's. An investigation that reaches protected association is valid only if "the State convincingly show[s] a substantial relation between the information sought and a subject of overriding and compelling state interest." Gibson v. Fla. Legis. Investigation Comm., 372 U.S. 539, 546 (1963); see NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 463–66 (1958) (demand fell because the State had not shown an interest sufficient to justify its deterrent effect); Buckley v. Valeo, 424 U.S. 1, 64, 68 (1976). The same rule governs burdens on charitable solicitation. Riley v. Nat'l Fed. of the Blind of N.C, Inc., 487 U.S. 781, 795–98 (1988). The burden is evidentiary. McCullen v. Coakley, 573 U.S. 464, 467, 494–96 (2014); Reynolds v. Middleton, 779 F.3d 222, 226, 229–31 (4th Cir. 2015) Defendant has made no showing.

His only answer (at 9, 18) is his withdrawal of the donor demands. But the subpoenas still command production of Plaintiffs' coalition partners, joint work plans, and grants given (Demand 16), coordination with third parties (Demand 12), the organizations they pay (Demand 9(b)), shared officers and board members (Demand 14(c)), communications with attribution organizations (Demand 7(b)), and every solicitation containing a Climate Claim sent to a West Virginian, with its targeting and tools (Demand 5). Each compels ""disclosure of affiliation with groups engaged in advocacy,"" NAACP, 357 U.S. at 462, or burdens solicitation, Riley, 487 U.S. at 796, and First Choice treats both of those as injuries, 608 U.S. at 189–90.

On the interest side, Defendant offers nothing. He identifies no complaint, no transaction, and no use for Plaintiffs' partner, grantee, board, or solicitation records, and his brief does not mention those surviving demands. A demand for a decade of associational records in service of an investigation with no lawful subject is flatly unconstitutional.

### III. Plaintiffs Have Satisfied the Remaining Winter Factors.

Defendant (at 18) admits that an infringement on First Amendment rights, even briefly, is irreparable harm. But he says (at 18) that Plaintiffs' alleged chill on their speech and association is "not warranted given that these subpoenas expressly disclaim disclosure of any donor identities."

The surviving demands that do not ask for donors still cause irreparable harm. WV Rivers is self-censoring its internal communications, Smith Decl. ¶ 17, because the subpoena seeks them, ECF No. 2-1 at 33–34 ¶ 7 (Demand). WV Rivers also paused its mini-grant funding because the subpoena demands the identification of groups it funds. Smith Decl. ¶ 24; ECF No. 2-1 at Exs. 4 & 5 (Demands 9(b) and 16). 350.org is still screening its U.S. content and will not take on any new work in West Virginia while it is being investigated. Odendahl Decl. ¶ 18. And both are diverting staff and leadership time from their missions to the investigation. Smith Decl. ¶¶ 14, 18; Odendahl Decl. ¶¶ 14, 16–17, 19. Because those demands survive Defendant's recent modification of the subpoenas, irreparable harm remains. First Choice, 608 U.S. at 197 ("A government that takes three limbs but spares the last imposes an injury all the same.").

The Fourth Amendment injury is irreparable as well, and Defendant's only response (at 18)—that the Act authorizes his conduct—fails for the reasons set out in Section II.A. Leaders of a Beautiful Struggle v. Balt. Police Dep't, 2 F.4th 330, 346 (4th Cir. 2021) (en banc).

Because Plaintiffs have shown Defendant's investigations and subpoenas violate their First and Fourth Amendment rights, the balance of equities and the public interest favor a TRO and an injunction. Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002); Newsom, 354 F.3d at 261. That Defendants investigations may benefit the oil and gas industry (at 19) is Defendant's motive, not a public interest.

Defendant does not ask for a bond under Rule 65(c), and none is warranted where constitutional rights are at stake. Poindexter v. Strach, 324 F.Supp.3d 625, 636 (E.D.N.C. 2018); Maryland v. USDA, 770 F.Supp.3d 779, 820 (D. Md. 2025).

## IV. The Requested Relief Is Bounded and Reaches the Investigations that Cause the Injury.

Defendant says (at 19-20) the injunction would place his investigation under "federal judicial superintendence." Applesauce. The relief sought prohibits defined acts in defined investigations: enforcing the September 16 subpoenas, continuing the investigations, and bringing proceedings on their subjects. It supervises nothing. This Court entered similar relief in Capital One, 563 F.Supp.2d at 618, 622, and the D.C. and Eleventh Circuits have affirmed it in Crist and Media Matters.

Defendant also says (at 20) relief must track "the specific injury demonstrated." It does. The injuries are the investigations and subpoenas, inflicted "for as long as [they] remain[] outstanding." First Choice, 608 U.S. at 189. An order limited to two subpoenas is not complete relief; it is an invitation to issue more—or worse. See Jolt Initiative, Inc. v. Paxton, 821 F.Supp.3d 706, 723, 727 (W.D. Tex. 2026).

## CONCLUSION

The Attorney General's investigation is rogue in several respects—it is not authorized by West Virginia law; it ignores and misconstrues climate science, in an Orwellian exercise that attempts to cast the publishing of truths about the connection between fossil fuels and climate change as deception; and it construes West Virginia law to be broader than the First and Fourth Amendments allow. Defendant's Orwellian exercise attempting to establish that publishing or stating the truth about the connection between fossil fuels and climate change constitutes deception ignores and misconstrues climate science and would make West Virginia a state where political ambition outweighs science and reason. Accordingly, Plaintiffs respectfully request the Court grant its request for a Temporary Restraining Order and Preliminary Injunction.

DATE: October 27, 2026

Respectfully submitted,

***s/ Derek Teaney***
DEREK TEANEY (WVBN 10223)
AMANDA DEMMERLE (WVBN 13930)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org
ademmerle@appalmad.org

Counsel for Plaintiffs