**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

WEST VIRGINIA RIVERS COALITION, INC., and
350.ORG,

Plaintiffs,

v. CIVIL ACTION NO. 2:26-cv-00679

JOHN B. MCCUSKEY,
*In his official capacity as Attorney General of the State of West Virginia*

Defendant.

**MEMORANDUM OPINION AND ORDER**

The Attorney General of West Virginia has used the State's power to compel two citizen organizations to open ten years of their files: their drafts and internal arguments, the groups they have funded, the people who serve on their boards, the coalitions they have joined, and what they have told the agencies they petition. Neither organization markets goods nor services relevant to the subpoenas. The Attorney General identifies no consumer who was cheated, no sale, and no purchase made in reliance on anything either group said.

What these organizations do is argue in public about what coal, oil, and gas do to West Virginia's waters and climate. The State's chief legal officer, who has publicly condemned that advocacy, now demands to know how they reached their views and who stood with them.

The First Amendment forbids a State from using its investigative power that way, and I will not allow it while this case is pending.

The country was founded on the premise that a citizen owes the government no account of his opinions or of the people he holds them with. The Attorney General has demanded that two citizen organizations hand the State their working lives.

The State wants a decade of what they published, down to a note sent to a single person outside the organization, along with the unreleased drafts and the internal arguments over what to say. He demanded the names of the organizations that fund them and what each gave, and he has now withdrawn that demand. He still wants the groups they paid, the board members they share, the coalitions they joined, and the comments they filed with the agencies they were petitioning. Because the demand period runs to the date of compliance, the subpoenas reach new communications written while they remain outstanding. No demand identifies a consumer, a sale, or a statement anyone relied on. The subpoenas go into how these citizens arrived at their positions on public questions and who helped them get there.

The Plaintiffs in this case, West Virginia Rivers Coalition, Inc. ("WVRC") and 350.org, promote clean waters, reduced carbon emissions, and healthier lives for the people of West Virginia and beyond. They do not sell any service. They do not advertise a certain product of their own. Instead, they promote ideas. Some of that advocacy and some of those ideas are based, in part, on one model. For that, they have been subpoenaed and asked to turn over ten years' worth of information far beyond any use of that one model.

AG McCuskey's actions violate the protections afforded by the United States Constitution. The Plaintiffs, on this record, have only engaged in protected advocacy speech, not commercial speech. The subpoenas issued on the Plaintiffs trespass on their freedom of association, chill their exercise of the First Amendment, and deter others from engaging in similar conduct.

Because Plaintiffs are likely to succeed on the merits of their claim that the subpoenas violate their First Amendment freedom of association, and because the remaining injunction factors also favor Plaintiffs, their Motion for a Temporary Restraining Order, [ECF No. 2], is **GRANTED**.

Attorney General McCuskey is enjoined from enforcing these investigative subpoenas for the next fourteen days as set out in the Conclusion of this Memorandum Opinion and Order.

## I. BACKGROUND

### A. The Plaintiffs

Plaintiff WVRC is a river advocacy nonprofit corporation organized under the laws of West Virginia, and its "mission is to promote clean and healthy West Virginia waters for all." [ECF No. 1, ¶ 13]. The nonprofit is committed to "clean water and healthy rivers through research, public education, policy advocacy, citizen water-quality monitoring, and engagement with state and federal agencies." [ECF No. 1, ¶¶ 20, 22]. It has a modest staff of 15 and an annual budget of approximately $2 million primarily funded by foundations and other organizations. [ECF No. 1, ¶ 21]. WVRC regularly submits comments on proposed legislation, permits, and rules concerning water quality. *Id.* ¶ 23. And as this court is familiar, WVRC is a party litigant in multiple cases across the Fourth Circuit that challenge permits and approvals for infrastructure projects, pipeline projects, injection wells, and toxic discharges.[1] Because of its litigation efforts, WVRC coordinates "with other organizations through shared counsel" about litigation strategy. [ECF No. 1, ¶ 25].

WVRC also engages in public education and information campaigns, including "statements about the effects of climate change in West Virginia's waters and communities, and about the environmental effects of fossil-fuel extraction, transport, and combustion." [ECF No. 1, ¶ 26]. It is a member of multiple different coalitions committed to similar goals. *Id.* ¶ 27. To fund

[1] *W. Va. Rivers Coalition, Inc. v. Chemours Company FC, LLC*, 793 F. Supp. 3d 790 (S.D. W. Va. 2025), *vacated* 178 F. 4th 102 (4th Cir. 2026); *see also United States v. Chemours Company*, No. 2:26-cv-00418 (S.D. W. Va. June 24, 2026) (related case to approve consent decree).

its work, WVRC "solicits charitable contributions from the public through its website, mailings, emails, and events," but it does not publish the identities of its funders. *Id.* ¶ 28.

Plaintiff 350.org is a nonprofit corporation, and its "mission is to build a grassroots movement to end the use of fossil fuels and to accelerate the transition to renewable energy." *Id.* ¶ 15. The organization publishes information about climate change, organizes public demonstrations, and coordinates with other organizations with similar goals. *Id.* ¶ 32. 350.org also "solicits charitable contributions from the public through grant applications and through its website, mailings, emails, and events." *Id.* ¶ 33. Those grants and contributions are subject to opt-in confidentiality in some cases and agreed upon confidentiality in other cases. *Id.*

**B. Attorney General McCuskey**

According to the Complaint, Attorney General McCuskey ("AG McCuskey") has publicly challenged "climate lawsuits," environmental advocacy organizations, and information reporting the danger of greenhouse gas emissions since he took office in 2025. *Id.* ¶¶ 35–64. He has joined numerous letters urging the Department of Justice ("DOJ") to investigate climate advocacy groups, urging the Federal Judicial Center to withdraw climate change science from a reference manual for federal judges, urging the Environmental Protection Agency ("EPA") to repeal its finding that greenhouse gas emissions endanger public health and welfare, and urging the EPA to cancel grants for climate-science education programs. *See id.* ¶¶ 4, 38, 39, 41, 43. AG McCuskey has asserted that environmental advocacy groups seek to "undermine American energy independence" and "weaponize laws and add unnecessary layers to an established and workable permit process." *Id.* ¶¶ 42, 49. In another instance he called climate advocates "insane leftist greeno's" and a "green cabal" full of people who are "willing to destroy our economy, and harm our citizens in the name of a quasi religion and adherence to the doctrine of climate insanity." *Id.* ¶¶ 62–63.

**C. The Subpoenas**

On September 16, 2026, AG McCuskey sent Plaintiffs nearly identical subpoenas. [ECF No. 1, ¶¶ 57, 65; ECF No. 1-1; ECF No. 1-2]. The subpoenas were issued pursuant to W. Va. Code § 46A-7-104(1) and "concern[] an investigation into alleged unfair or deceptive acts or practices and other possible violations of the West Virginia Consumer Credit and Protection Act ('WVCCPA'), W. Va. Code §§ 46A-1-101 *et seq.*" [ECF No. 1-1, at 2].[2] They do not identify what unfair or deceptive acts the Plaintiffs took.

The subpoenas, however, are shockingly broad. First, the "Relevant Period" of the subpoenas begins on January 1, 2017, nearly ten years ago. [ECF No. 1-1, at 3]. The subpoena reaches WVRC as well as "any of its corporate or trade names, predecessors, successors, divisions, subsidiaries, and affiliates, and any officer, director, employee, contractor, or agent acting on its behalf and not in a personal capacity only." *Id*. The term "Document" includes "the original and all drafts or non-identical copies of all written or graphic matter of any kind, however produced or reproduced," and it lists 25 different forms of a document.[3] *Id.* The word "Pertaining" includes "relating to, containing, alluding to, responding to, commenting upon, discussing, showing, disclosing, explaining, mentioning, analyzing, constituting, comprising, evidencing, setting forth, summarizing or characterizing, either directly or indirectly, in whole or in part." *Id.* at 5–6. Lastly, a "Climate Claim" includes

> a statement asserting, on a purportedly scientific or statistical basis, a demonstrable or otherwise traceable connection between emissions of greenhouse gases from the

[2] Page number references reflect CM/ECF page numbers as visible in blue at the top of every filed document.

[3] "[F]acsimiles, summaries, financial statements, diaries, communications, invoices, receipts, log books, e-mails, telegrams, ledgers, accounts, press releases, reports, white papers, paid advertising, website and social media content (including posts, reposts, comments, and videos on organizational or work-related individual accounts), minutes, pamphlets, notes interoffice communications, training materials, records of meetings, conferences, and telephone or other conversations or communications, and any electronic or magnetic record of the foregoing, or non-identical copies thereof, whether prepared by you or by any other person, that are in your possession, custody, or control." [ECF No. 1-1, at 5].

> extraction, processing, transport, combustion, or petrochemical conversion of fossil fuels (including, but not limited to coal, lignite, oil, and natural gas) to changes in climate, weather patterns, and/or extreme weather events, including, but not limited to, climate/weather event attribution, impacts to public health, and economic harm (i) allegedly or purportedly caused by energy companies and/or projects or (ii) linked by name, or by clear and specific implication, with sufficient clarity that a reasonable recipient would understand the statement to refer to a specific WV Energy Business.

[ECF No. 1-1, at 6]. Other terms like "WV Energy Business," "Published," and "West Virginia Recipient" are defined with similar breadth.

The subpoenas make 16 Demands. *See* [ECF No. 1-1, at 7–12]. The Demands include every Document Pertaining to every statement made by WVRC that names a WV Energy Business and makes a Climate Claim; Documents Pertaining to WVRC's use of certain climate change projections and communications about those Documents; Documents Pertaining to the organizations which supplied those projections; and all Documents "relied upon, consulted, Pertaining to or referenced in preparing, reviewing, approving, or Publishing any of the materials identified in Demand No. 2." *Id.* at 8. WVRC is also instructed to produce Documents Pertaining to all donation requests containing a Climate Claim aimed at West Virginia Recipients as well as Documents Pertaining to every climate model WVRC has "used, licensed, funded or commissioned, . . . or otherwise institutionally supported, and that produced a West Virginia-specific output." [ECF No. 1-1, at 8].

Demand Nos. 7 through 11 generally demand Documents Pertaining to studies that WVRC has used or considered or supported, any communication (internal and external) about those studies, the underlying data of every study, funding agreements, peer review and pre-publication review, and to put it simply: every Document wherein WVRC even considered a component of a study, model, projection, report, or paper. [ECF No. 1-1, at 8–10].

Lastly, Demand Nos. 12 through 16 generally demand all Documents Pertaining to third party communication to "develop communications, strategies, or public relations campaigns or messaging about an Identified Claim or a WV Energy Business, including but not limited to strategy memos, campaign plans, communications calendars, talking points, message testing, polling or focus groups, embargo coordination, and agreed divisions of subject matter or audience." [ECF No. 1-1, at 10]. These communication Demands extend to Documents Pertaining to renewable energy companies and developers, WVRC's relationship with those groups, and "dealings with any coalition, advocacy group, or organization operating in or targeting West Virginia about a WV Energy Business, an Identified Claim, or advocacy on West Virginia energy facilities, permitting, or regulation, including coalition agreements, joint work plans, shared budgets, grants, and funding given." *Id.* at 11–12.

**D. Injury to Plaintiffs**

According to the Complaint, from the day they learned of the subpoenas, Plaintiffs suffered, and continue to suffer, injury. [ECF No. 1, ¶¶ 122–23]. WVRC is "self-censoring its communications," because it "does not want the Attorney General to read [the staff's] internal deliberations. This reduced communication amongst staff hinders WV Rivers' work." *Id.* ¶ 124. The Executive Director of WVRC has informed organizational funders and foundations—which make up more than eighty percent of WVRC's budget—that she cannot guarantee the confidentiality of these contributions. *Id.* ¶ 125. This is expected to "scare off new funders" and result in a reduced budget. *Id.* Also called into doubt is WVRC's cooperation with the state legislature and state agencies as the chief legal officer of West Virginia investigates WVRC.

As alleged in the Complaint, staff members question what actions they should take in light of the pending investigation, and the confusion continues to hinder WVRC's endeavors. *Id.* ¶ 127.

And because "unreleased drafts, comments, and approval communications" about climate and energy matters are demanded under the subpoena, the staff is expected to censor their own opinions having been chilled from expressing strong opinions about their projects and advocacy. *Id.* ¶ 128.

WVRC has stopped the publication of story maps and paused a mini-grant program that aims to further small communities' "important work defending headwaters, uplifting community voices, and improving water quality." *Id.* ¶¶ 129–30. Because the staff is only 15 members large, WVRC will be forced to hire at least one outside vendor to identify and catalog nearly 10 years' worth of demanded records. *Id.* ¶ 131.

350.org is similarly injured. It has elected to maintain its self-censorship and only commit to speaking out about "less controversial topics." *Id.* ¶ 132. In caution, 350.org has continued indefinitely its internal process to screen every publication for the executive director's review with the subpoena demands in mind. *Id.* ¶ 133. Publications have been altered and withheld during this review. *Id.* 350.org will take no new work in West Virginia. *Id.* ¶ 134. And like WVRC, 350.org's funders cannot be certain their contributions will remain private. *Id.* ¶ 135–37.

### E. The Complaint and Motion for Injunction

On October 22, 2026, Plaintiffs WVRC and 350.org filed a Complaint alleging numerous constitutional violations against AG McCuskey. [ECF No. 1]. Specifically, Plaintiffs allege six counts under 42 U.S.C. § 1983 arising from violations of the First, Fourth, and Fourteenth Amendments. Plaintiffs allege retaliation for protected speech, association, and petition (Count I); freedom of association violations (Count II); right to petition and to associate for litigation violations (Count III); unreasonable demands under the Fourth Amendment (Count IV); charitable solicitation as protected speech violations (Count V); and viewpoint discrimination and selective enforcement (Count VI).

On the same day, Plaintiffs also filed a Motion for a Temporary Restraining Order and Preliminary Injunction, [ECF No. 2]. Plaintiffs assert that the "subpoenas were not issued for any legitimate governmental purpose but are a political action by the Attorney General that is intended to stifle speech that he does not like and to otherwise harass and retaliate against groups to which he and his allies are politically opposed." [ECF No. 2, at 1]. Plaintiffs move for a temporary restraining order and preliminary injunction against AG McCuskey, "prohibiting [AG McCuskey] from taking any steps to further his sham investigations into Plaintiffs, including enforcing the subpoenas he has issued and/or initiating any other judicial proceedings under the [WVCCPA] or any other law predicated on the subjects of the investigations." *Id*. at 1–2.

The court ordered AG McCuskey to file a response no later than October 26, 2026, and Plaintiffs to file any reply no later than October 27, 2026. AG McCuskey's response challenges the Plaintiffs' standing and opposes the issuance of an injunction on the basis of all four factors. [ECF No. 14]. Plaintiffs replied in support of their motion. [ECF No. 17]. Based on AG McCuskey's response, [ECF No. 14], and an exhibit attached to Plaintiffs' reply, [ECF No. 17-1], it appears that AG McCuskey has withdrawn or intends to withdraw provisions in the subpoenas that demand the production of donor information. This letter came from AG McCuskey on October 26, 2026, the day his response was due and four days after the instant motion was filed.

The court also scheduled a hearing on the motion on October 29, 2026, one week after the Complaint was filed and four days before the production deadline of November 2, 2026.

**F. The Hearing**

The court held a hearing on the Motion for a Temporary Restraining Order on October 29, 2026. Counsel for both parties were present, and counsel presented their arguments. Counsel for AG McCuskey offered to the court that the Attorney General was willing to stipulate to not

enforcing the subpoenas during the pendency of this litigation. But the court observed that the stipulation was an option for the parties, not the court. The parties did not reach an agreement, so they began their arguments on the motion.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions. *See* Fed. R. Civ. P. 65. "A temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). Rule 65 authorizes a temporary restraint of not more than 14 days, renewable once for another 14 days. Fed. R. Civ. P. 65(b).

Despite the differing procedures, the factors a movant must show to succeed on a motion for a temporary restraining order are the same as those required for a preliminary injunction. *Hoechst Diafoil Co.*, 174 F.3d at 422. As such, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *S.C. Coastal Conservation League v. United States Army Corps of Eng'rs, Charleston Dist.*, 127 F.4th 457, 466 (4th Cir. 2025). "All four requirements must be satisfied." *S.C. Progressive Network Educ. Fund v. Andino*, 493 F. Supp. 3d 460, 469 (D.S.C. 2020) (quoting *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009)). The movant must "demonstrate by 'a clear showing'" that it is entitled to the relief sought. *Real Truth*, 575 F.3d at 345 (quoting *Winter*, 555 U.S. at 22).

## III. DISCUSSION

### A. Standing

Because it is a threshold question, I first address standing. "Without jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (citing *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). Every court, including the Supreme Court, has an obligation to ensure that jurisdiction exists. *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908).

Article III standing is a constitutional limit on jurisdiction of the federal courts. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (The standing doctrine developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood."). Standing requires a plaintiff to be able to show at every stage of litigation that (1) she has suffered a concrete, particularized injury, (2) her injury was caused by the defendant, and (3) her injury is redressable by the federal court for each form of relief sought. *Id.*

AG McCuskey primarily disputes the first element.[4] Here, the question of injury has been squarely answered by the Supreme Court—Plaintiffs WVRC and 350.org have standing.[5] *See First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174, 188–89 (2026). In *First Choice*, the New Jersey Attorney General served a subpoena on a nonprofit organization demanding the identities of its financial supporters. *Id.* at 178–79. The subpoena demanded "28

[4] To the extent he challenges "traceability," [ECF No. 14, at 8–9], I am not persuaded. Plaintiffs have sufficiently alleged that because of these subpoenas they have curtailed their associations, altered publications, and withdrawn certain advocacy efforts. Additionally, an order from this court enjoining the enforcement of the subpoenas would redress the injuries suffered by Plaintiffs.

[5] The Fourth Circuit's recent opinion distinguishing *First Choice* is not applicable here. *See TitleMax of S.C., Inc. v. Spicher*, 185 F. 4th 141, 165–66 (4th Cir. 2026). In *TitleMax*, the Fourth Circuit found that the subpoena it considered was "non-self-executing," and nonetheless the appellant had not alleged "that the subpoena itself cause[d] 'actual or imminent' constitutional injury." *Id.* at 166. Here, as in this section, both Plaintiffs have alleged that the subpoena itself has disrupted their advocacy and fundraising ability, burdening their associational rights. For these reasons, AG McCuskey's argument about non-self-executing subpoenas falls flat.

categories of documents" including the "names, phone numbers, addresses, and places of employment of all individuals" who had donated to the organization by any means other than one webpage. *Id.* at 180. The plaintiff filed a lawsuit under 42 U.S.C. § 1983 alleging that the "Attorney General's demand for information about its donors violated its First Amendment rights" among other things. *Id.* at 181. And like the Plaintiffs here, the plaintiff in *First Choice* alleged that anonymity of donors was important, and "its inability to guarantee that anonymity in the face of the Attorney General's demands injured the group by discouraging donors from associating with it." *Id.*

The Court held that the plaintiff satisfactorily alleged an injury in fact for Article III standing. *Id.* at 197–99. The Court understood that "actual or imminent" injuries meant that "a party need not always wait for the government to take coercive action against it before filing suit to challenge the government's conduct." *Id.* at 183. In *First Choice*, the subpoenas commanded the plaintiff to produce donor information, despite the plaintiff's practice to keep that information private, and warned of the consequences for noncompliance. *Id.* at 188. The plaintiff also alleged the Attorney General's disparaging public comments about the plaintiff, calling pro-life groups "extremists" and suggesting that charges might be brought against them. *Id.* Additionally, the plaintiff provided declarations from donors and plaintiff's executive director that fundraising would be burdened or reduced in light of the "Attorney General's 'record of hostility.'" *Id.* at 189. These allegations were "more than enough to establish injury in fact" under Supreme Court precedent. *Id.*

Here, Plaintiffs allege nearly identical facts sufficient to establish Article III injury in fact. They allege a series of disparaging comments made by AG McCuskey against their advocacy efforts, and they allege that their groups and similar groups have been targeted by the State. The

declarations Plaintiffs submitted show that their leaderships are burdened by these hanging subpoenas. [ECF No. 2-1, at 4–23]. And those burdens trickle down to staff as well. *Id.* Internal communications have been self-censored, and certain publications have been altered or withdrawn in response to the invasion of the subpoenas. 350.org's internal review of every public document remains in place because of the subpoenas, and WVRC has paused its mini-grant program to help small communities pursue clean water initiatives.

AG McCuskey's withdrawal of the subpoena provisions that demand donor information does not cure the Plaintiffs' injury or extinguish their standing. "Even if there [is] no disclosure to the general public, the pressure" to avoid ties and speech "which might displease" officials demanding disclosure can "be constant and heavy." *First Choice*, 608 U.S. at 198–99 (quoting *Shelton v. Tucker*, 364 U.S. 479, 486 (1960)). AG McCuskey has engaged in the same pressure, and the Plaintiffs have suffered injury because of it. Accordingly, Plaintiffs have suffered injury in fact under Article III, and they have standing to bring their claims in federal court.

**B. Injunctive Relief – Count Two**

Under 42 U.S.C. § 1983, a person may bring suit against "any person who, under color of state law, deprives another of his federal constitutional rights." *First Choice*, 608 U.S. at 181. Plaintiffs' § 1983 claims arise from alleged violations of the First, Fourth, and Fourteenth Amendments.

In Count Two, Plaintiffs allege that AG McCuskey's actions—the subpoenas and broad investigation—violate their First Amendment freedom to associate with others. [ECF No. 1, ¶¶ 153–161]. Specifically, Plaintiffs assert that the subpoenas demand disclosure of organizations that have funded Plaintiffs and the amounts given as well as identities of organizations (and amounts) that Plaintiffs have paid. *Id.* ¶ 157. The subpoenas also demand the "officers, directors,

employees, contractors, consultants, and board members whom each Plaintiff shares with renewable energy entities." *Id.* Additionally the subpoenas compel disclosure of the identities of organizations Plaintiffs have collaborated with, including all communication between them. *Id.* For the following reasons, I find that injunctive relief is appropriate because Plaintiffs are likely to succeed on the merits, will suffer irreparable harm without an injunction, and are favored by the balance of the equities and public interest.

1. First Amendment Protections—Freedom of Association

The First Amendment guarantees that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend I. It ensures that the people have "the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice*, 608 U.S. at 184. This necessarily includes the right to "associate with others," also called the right to peaceful assembly. *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 606 (2021) ("*AFP*"). "Like freedom of speech and a free press, the right of peaceable assembly was considered by the Framers of our Constitution to lie at the foundation of a government based upon the consent of an informed citizenry—a government dedicated to the establishment of justice and the preservation of liberty." *Bates v. City of Little Rock*, 361 U.S. 516, 522–23 (1960).

"Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *AFP*, 594 U.S. at 606 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)).

In *NAACP v. Alabama*, the Court observed that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." 357 U.S. 449, 460 (1958) (citing *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) and *Thomas v. Collins*, 323 U.S. 516, 530 (1945)). "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates,* 361 U.S. at 523. Because if the Government "[s]trip[s] away the ability of individuals to work together free from governmental oversight and intrusion," "the freedom to associate may become no freedom at all—individuals deterred, groups diminished, and their protected advocacy suppressed." *First Choice*, 608 U.S. at 185–86 (collecting cases of the Court's heightened First Amendment analysis).

That is why the Court applies "exacting scrutiny" to compelled disclosures of protected First Amendment speech and association. *AFP*, 594 U.S. at 607. To be a permissible intrusion on the First Amendment, "there must be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest.'" *Id.* (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). And to survive this scrutiny, "'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'" *Reed*, 561 U.S. at 196 (quoting *Davis v. Federal Election Com'n*, 554 U.S. 724, 744 (2008)).

2. Likelihood of Success on the Merits

Here, the State's actions cannot survive "exacting scrutiny." Plaintiffs have engaged in protected speech—not commercial speech. Because Plaintiffs' speech in this case is not commercial, the WVCCPA, on this record, cannot supply a sufficient governmental interest. Therefore, AG McCuskey cannot rely on it for a basis of liability and the reason for his

investigation. In addition, the subpoenas by AG McCuskey are overbroad, unrelated to the State's interest, and severely burdensome on the Plaintiffs.

For the following reasons, Plaintiffs are likely to succeed on Count Two—violations of the First Amendment freedom of association. First, I will consider the applicability of the WVCCPA, and then I will assess the scope and purpose of the subpoenas.

a. The WVCCPA

The subpoenas were "issued pursuant to W. Va. Code § 46A-7-104(1) and concern[] an investigation into alleged unfair or deceptive acts or practices and other possible violations of the West Virginia Consumer Credit and Protection Act ('WVCCPA')." [ECF Nos. 1-1, 1-2]. *See* W. Va. Code § 46A-6-104. State code authorizes the Attorney General, if he "has probable cause," to "subpoena witnesses, compel their attendance, adduce evidence, and require the production of any matter which is relevant to the investigation." W. Va. Code § 46A-7-104(1).

Under West Virginia law, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." W. Va. Code § 46A-6-104. Trade or commerce "means the advertising, offering for sale, sale or distribution of any goods or services and shall include any trade or commerce, directly or indirectly, affecting the people of this state." W. Va. Code § 46A-6-102(6). "Unfair methods of competition and unfair or deceptive acts or practices" includes 16 different definitions including "[e]ngaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." *See* W. Va. Code § 46A-6-102.

Deploying these broad definitions, AG McCuskey's theory is that the Plaintiffs, environmental advocacy groups, published information, made comments, and advocated based on a study, the RCP8.5, that has been determined "implausible." *See* [ECF No. 14]. According to AG

McCuskey, this reliance, and subsequent advocacy, is a deceptive act or practice that affects the energy marketplace of West Virginia.

Begin with common sense—in what way could WVRC and 350.org violate the WVCCPA?[6] They are not financial institutions, lenders, or creditors. They are not businesses seeking to make a profit by engaging with consumers. In fact, both are 501(c)(3) nonprofit organizations. [ECF No. 1 ¶¶ 13, 15]. They do not sell services of any kind. As explained, Plaintiffs are advocacy organizations committed to climate issues. Their missions are public education, dissemination of information, advocacy in support of their ideals, and public support of those who align with their beliefs. What little items they sell are merchandise bearing their names and logos. [ECF No. 2-1, at 5, 19]. Surely these minimal sales from advocacy organizations are not the transactions the West Virginia legislature sought to protect consumers from.

Applying the WVCCPA to the Plaintiffs here also raises a troubling practical consequence. Take, for example, a man who stands outside of a Kroger with a sign that says "Cupcakes kill!" Some passersby are sure to ignore him. But others may buy a scone or a danish instead of a cupcake, and Kroger's sale of goods will have been affected. And, according to the Attorney General, he could subpoena the anti-cupcake protester. In that case he could ask for years' worth of records and communications, cupcake-related or not. And the Attorney General would defend the subpoena by pointing to studies that say sugar can be beneficial and that the protester's misleading comments affected West Virginia commerce.

The example, admittedly, is silly. Its implications, however, are serious. True, the WVCCPA has oft been observed as wide-sweeping and generally inclusive. *See White v. Wyeth*, 227 W. Va. 131, 139 (2010); *Tederick v. LoanCare, LLC*, 168 F.4th 154, 170 (4th Cir. 2026). But

---

[6] The court is not persuaded by AG McCuskey's late-rising argument that the speech used to solicit an online donation is speech subject to the WVCCPA. *See* [ECF No. 18].

it surely cannot apply here, to advocacy groups committed to environmental preservation whether or not their advocacy affects business in the state.

AG McCuskey says this is too narrow an application of the broad and sweeping liability imposed by the WVCCPA. I return to the text of the statute: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." W. Va. Code § 46A-6-104.

Simply, a person cannot use unfair or deceptive acts "in the conduct" of trade or commerce. *Id.* But Plaintiffs WVRC and 350.org are not "in the conduct" of trade or commerce. Their conduct—their mission—is advocacy.

And how do we know that the alleged violator must be making statements "in the conduct of any trade or commerce"? Well, the words "trade" and "commerce" are defined with an advertiser, buyer, seller, or distributor in mind. *See* W. Va. Code § 46A-6-102(6) ("'Trade' or 'commerce' means the advertising, offering for sale, sale or distribution of any goods or services and shall include any trade or commerce, directly or indirectly, affecting the people of this state."). This makes sense, especially considering that nearly all the statutory definitions also contemplate some party to a sale. *See* W. Va. Code § 46A-6-102.

The cases AG McCuskey relies on actually support the court's reading of the statute. In one case the State sued Johnson & Johnson and Janssen Pharmaceutica Products, L.P., ("Appellants") for communicating "false and misleading information to healthcare providers in West Virginia regarding two pharmaceutical drugs manufactured and distributed by the Appellants." *State ex rel. McGraw v. Johnson & Johnson*, 226 W. Va. 677, 680 (2010). That summary alone answers the question: the alleged WVCCPA violators were engaging in "deceptive acts" *in the conduct* of selling and distributing their own drugs. *Id.* In fact, the Supreme Court of

Appeals of West Virginia did not even address whether the Appellants "engaged in commerce in West Virginia" because neither party disputed it. *Id.* at 685. Here, the record shows that Plaintiffs are not engaged in commerce in West Virginia, and none of their advocacy efforts further the sale of their own goods or services.

AG McCuskey also relies on *Nat'l Comm'n on Egg Nutrition v. F.T.C.*, 570 F.2d 157 (7th Cir. 1977) ("*NCEN*"). [ECF No. 14, at 15–16]. In *NCEN*, the Petitioners were (1) a trade association, the National Commission on Egg Nutrition, and (2) its advertising agency. *NCEN*, 570 F.2d at 159. NCEN consisted of "members of the egg industry" committing to counteracting "anti-cholesterol attacks on eggs which had resulted in steadily declining per capita egg consumption." *Id.* But it suffers the same flaw as *Johnson & Johnson*. NCEN was a trade organization made of egg industry members using false messaging *to sell more eggs*. Critical to the Seventh Circuit's holding was the relationship between advertiser and his own product. *NCEN*, 570 F.2d at 163 (Restraints on commercial speech extend to "false claims as to the harmlessness of the advertiser's product asserted for the purpose of persuading members of the reading public to buy the product.). *See also NCEN*, 570 F.2d at 162 ("Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech." (quoting *Bates v. State Bar of Arizona*, 433 U.S. 350, 381–84 (1977)).

The last case AG McCuskey relies on is quoted out of context. *See West Virginia ex rel. McGraw v. Minnesota Mining and Mfg. Co.*, 354 F. Supp. 2d 660 (S.D. W. Va. 2005) (Copenhaver, J.). In *Minnesota Mining*, the State sued the defendants responsible for allegedly defective respirators and dust masks that injured miners across the state. *Id.* at 662. The case began in state

court, but Defendants removed it to federal court. The State then filed a motion to remand, and that is the primary legal analysis of the opinion.

Specifically, Judge Copenhaver analyzed fraudulent joinder of the attorney general by asking whether he had statutory authority to bring an action under the WVCCPA. *Id.* at 665–67. Defendants argued that the attorney general exceeded his authority because sales of respirators did not qualify as "consumer transactions" under state code. *Id.* at 667. Under the standard for fraudulent joinder, the plaintiff need only show a "glimmer of hope" to have his claims remanded. *Id.* at 666. So, Judge Copenhaver assumed that the attorney general could bring a consumer credit protection claim without a consumer transaction, in light of the favorable interpretation for a plaintiff. He wrote: "Inasmuch as the supreme court of appeals could possibly conclude the attorney general may, on the state's behalf, pursue an action under section 46A–6–104 in the absence of a consumer transaction, plaintiff's CCPA claims possess at least a 'glimmer of hope.'" *Id.* at 667. This is far from a holding interpreting that WVCCPA violations need not implicate a consumer or consumer transaction.

Really, though, AG McCuskey puts the cart before the horse. The WVCCPA—a statute that prohibits deceptive and unfair acts—may infringe the right to free speech, but it can only apply to commercial speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 562–63 (1980) ("*Central Hudson*") ("The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). Commercial speech is "speech specifically related to commercial transactions." *Maryland Shall Issue, Inc. v. Anne Arundel Cnty. Maryland,* 91 F. 4th 238, 248 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 152 (2024). Speech is commercial if it "propos[es] a commercial transaction" or if it is "related solely to the economic interests of the speaker and its audience." *Zauderer v. Office of*

*Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 637 (1985); *Central Hudson*, 447 U.S. at 561.

Plaintiffs do not engage in commercial speech. By virtue of their missions as nonprofit environmental advocacy groups, their interests are not economic. Their interests include public education, funding environmental projects, modeling and projecting the effects of climate change, and contributing to a society that values clean air, clean water, and healthier lives. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("'[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). The fact that their advocacy touches on the economy is insufficient to be commercial speech. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 909–12 (1982) (peaceful picketing designed to induce customers not to patronize a restaurant was entitled to constitutional protection); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–511 (1972) (groups with common cause may "advocate their causes and points of view"). Therefore, Plaintiffs' protected speech and advocacy alleged in this case cannot be regulated under the WVCCPA.

Accordingly, I find that the WVCCPA cannot supply a "sufficiently important governmental interest" under the "exacting scrutiny" applied to freedom of association claims. I next turn to the severity of the "disclosure requirement" under the "exacting scrutiny" analysis.

b. The Subpoenas

As discussed, the subpoenas broadly assert that a violation of the WVCCPA *might* have occurred. [ECF Nos. 1-1, 1-2]. And in his response, AG McCuskey admits that there may not be any WVCCPA violation. [ECF No. 14, at 19]. He does, however, have authority to issue subpoenas

to investigate "whether a violation . . . has, in fact, occurred." *Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 335 (2013).

That violation, AG McCuskey argues, arises from only a few instances of Plaintiffs using a certain climate projection model, RCP8.5. [ECF No. 14, at 4, 5, 18, 19]. Any publication born from that model, he asserts, is potentially unfair or deceptive. *Id.* So to assess the breadth of the subpoenas and the compelled disclosure Plaintiffs are subjected to, the court turns to the subpoenas' demands. It is reasonable to assume that the demands would roughly track the RCP8.5-related violations and the allegations of unfair or deceptive trade practices.

Not so. The subpoenas ask for much more. The 16 categories of demands include every statement Plaintiffs have ever published about a West Virginia energy business with a "Climate Claim." [ECF No. 1-1, at 7]. But that demand is not limited to climate-related statements supported by the RCP8.5 model. It includes *every* climate-related statement that names a West Virginia energy business which is published and supported or informed, at least in part, by any model, study, project, plan, projection, or paper. Demand No. 4 is similarly broad: the subpoena demands every published projection concerning West Virginia and all documents related to those projections, without narrowing it down to those supported by the RCP8.5.

The rest of the demands do not even try to mask their broad and sweeping intentions. Donation requests, payments to third parties, and licensing and funding documents of all projects concerning West Virginia are demanded. [ECF No. 1-1, at 8]. Every document projecting costs and damages is demanded, as well as every report, study, model, or paper that the Plaintiffs directly or indirectly supported. *Id.* at 9. Documents pertaining to internal considerations are demanded wholesale. *Id.* at 10. So, too, are all documents pertaining to third-party communication and coordination in any fashion. *Id.* at 10–12. And even with AG McCuskey's last-minute withdrawal

of certain demands for donor information, Plaintiffs will still be obligated to disclose "board affiliation, coalition partners, grantees, agency submissions, internal deliberations and drafts, solicitation totals and targeting." [ECF No. 17, at 2–3] (citation modified).

Plaintiffs call this a fishing expedition.[7] In part, I agree. The subpoenas demand a large share of documents in Plaintiffs' control for the last ten years. But even on a fishing expedition, hoping to just get one bite in the vast and quiet water, a person brings a fishing pole. And in other cases, perhaps, a net. Here, AG McCuskey has abandoned both the fishing pole and the net. Instead, he has brought dynamite to the lake. Tossing a couple in, he hopes to catch something.

As stated, compelled disclosure that invades First Amendment protections can only stand if there is a substantial relation between what must be disclosed and a "sufficiently important governmental interest." *AFP*, 594 U.S. at 607. Here, I find neither a sufficiently important government interest nor do I find a substantial relationship between the compelled disclosure and the government interest. On these facts, the WVCCPA cannot supply a sufficient government interest for AG McCuskey, and the subpoenas he issued severely and unconstitutionally burden the Plaintiffs' First Amendment right to free association. Therefore, I find that Plaintiffs are likely to succeed on the merits of Count Two.

3. Irreparable Harm

To succeed on the irreparable harm factor, a plaintiff must show "more than just a 'possibility' of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Injuries consisting *only* of "money, time and energy" are not enough, and the possibility that later corrective relief will cure the injuries weighs against a claim of irreparable harm. *Id.* at 230

[7] "[I]t is 'clearly true' that an agency undertaking a civil investigation may not 'conduct an unlimited fishing expedition.'" *Endocrine Society v. FTC*, 832 F. Supp. 3d 1, 18 (D.D.C. 2026) (quoting *United States v. Time Warner, Inc.*, No. MISC.A. 94-338(HHG), 1997 WL 118413, at *4 (D.D.C. Jan. 22, 1997)).

(quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). That is, if the injuries suffered can be remedied by a money judgment at the end of litigation, a plaintiff's harm is not irreparable. *Doe 1 v. Office of the Director of National Intelligence*, 180 F. 4th 536, 548–49 (4th Cir. 2026) (citing *Roe v. Department of Defense*, 947 F.3d 207, 228 (4th Cir. 2020)).

Here Plaintiffs allege constitutional violations and the denial of rights guaranteed by the Constitution. "[T]he denial of a constitutional right constitutes irreparable harm." *Doe 1*, 180 F. 4th at 549. Accordingly, the irreparable harm to the Plaintiffs is clear, as described in the adverse effects of AG McCuskey's action and the likelihood of success on the merits. *Doe 1*, 180 F. 4th at 549 (agreeing with the district court that the plaintiffs' "likelihood of success on their constitutional claims supports a finding of irreparable harm"). Plaintiffs are self-censoring and second-guessing every advocacy statement and position—protected speech and association under the First Amendment. Plaintiffs have canceled programs and withheld protected statements in response to these subpoenas. And because of these subpoenas, Plaintiffs have notified their members, grantees, and funders that every subsequent action or communication may be subject to review by the State. The loss of faith or commitment to these organizations, as well as the denial of protected speech and association, cannot be cured with damages and this constitutes irreparable harm. *Doe 1*, 180 F. 4th at 549. *See also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987).

As discussed, Plaintiffs face irreparable harm in the face of these subpoenas, and only an injunction of the State's actions can ensure that the Plaintiffs do not needlessly suffer these harms.

4. Balance of Equities and the Public Interest

These factors, the "balance of equities and consideration of the public interest—are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Winter*,

555 U.S. at 32; *Nken v. Holder*, 556 U.S. 418, 435 (2009) (these factors merge when the government is the opposing party). The district court's analysis is case-specific, and it must assess "the harm to the opposing party and weigh[] the public interest." *Id.*

Here there is no doubt that the public interest and balance of the equities favor the Plaintiffs. Plaintiffs are asserting constitutional rights which the public certainly has an interest in preserving. There is no danger to the public if the State's investigation is paused,[8] nor is there a risk that Plaintiffs' documents may become unrecoverable. Nevertheless, if the subpoenas are violative of the First Amendment, AG McCuskey has no right to the information demanded to be produced. As such, the public's interest in maintaining its right to speech and association favors injunction. *B.P.J. v. W. Va. Board of Educ.*, 550 F. Supp. 3d 347, 357 (S.D. W. Va. 2021) (Goodwin, J.) ("It is always in the public interest to uphold constitutional rights." (citing *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013)).

## IV. RETALIATION AND REMAINING COUNTS

In addition to the freedom of association claim, Plaintiffs assert five other claims including retaliation, viewpoint discrimination, burdening charitable solicitation, violation of the right to petition, and unreasonable demands under the Fourth Amendment. As for Count One, retaliation, Plaintiffs have alleged substantial evidence to support their claim. AG McCuskey has publicly disparaged pro-environmental groups and has called for the DOJ to investigate similar groups. He has joined contentious litigation against environmental advocacy organizations. And the chasm

[8] Briefly, AG McCuskey asserts that the public interest and balance of the equities favor him and the state because the "production and export of fossil fuels are a cornerstone of West Virginia's economy." [ECF No. 14, at 20]. First, the constitutional rights guaranteed by the Founders are superior to the economics of a state. Second, nowhere in his response does AG McCuskey assert that the protected speech by Plaintiffs has actually impacted the energy market in West Virginia. Lastly, AG McCuskey's argument is based on a false premise that enjoining his actions in this case would injure the energy economy of the state, on which the public relies for its basic needs, employment, and livelihood. His suggestion only emphasizes that the balance of the equities and the public interest favor Plaintiffs.

between the subpoenas' demands and the purported basis for investigation suggests a retaliatory motive.

This phenomenon of state and federal investigation into the affairs of advocacy non-profits has begun to permeate our culture. The courts have enjoined civil investigative demands on comparable records. *See Media Matters for America v. Paxton*, 138 F.4th 563, 569 (D.C. Cir. 2025) (enjoining the enforcement of civil investigatory demands against a media group who published unfavorable reporting); *Endocrine Society v. FTC*, 832 F. Supp. 3d 1, 3 (D.D.C. 2026) (enjoining the enforcement of civil investigatory demands against a medical non-profit organization that studied gender-affirming care and the science of hormones); *Exodus Refugee Immigration, Inc. v. Rokita*, No. 1:25-cv-01885-TWP-CSW, 2026 WL 2249397, at *1 (S.D. Ind. Aug. 5, 2026) (enjoining the enforcement of civil investigatory demands against a non-profit that provided services to immigrants, refugees, migrants, and other noncitizens).

However, because retaliation concerns the Attorney General's motive, I will reserve judgment on Count One until he can present evidence at a hearing for a preliminary injunction. Having already determined that an injunction is warranted on the basis of Count Two (freedom of association), the court declines to address the remaining counts.

## V. CONCLUSION

The WVCCPA gives the Attorney General power to police deception in the marketplace, and nothing in this order limits that power where it applies. Nonetheless, the state consumer credit protection act cannot reach two advocacy groups who are not in the conduct of trade or commerce. Instead, the Plaintiffs, advocacy groups in pursuit of a shared goal, have engaged in protected free speech guaranteed by the First Amendment. On this record, AG McCuskey cannot abridge that.

Plaintiffs' motion for a temporary restraining order, **[ECF No. 2]**, is **GRANTED**. It is **ORDERED** that:

1. Attorney General of West Virginia John B. McCuskey, his officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them who receive actual notice of this order, are **ENJOINED** from:

    a. enforcing, seeking to enforce, or requiring compliance with the investigative subpoenas dated September 16, 2026, issued by the Office of the Attorney General of West Virginia to West Virginia Rivers Coalition, Inc., and to 350.org, including their November 2, 2026, return date and the privilege-log requirement of Instruction 9;

    b. filing any petition under W. Va. Code § 46A-7-104(3), or otherwise seeking any order compelling compliance with those subpoenas in any court; and

    c. issuing to either Plaintiff any further subpoena or other compulsory demand seeking the categories of information described in those subpoenas.

2. Security under Federal Rule of Civil Procedure 65(c) is set at **$100** payable to the Clerk of the Court for the Southern District of West Virginia.

3. This order is issued October 29, 2026, at 4:00 p.m., and expires November 12, 2026, at 4:00 p.m., unless extended under Federal Rule of Civil Procedure 65(b)(2).

4. A hearing on the motion for a preliminary injunction will be set by a separate order.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: October 29, 2026

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE